NO. 25-60550

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

---

**EMMERICH NEWSPAPERS, INCORPORATED,**
*Plaintiff - Appellant*

**V.**

**PARTICLE MEDIA, INCORPORATED, DOING BUSINESS AS NEWSBREAK**
*Defendant - Appellee*

---

## APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## NORTHERN DIVISION (NO. 3:23-CV-26 TSL-MTP)

---

## APPELLANT'S INITIAL BRIEF

---

i

**ATTORNEYS OF RECORD FOR APPELLANTS:**

WILSON H. CARROLL, MS Bar No. 5984
WILSON CARROLL, PLLC
2506 Cherry Street
Vicksburg, Mississippi 39180
Tel:        601-953-6579
Email:      wilsoncarroll59@gmail.com

MICHAEL B. WALLACE
CHARLES E. COWAN
WISE CARTER CHILD & CARRAWAY, P.A.
401 E Capitol St.
Jackson, Mississippi 39201
Tel:        601-968-5500
Email:      mbw@wisecarter.com

DON W. BARRETT
BARRETT LAW GROUP, P.A.
404 Court Square North
Lexington, Mississippi 39095
Tel:        662-834-9168
Email:      donbarrettpa@gmail.com

CHRISTIAN E. HUDSON
CUNEO GILBERT & LADUCA, LLP
222 Livingston Street
Second Floor
Brooklyn, New York 11201
Tel:        202-789-3960
Email:      christian@cuneolaw.com

## CERTIFICATE OF INTERESTED PERSONS

No. 25-60550

### *Emmerich Newspapers, Inc. v. Particle Media, Inc.*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

| | |
|---|---|
| Appellant: | Emmerich Newspapers, Inc. (No publicly held corporation owns 10% or more of its stock and it has no parent corporation) |
| Appellants' Counsel: | Wilson H. Carroll, WILSON CARROLL, PLLC<br>Michael B. Wallace, WISE CARTER CHILD & CARAWAY, P.A.<br>Don W. Barrett, BARRETT LAW GROUP, P.A.<br>Christian E. Hudson, CUNEO GILBERT & LADUCA, LLP<br>Charles E. Cowan, WISE CARTER CHILD & CARAWAY, P.A. |
| Appellee: | Particle Media, Inc. |
| Appellees' Counsel: | Steven Carmody, BRUNINI, GRANTHAM, GROWER & HEWES, PLLC<br>Karen Howell, BRUNINI, GRANTHAM, GROWER & HEWES, PLLC |
| District Judge: | The Honorable Tom Lee |

<u>/s/ Wilson H. Carroll</u>
Appellants' Counsel

iii

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Undersigned counsel requests oral argument to assist the Court in understanding the legal and factual issues that are presented in this Appeal.

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ........................................................... 1

STATEMENT OF ISSUES ................................................................... 1

STATEMENT OF THE CASE ............................................................... 2

    I.   Statement of the Facts ........................................................... 2

        A.   Background ................................................................... 2

        B.   Definitions ................................................................... 4

        C.   Facts Concerning Unlawful Display ................................ 9

        D.   Facts Concerning Copyright Management Information ........... 11

    II.   Relevant Procedural History and the District Court's Order .... 13

STANDARD OF REVIEW .................................................................. 15

SUMMARY OF THE ARGUMENT ....................................................... 15

ARGUMENT ................................................................................. 21

    I.   The Server Test is Inconsistent with the Statutory Language, which Dictates that Particle's Display of Emmerich's Content Violates 17 U.S.C. § 106(5). ......................................................... 21

        A.   Embedding is a Violation of the Display Right Under the Plain Terms of the Copyright Act. ..................................... 24

        B.   The Server Test is Inconsistent with the Broad Protection Intended by Congress in Adopting the 1976 Act. ................. 28

        C.   The Supreme Court Has Given a Broad and Practical Reading to the 1976 Act, As Even the Ninth Circuit Recognizes. ................. 32

        D.   The Server Test Has Adversely Affected the Constitutional and Statutory Goal of Promoting the Useful Art of Writing. ............. 35

        E.   The District Court's Reliance on Transmission Is Not Part of the Server Test and Does Not Preclude Particle's Liability. ............. 39

        F.   The Court Should Join Those That Have Rejected the Server Test. ......................................................................... 44

    II.   Emmerich's URLs Qualify as Copyright Management Information ................................................................... 48

A.   Emmerich's URLs Are CMI Under the Plain Text of the DMCA. ................................................................................50

   1.   The Domain is the Copyright Owner.....................................52

   2.   File Names are Titles.............................................................53

   3.   The Entirety of the URL is a Link to Identifying Information...........................................................................55

   4.   The Preceding Information is Conveyed in Connection with Emmerich's Content.............................................................57

B.   The Information in Emmerich's URLs is CMI, and Provides Notice as Such. ..................................................................58

C.   Particle Has Violated § 1202(b). ..............................................62

CONCLUSION ..........................................................................................63

CERTIFICATE OF SERVICE...................................................................65

CERTIFICATE OF COMPLIANCE.........................................................65

# TABLE OF AUTHORITIES

**Cases**

*American Broadcasting Cos., Inc. v. Aereo,*
  573 U.S. 431 (2014) ............................................................ passim

*BanxCorp v. Costco Wholesale Corp.,*
  723 F. Supp. 2d 596 (S.D.N.Y. 2010) .................................... 52

*Batiste v. Lewis,*
  976 F.3d 493 (5th Cir. 2020) .................................................. 22

*BMG Rights Management (US) LLC v. Cox Communications, Inc.,*
  149 F. Supp. 3d 634 (E.D. Va. 2015) ..................................... 53

*Business Casual Holdings, LLC v. TV-Novosti,*
  No. 21-CV-2007, 2023 WL 1809707 (S.D.N.Y Feb. 8, 2023) ............... 52

*BWP Media USA Inc. v. T & S Software Assocs., Inc.,*
  852 F.3d 436 (5th Cir. 2017) .................................................. 15

*Canada Hockey, L.L.C. v. Marquardt,*
  No. 20-20530, 2022 WL 252186 (5th Cir. Jan. 26, 2022) ..................... 21

*Compaq Computer Corp. v. Ergonome Inc.,*
  210 F. Supp. 2d 839 (S.D. Tex. 2001) .................................... 45

*Duke v. Univ. of Tex. at El Paso,*
  663 F.2d 522 (5th Cir. 1981) .................................................. 28

*Easter Seal Soc. For Crippled Children and Adults of Louisiana Inc. v.*
  *Playboy Enter.,*
  815 F.2d 323 (5th Cir. 1987) ............................................ 45, 46

*Elder v. Holloway,*
  510 U.S. 510 (1994) ................................................................ 15

*Energy Intel. Grp. Inc. v. Kayne Anderson Cap. Advisors, L.P.*,
  948 F.3d 261 (5th Cir. 2020)...................................................... passim

*Eng'g Dynamics, Inc. v. Structural Software, Inc.*,
  26 F.3d 1335 (5th Cir. 1994).........................................................22

*Fashion Nova, LLC v. Blush Mark, Inc.*,
  No. CV 22-6127-PSG-RAO, 2023 WL 4307646 (C.D. Cal. June 30,
  2023)....................................................................................... 60, 61

*Fischer v. Forrest*,
  286 F. Supp. 3d 590 (S.D.N.Y 2018)............................................... 60, 61

*FurnitureDealer.Net, Inc. v. Amazon.com, Inc.*,
  No. 18-CV-232-JRT/HB, 2022 WL 891473 (D. Minn. Mar. 25,
  2022)....................................................................................... 60, 62

*Garcia v. Orta*,
  47 F.4th 343 (5th Cir. 2022) ..............................................................15

*Goldman v. Breitbart News Network, LLC*,
  302 F.Supp.3d 585 (S.D.N.Y. 2018)............................................. passim

*Gordon v. Nextel Commc'ns & Mullen Advert. Inc.*,
  345 F.3d 922 (6th Cir. 2003)............................................................63

*Great Bowery v. Best Little Sites*,
  No. 2:21-CV-00567-DBB-JCB, 2024 WL 3416038 (D. Utah Jul. 15,
  2024).................................................................................. 6, 39, 44

*Hunley v. Instagram*,
  73 F.4th 1060 (9th Cir. 2023) .................................................. 18, 34, 35

*Leader's Inst., LLC v. Jackson*,
  No. 3:14-CV-3572-B, 2017 WL 5629514 (N.D. Tex. Nov. 22,
  2017)................................................................................. 4, 10, 41, 46

*Looney Ricks Kicks Architects, Inc. v. Bryan*,
   No. CIV.A. 07-572, 2010 WL 4068885 (W.D. La. Oct. 14, 2010) ......... 45

*McGucken v. Newsweek LLC*,
   No. 19 CIV. 9617 (KPF), 2022 WL 836786 (S.D.N.Y. Mar. 21,
   2022)....................................................................................................... 46

*Microsoft Corp. v. AT&T Corp.*,
   550 U.S. 437 (2007)................................................................................ 48

*Mitchell v. Forsyth*,
   472 U.S. 511 (1985)................................................................................ 15

*Montgomery Cty. Ass'n of Realtors, Inc. v. Realty Photo Master Corp.*,
   878 F. Supp. 804 (D. Md. 1995)............................................................ 53

*Nicklen v. Sinclair Broad. Grp., Inc.*,
   551 F. Supp. 3d 188 (S.D.N.Y. 2021).................................................... 45

*Perfect 10, Inc. v. Amazon.com, Inc.*,
   508 F.3d 1146 (9th Cir. 2007)......................................................... passim

*Pers. Keepsakes, Inc. v. Personalizationmall.com, Inc.*,
   975 F. Supp. 2d 920 (N.D. Ill. 2013)..................................................... 60

*Prepared Food Photos, Inc. v. Chicken Joes, LLC*,
   No. 23-CV-3895-JGLC, 2024 WL 382529 (S.D.N.Y. Feb. 1,
   2024).................................................................................................. 44, 46

*Recif Res., LLC v. Juniper Cap. Advisors, L.P.*,
   No. CV H-19-2953, 2020 WL 5739138 (S.D. Tex. Sep. 24, 2020) ........ 62

*Reed v. Taylor*,
   923 F.3d 411 (5th Cir. 2019).................................................................. 59

*Seth B. ex rel. Donald B. v. Orleans Parish School Bd.*,
   810 F.3d 961 (5th Cir. 2016).................................................................. 59

*Sutton v. United States,*
   819 F.2d 1289 (5th Cir. 1987)..................................................22, 49

*Thomas v. Reeves,*
   961 F.3d 800 (5th Cir. 2020)...........................................................59

*United States v. Kay,*
   359 F.3d 738 (5th Cir. 2004)...........................................................22

*United States v. Maturino,*
   887 F.3d 716 (5th Cir. 2018)...........................................................59

*United States v. Orellana,*
   405 F.3d 360 (5th Cir. 2005).......................................................22, 49

*Urbanimage Media Ltd. v. IHeartMedia, Inc.,*
   793 F. Supp. 3d 852 (W.D. Tex. 2025)......................................43, 46, 47

*Wright v. Miah,*
   No. 22-CV-4132-CBA-JRC, 2023 WL 6219435 (E.D.N.Y. Sep. 7,
   2023)....................................................................................52

*Yates v. United States,*
   574 U.S. 528 (2015).............................................................25, 55, 57

**Statutes**

17 U.S.C. § 101 .......................................................... passim

17 U.S.C. § 106 ..................................................................24

17 U.S.C. § 106(1)..............................................................28

17 U.S.C. § 106(4)..............................................................32

17 U.S.C. § 106(5)...................................................... passim

17 U.S.C. § 1201 ..................................................................................48

17 U.S.C. § 1202 ................................................................. 1, 14, 19, 48

17 U.S.C. § 1202(b) ..................................................................... passim

17 U.S.C. § 1202(c) ..................................................................... passim

17 U.S.C. § 201(a) .................................................................................21

17 U.S.C. § 201(b) .................................................................................21

17 U.S.C. § 501(a) .................................................................................22

28 U.S.C.  §1331 .....................................................................................1

28 U.S.C. §1332 ......................................................................................1

28 U.S.C. §1338 ......................................................................................1

28 U.S.C. §1367 ......................................................................................1

Fed. R. App. P. 31 ..................................................................................1

## Other Authorities

*About Us*,
   THE CLARKSDALE PRESS REGISTER ......................................................2

*About Us*,
   THE STAR-HERALD ..............................................................................2

ANTONIN SCALIA & BRYAN A. GARNER,
   READING LAW: THE INTERPRETATION OF LEGAL TEXTS (2012)...............59

*Browser*,
MERRIAM-WEBSTER.COM (DEC. 11, 2025) ...............................................4

C. Sands,
*Statutes and Statutory Construction* § 47.24 (4th ed. 1973) ...............28

*Convey*,
MERRIAM-WEBSTER.COM (Dec. 11, 2025) ............................................57

Daniel Reinke,
*The Incorporation Test: Putting the Public Display Right Back Online*,
47 AIPLA Q.J. 579, 581 (2019)...........................................................36

*Embedded*,
MERRIAM-WEBSTER.COM (Oct. 25, 2025)..............................................6

H. Comm. on the Judiciary, 105TH Cong*.,*
*WIPO Copyright Treaties Implementation and On-Line Copyright*
*Infringement Liability Limitation*, H.R. Rep. No. 105-551 (1998). .....56

*H. Comm. On the Judiciary*, 89TH Cong.,
*Copyright Law Revision 6: Supplementary Report of the Register of*
*Copyrights on the General Revision of the U.S. Copyright Law: 1965*
*Revision Bill* (Comm. Print. 1965) ...............................................30, 31

H. Comm. on the Judiciary, 94TH Cong.,
*Copyright Law Revision*, H.R. Rep. No. 94-1476 (1976).... 17, 29, 30, 31

*Hyperlink*, MERRIAM-WEBSTER.COM (Nov. 25, 2025) ...............................5

Initial Comments in Response to the U.S. Copyright Office Notice of
Inquiry Regarding Copyright Protection for Certain Visual Works,
DIGITAL MEDIA LICENSING ASS'N, 80 Fed. Reg. 23054 (July 23, 2015) 38

Jane C. Ginsburg & Luke Ali Budiardjo,
*Embedding Content or Interring Copyright: Does the Internet Need the*
*"Server Rule"?*, 32 COLUM. J. L. & ARTS 417 (2019)......................37, 38

*Link*,
  Merriam-Webster.com (Dec. 14, 2025) ...........................................5, 56

S. Comm. on the Judiciary, 105ᵀᴴ Cong.,
  *The Digital Millennium Copyright Act of 1998*, S. Rep. No. 105-190
  (1998) ...............................................................................20, 58

*Show*,
  Merriam-Webster.com (Dec. 12, 2025) ..............................................25

*URL*,
  Merriam-Webster.com (Oct. 29, 2025).................................................5

**Treatises**

3 Melville B. Nimmer and David Nimmer,
  Nimmer on Copyright § 13.01[A] (1993)..............................................53

## JURISDICTIONAL STATEMENT

The District Court exercised jurisdiction pursuant to (a) 28 U.S.C. §1331; (b) 28 U.S.C. §1332 (in that this is an action between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs); (c) 28 U.S.C. §1338; and (d) 28 U.S.C. §1367.  This Court has jurisdiction under 28 U.S.C. §1292(b), pursuant to this Court's order of October 14, 2025.  ROA.72164, R.E. Tab 4.[1]  This brief is timely filed on December 15, 2025, within 40 days after the filing of the record on November 4, 2025, as required by Fed. R. App. P. 31.

## STATEMENT OF ISSUES

1.    Whether the "server test" is the proper standard for evaluating infringement on the copyright holder's exclusive display right under 17 U.S.C. § 106(5).

2.    Whether under 17 U.S.C. § 1202 a URL can be considered Copyright Management Information ("CMI"), and, if so, whether a URL's intentional removal constitutes a violation of § 1202(b)(1).

---

[1] The record on appeal is cited in the form: "ROA.[page]."  The record excerpts are cited in the form: "ROA.[page], R.E. Tab ___."

1

**STATEMENT OF THE CASE**

## I.    Statement of the Facts

### A.    Background

Emmerich Newspapers, Inc. ("Emmerich") is an independent owner and publisher of over twenty-six publications serving communities in Mississippi, Arkansas, and Louisiana. ROA.1190–91. Its papers cover a range of locales; from small towns of a few thousand people, such as Madison Parish's Madison Journal, ROA.43–44, to bustling Southern metropolises, like Jackson, Mississippi's Northside Sun. ROA.43–44. Many of Emmerich's newspapers have been in business for well over a century; some even date their founding to the Civil War era. *See e.g.*, *About Us*, THE CLARKSDALE PRESS REGISTER, https://www.pressregister.com/about-us-1 (last visited Dec. 14, 2025) ("serving Clarksdale and Coahoma County since 1865"); *About Us*, THE STAR-HERALD, https://www.starherald.net/about-us (last visited Dec. 14, 2025) ("The Star-Herald in Kosciusko is a Mississippi-owned newspaper that dates back to 1866."). Each edition becomes part of the town's historical record.

Local newspapers are an essential piece of the American story. They foster a sense of shared community identity, drive civic

engagement, and document local history, offering something no national outlet can replace. Emmerich's newspapers keep communities across the lower Mississippi Valley informed with reliable reporting on local events, issues, and decisions that affect daily life. They strengthen civic engagement by holding local and state public officials accountable, monitoring elections, and ensuring transparency. Beyond politics, Emmerich's papers highlight the stories and voices that shape their readers' hometowns. Some of the most historic papers have become archives of communities' histories, preserving the stories, challenges, and triumphs of Franklintonians to Yazooans for nearly 125 years. ROA.1192. Over the course of decades, Emmerich's newspapers have evolved to include substantial online publications, as well as print. ROA.1192. This case involves the theft of Emmerich's newspapers' online content.

Particle Media, Inc. d/b/a NewsBreak ("Particle"), is a news aggregator from Mountain View, California. It displays and distributes news content from publications across the country and republishes them on NewsBreak, either on its website or its mobile application ("app"). News aggregators like Particle generally do not create any original

content of their own, except for advertisements. Rather, they take work created by news organizations like Emmerich's and monetize the display of that creative labor. This appeal asks this Court to determine whether Particle's use of Emmerich's content violates the 1976 Copyright Act and the Digital Millenium Copyright Act ("DMCA").

## B.   Definitions

As a threshold matter, a number of technical terms must be defined. A computer user (including someone viewing content on a mobile device such a cell phone) is always viewing a webpage through the use of a "browser." A "browser" is "a computer program used for accessing sites or information on a network (such as the Internet)." *Browser*, MERRIAM-WEBSTER.COM (DEC. 11, 2025), https://www.merriam-webster.com/dictionary/browser. "Webpages consist of data. This data is stored on computers. When a user instructs her web browser to access a webpage, the web-browser software interprets code stored on the computer that stores the website's data and displays the information as a webpage." *Leader's Inst., LLC v. Jackson*, No. 3:14-CV-3572-B, 2017 WL 5629514, at *10 (N.D. Tex. Nov. 22, 2017).

Every webpage has a unique identity known as a "uniform resource locator," or "URL." A URL is the location of a resource, such as a document or website, on the Internet that consists of "the name or address" of a location on the network and "that often includes additional locating information (such as directory and file names)." *URL*, MERRIAM-WEBSTER.COM (Oct. 29, 2025), https://www.merriam-webster.com/dictionary/URL. Particle's expert stated "[t]he purpose of URLs is to serve as a navigation *link* to platforms, folders and subfolders on the Internet where content is located." ROA.41275 (emphasis added).

Different pages on the Internet may be connected by "links." A "link" is an "identifier attached to an element in a system (such as an index term in a database) in order to indicate or permit connection with other similarly identified elements." *Link*, MERRIAM-WEBSTER.COM (Dec. 14, 2025), https://www.merriam-webster.com/dictionary/link (defining the term as "hyperlink"). Also referred to as a "hyperlink", electronic links provide direct access from one distinctively marked place to another. *Hyperlink*, MERRIAM-WEBSTER.COM (Nov. 25, 2025), https://www.merriam-webster.com/dictionary/hyperlink. URLs are often

the undergirding structure of links, providing the directed address to visit the content being accessed from that distinctively marked place.

One website may use a URL to connect to another website. Such a link is said to be "embedded" in the first website. Embedded digital content means that the content is "drawn from and linked to an external source but displayed or accessed locally." *Embedded*, MERRIAM-WEBSTER.COM (Oct. 25, 2025), https://www.merriam-webster.com/dictionary/embedded. Courts have also referred to embedding as the process by which content is "hosted on [a] website." *See Great Bowery v. Best Little Sites*, No. 2:21-CV-00567-DBB-JCB, 2024 WL 3416038, at *2 (D. Utah Jul. 15, 2024).

Particle uses a "web crawler" which "crawls the websites of both partner and nonpartner publishers using RSS feeds or fetching [*i.e.* scraping] web pages." ROA.41380. Its web crawler extracts and saves the website's URL, image, headline and text of the article for use on the NewsBreak feed. ROA.41380. Particle has admitted that its crawler scrapes the entire webpage for each article, and then it utilizes a "parser" to selectively remove content that it considers non-essential. ROA.41380.

NewsBreak displays news content from national outlets and local publications, like Emmerich's, based on the user's interests and geographical location in a customized newsfeed or "feed."  ROA. 41375-76.  A user's NewsBreak feed contains portions or "snippets" of that news content, including images and text.    ROA.41380, ROA.41447. NewsBreak users were given two options to view Emmerich's articles.

First, NewsBreak's "Framed View" refers to a display mode on the app. There, Particle embedded a link to an external website in a frame on Particle's webpage under NewsBreak's URL:



ROA.68339.[2]    Users looking at Emmerich's articles in Framed View

would not be aware they were not on Emmerich's website without looking

at the URL or the advertisements displayed.

---

[2] This screenshot shows an example of an article appearing in Framed View on NewsBreak from the Columbus Dispatch. Like Emmerich's publications, the Columbus Dispatch never authorized Particle to display its articles in Framed View or in any manner on NewsBreak. *See* ROA.2433.

Second, "Full-Text View" refers to a display mode on NewsBreak in which the full content of an Emmerich article would appear under NewsBreak's URL, with all Emmerich's identifying information removed apart from the article's headline, accompanying photograph, and full-text news article. ROA.2495–96.

## C.    Facts Concerning Unlawful Display

NewsBreak users are able to customize their newsfeed so they only see snippets of articles derived from their geographic location or involving topics of interest to them. ROA.1194. When a user clicked on an item listed on the news feed, the user could view the full article on NewsBreak in Full-Text View or in Framed View. Particle claims that Framed View took the reader to Emmerich's website. It admits that the website was displayed in a window or frame on Particle's own platform, and that Particle included its own ads on the screen as its source of revenue. ROA.2610–11. Particle's advertisements never appeared on Emmerich's actual websites, evidenced by the sum zero advertising revenue that Emmerich's publications have received from NewsBreak. ROA.2611. Advertising revenue is how Particle makes money. ROA.2610.

Whether the viewer uses Full-Text View or Framed View, the article appears under Particle's URL.  Even when Particle claims it takes the reader to the publisher's website, the reader always sees Particle's ads, which can only occur if they are still on Particle's website.

"Framing" has been explained as follows:

> [A] webpage can include code that instructs the web browser to retrieve code from another computer and to display that information at the same time as information retrieved from the first computer. In such a situation, the user would see the website she has visited framing the content the website instructed the web browser to retrieve from the other computer.

*Leader's Inst.,* 2017 WL 5629514, at *10. Particle euphemistically describes this as the NewsBreak app "acting as a web browser," while admitting that parts of Emmerich's own websites were "retrieved and shown" on NewsBreak in a "WebView" window without creating a distinct copy of that material on Particle's servers.  ROA.41383. Particle's expert described this process as "rendering [Emmerich's] content" inside the WebView window.  ROA.6124.  In this manner, NewsBreak's Framed View created the illusion the reader was on Emmerich's own websites, when in reality the reader was actually viewing Emmerich's content on NewsBreak.

Importantly, Particle *does not dispute* it published embedded versions of Emmerich's articles on NewsBreak.  The issue before this Court is whether Particle showing its customers "*Emmerich's* content on *Emmerich's* website," ROA.72039, R.E. Tab 2 (emphasis in original), is a display prohibited by the Copyright Act.  Emmerich contended before the District Court, as it does now, that the display of works protected by copyright through the use of embedding or framing is a violation of the exclusive rights of the copyright owner to display its copyrighted work publicly. 17 U.S.C. § 106(5).

**D.    Facts Concerning Copyright Management Information**

When Particle displayed Emmerich's articles in Full-Text View, it did so on its own website, by definition under its own URLs.  Emmerich's URLs included both the title of the work and the name of the copyright owner (*i.e.*, the publisher), clearly meeting the definition of Copyright Management Information ("CMI"), found in 17 U.S.C. § 1202(c).  This CMI was deleted every time an Emmerich article was displayed in Full-Text View on NewsBreak.

Website operators such as Emmerich have the ability to create their own URLs for every article or photograph, so that a reader is automatically

directed to their own website. According to publisher Wyatt Emmerich, "[t]he purpose of this naming protocol is to protect our copyrights by ensuring that readers actually go to our websites where they will be exposed to our advertisements and other stories." ROA.7461, R.E. Tab 5.

According to Particle's own expert, "[a] URL by definition changes when the resource such as a news article is located on a different server or in a different folder. Whenever the location of any object on the Internet changes, the URL changes, by design, by function, by definition and by logic." ROA.41289.

Each of Emmerich's articles is originally displayed on its own webpage under a unique URL. Those URLs contain unique information identifying the owner and publisher of the article. ROA.2472. In reproducing Emmerich's articles in Full-Text View, however, Particle ***stripped the articles*** of Emmerich's unique URLs, replacing them with NewsBreak URLs. Particle admits this. It confessed that Emmerich's articles were reproduced in full text on NewsBreak websites. ROA.6104. Since the facts are clear, the question before the Court is whether Emmerich's URLs constitute CMI under 17 U.S.C. § 1202(c). If so,

stripping the articles of those URLs may constitute a violation of the DMCA under 17 U.S.C. § 1202(b).

## II.    Relevant Procedural History and the District Court's Order

On January 12, 2023, Emmerich filed its first action against Particle. ROA.40–59. Emmerich then amended that action on April 15, 2023. ROA.1187–1206. On July 13, 2023, consolidation of the first action with a second filed by Emmerich was ordered. ROA.2260–61.

Following discovery, Emmerich moved for summary judgment, which the District Court denied on June 25, 2024. ROA.4405–27. Subsequently, Emmerich moved again for summary judgment on various claims and issues, and Particle contemporaneously moved for partial summary judgment on certain of Emmerich's copyright infringement claims and DMCA claims. ROA.44934–39; ROA.6427–30; ROA.6827–29. On July 29, 2025, the District Court granted in part and denied in part Emmerich's motion for summary judgment and granted in part and denied in part NewsBreak's motion for partial summary judgment, while granting NewsBreak's motions for partial summary judgment as to circumvention claims and copyright management claims. ROA. 72012–13, R.E. Tab 2.

In relevant part, the District Court held that Particle's presenting Emmerich's articles in Framed View, synonymous with embedded view, did not amount to a display under 17 U.S.C. § 106(5), and thus did not constitute infringement.  ROA.72066–67, R.E. Tab 2.  On this claim the District Court granted partial summary judgment in favor of Particle. Additionally, the District Court concluded that "URLs are not conveyed in connection with a copyrighted work and therefore, do not constitute CMI."  ROA.72070, R.E. Tab 2.

On August 21, 2025, Emmerich filed a motion for interlocutory appeal of the District Court's order.  ROA.72091–109.  The District Court granted interlocutory appeal as to these two questions:

1. Whether the "server test" is the proper standard for evaluating infringement on the copyright holder's exclusive display right under 17 U.S.C. § 106(5); and

2. Whether under § 1202 a URL can be considered Copyright Management Information, and, if so, whether a URLs intentional removal constitutes a violation of § 1202(b)(1).

ROA.72162, R.E. Tab 3.

The District Court stayed proceedings pending resolution of the appeal before this Court.  ROA.72163, R.E. Tab 3.  Emmerich timely

14

petitioned this Court for appeal, and on October 14, 2025, this Court granted review.  ROA. 72164, R.E. Tab 4.

## STANDARD OF REVIEW

This appeal concerns an interlocutory appeal from the District Court's partial summary judgment ruling.  For an interlocutory appeal, review is generally limited "to the extent that it turns on an issue of law." *Garcia v. Orta*, 47 F.4th 343, 348 (5th Cir. 2022) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985)).  The review of that issue of law is *de novo*.  *See Elder v. Holloway*, 510 U.S. 510, 516 (1994) ("That question of law, like the generality of such questions, must be resolved *de novo* on appeal.").  Because this appeal focuses on the proper interpretation of the Copyright Act and the DMCA, *de novo* review applies.  *BWP Media USA Inc. v. T & S Software Assocs., Inc.*, 852 F.3d 436, 438 (5th Cir. 2017) ("Here, there is no factual dispute; the case turns on the proper interpretation of the Copyright Act.  We review the district court's interpretation of the Act *de novo*.").

## SUMMARY OF THE ARGUMENT

Each of the questions this Court has agreed to consider presents straightforward issues of statutory construction.  Each is also supported by legislative history and judicial interpretation.

15

An owner's exclusive right to "display the copyrighted work publicly" is protected by 17 U.S.C. § 106(5). The "server test" developed in *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007), provides that "a person displays a [work] by using the computer to fill a computer screen with a copy of the [work] fixed in the computer's memory." *Id.* at 1160. "[T]he owner of a computer that does not store and serve the electronic information to a user is not displaying that information," even when it makes the work visible. *Id.* at 1159.

The works in question here were stored on Emmerich's computers, not Particle's, but Particle showed those works to users through a process known as "framing" or "embedding," which makes the works stored on Emmerich's computers visible to Particle's customers. Relying on definitions found in 17 U.S.C. § 101, *Perfect 10* found that a party could display only a copy fixed in its own computer. *Id.* at 1160 (citing 17 U.S.C. § 101). However, § 101's definition of "copy" includes the original work fixed in Emmerich's computers, which Particle displayed by means of framing. Nothing in any of the definitions suggests that an infringer can display only a copy in its own possession.

16

Of course, framing did not exist when Congress adopted the 1976 Copyright Act. "Specifically, in considering the display right, Congress cast a very wide net, intending to include '[e]ach and every method by which the images . . . comprising a . . . display are picked up and conveyed,' assuming that they reach the public." *Goldman v. Breitbart News Network, LLC*, 302 F. Supp. 3d 585, 589 (S.D.N.Y. 2018) (quoting H. Comm. on the Judiciary, 94TH Cong., *Copyright Law Revision*, H.R. Rep. No. 94-1476, at 64 (1976). The process by which Particle showed Emmerich's work to the public falls within the broad language which Congress chose to encompass displays through any means that might be developed in the future.

The Supreme Court of the United States gave a broad and practical reading to the 1976 Act when it considered the right of performance in *American Broadcasting Cos., Inc. v. Aereo*, 573 U.S. 431 (2014). Aereo transmitted broadcast television to individual customers using a technology different from ordinary cable providers. The Court found the statutory language sufficient to cover the new and different technology because it had the same effect as cable. "But this difference means nothing to the subscriber. It means nothing to the broadcaster." *Id.* at

17

446.  Asked to reconsider *Perfect 10*, the Ninth Circuit acknowledged *Aereo*'s emphasis on "user perception" but declined "to read too much into this passage." *Hunley v. Instagram*, 73 F.4th 1060, 1075 (9th Cir. 2023).

The Copyright Act is intended to further the constitutional purpose of encouraging and protecting the creators of copyrightable works.  The server test discourages production because it permits Particle to make money from Emmerich's work when Emmerich does not.  The server test thus threatens the jobs of those who produce and distribute copyrightable work.  Scholars have recognized this adverse effect of the server test.

In addition to its reliance on the server test, the District Court found that Particle had not transmitted Emmerich's work. ROA.72045, R.E. Tab 2.  Thus, the work had not been shown publicly under its definition in § 101 because it had not been transmitted.  However, § 101 defines "transmit" to be "communicat[ion] . . . by any device or process whereby images or sounds are received beyond the place from which they are sent."  Here the images fixed on Emmerich's computers were communicated to other places by a process employed by Particle.  Nothing in the definition suggests that the displayed images must be sent directly from the source causing the communication.  Several district courts have

18

relied on definitions that the District Court here disregarded to determine that embedding or framing satisfies any transmission requirement of a public display.

Indeed, multiple district courts around the country have rejected the server test. This Court often looks to the authority of the Second Circuit because of its extensive experience with the Copyright Act. Although the Second Circuit has not addressed the server test, every district court in the Second Circuit to have done so has rejected it. The only two district courts in this Circuit to have considered the server test have rejected it. This Court should join the weight of authority in rejecting the server test.

Applying 17 U.S.C. § 1202, this Court has held that a file name may constitute Copyright Management Information ("CMI") if it is "conveyed in connection with copies of the underlying work." *Energy Intel. Grp. Inc. v. Kayne Anderson Cap. Advisors, L.P.*, 948 F.3d 261, 277 (5th Cir. 2020). That same opinion declared that definitions of CMI should be broadly construed. *Id.* at 277. Emmerich composes URLs to accompany each of its articles. The title of each article is included in the URL, as well as the name of the Emmerich publication holding the copyright to the article.

19

Section 1202(c) plainly defines CMI to include a title in subsection (1) and a copyright owner in subsection (3). Subsection (7) includes links to any other defined form of CMI. Each Emmerich URL links the user to an Emmerich article on an Emmerich website, which also includes CMI.

With little explanation, the District Court found that none of the URLs were "conveyed in connection with" a copyrighted work, as § 1202(c) requires. Emmerich's practice of connecting each URL to an individual article satisfies the dictionary definition of "convey." The legislative history reveals that the "term 'convey' is used in its broadest sense and . . . merely requires that the information be accessible in connection with, or appear with, the work being accessed." S. Comm. on the Judiciary, 105TH Cong., *The Digital Millennium Copyright Act of 1998*, S. Rep. No. 105-190, at 35 (1998). Emmerich's use of its URLs falls squarely within this explanation.

The District Court also found that Emmerich's URLs gave no notice of Emmerich's copyright claims. ROA.72070, R.E. Tab 2. The cases upon which it relied rest upon surmise concerning the purpose of the DMCA, and not on its actual words. The concept of notice is found nowhere in §

20

1202(c). In any event, Emmerich's URLs give notice by linking to the copyrighted work.

Section 1202(b)(1) forbids the removal or alteration of any copyright management information. The record below shows that Particle does exactly that when it displays Emmerich's articles. This Court should hold that Emmerich's URLs constitute CMI and remand so that the District Court can determine whether Particle's content satisfies all the requirements for liability.

## ARGUMENT

### I. The Server Test is Inconsistent with the Statutory Language, which Dictates that Particle's Display of Emmerich's Content Violates 17 U.S.C. § 106(5).

Copyright law affords protection to original works of authorship fixed in any tangible medium of expression. 17 U.S.C. § 101(a). "A copyright vests initially in the author of the work, unless the work is 'made for hire,' in which case the ownership of the copyright vests initially in the employer or commissioner of the work." *Canada Hockey, L.L.C. v. Marquardt*, No. 20-20530, 2022 WL 252186, at *3 (5th Cir. Jan. 26, 2022) (quoting 17 U.S.C. § 201(a) & (b)). The Copyright Act grants the owner of a copyright the exclusive right to "display the copyrighted

21

work publicly." 17 U.S.C. § 106(5). "Anyone who violates any of the exclusive rights of the copyright owner . . . is an infringer of the copyright . . . ." 17 U.S.C. § 501(a). Copyright ownership is "shown by proof of originality and copyrightability in the work as a whole and by compliance with applicable statutory formalities." *Batiste v. Lewis*, 976 F.3d 493, 501 (5th Cir. 2020) (quoting *Eng'g Dynamics, Inc. v. Structural Software, Inc.*, 26 F.3d 1335, 1340 (5th Cir. 1994)).

This Court has agreed to address whether the "server test," established by the Ninth Circuit in *Perfect 10 v. Amazon* is the proper standard for determining whether Particle infringed Emmerich's right to display its content under § 106(5). The answer to that question begins and ends with the statutory language, which this Court applies according to its plain meaning. *See United States v. Orellana*, 405 F.3d 360, 365 (5th Cir. 2005) ("We follow the 'plain and unambiguous meaning of the statutory language.'") (quoting *United States v. Kay*, 359 F.3d 738, 742 (5th Cir. 2004)); *see also Sutton v. United States*, 819 F.2d 1289, 1292 (5th Cir. 1987) ("Our duty is to construe a statute consistent with the intent of Congress as expressed in the plain meaning of its language.").

22

Particle used its computers to direct a viewer's computer to show content found on Emmerich's websites, a process known as "framing" or "embedding." Under the server test "a person displays a photographic image by using a computer to fill a computer screen with a copy of the photographic image fixed in the computer's memory." *Perfect 10,* 508 F.3d at 1160. However, according to the Ninth Circuit, a computer displays an image only when that image is fixed in the memory of that particular computer. "[T]he owner of a computer that does not store and serve the electronic information to a user is not displaying that information, even if such owner in-line links to or frames the electronic information." *Id.* at 1159.

Here, the images of Emmerich's content were not stored in Particle's computers. The District Court applied the server test to determine that Particle did not display Emmerich's content, ROA.72044–45, R.E. Tab 2, even though it provided the means to connect the viewer's computer to Emmerich's websites, where the content was stored. Because the statutory language provides no support for the notion that infringement depends on where the displayed copy is fixed, the server test is inconsistent with the plain language of the Act. Although not

23

necessary to this Court's determination, the legislative history and the explanation of the statute by courts and scholars confirm that the server test is wrong.

### A.     Embedding is a Violation of the Display Right Under the Plain Terms of the Copyright Act.

Emmerich's right of display is set forth in 17 U.S.C. § 106, which defines the copyright owner's exclusive rights:

> [T]he owner of copyright under this title has the exclusive rights to do and to authorize any of the following:
>
> [ . . . ]
>
> (5) In the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly . . . .

The parties agree that Emmerich's content falls within this language. Whether it is protected depends on definitions of terms found in 17 U.S.C. § 101.

Emmerich's right under § 106(5) necessarily depends on the definition of display:

> To "display" a work means to show a copy of it, either directly or by means of a film, slide, television image, or any other device or process or, in the case of a motion picture or other audiovisual work, to show individual images nonsequentially.

The Act does not define "show," so this Court should apply its ordinary meaning. *See Yates v. United States*, 574 U.S. 528, 537 (2015) ("Ordinarily, a word's usage accords with its dictionary definition.").[3] That meaning is "to cause or permit to be seen." *Show*, MERRIAM-WEBSTER.COM (Dec. 12, 2025), https://www.merriam-webster.com/dictionary/show. The statutory definition of "display" makes clear that a work may be shown "by means of . . . any other device or process," also defined by § 101 to include "one now known or later developed." When Congress adopted these definitions in 1976, it understood that technology was evolving, so it provided that newly developed means of display, like embedding, would be covered by the Act.

The thing being displayed is a copy, also defined in § 101:

"Copies" are material objects, other than phonorecords, in which a work is fixed by any method now known or later developed, and from which the work can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device. The term "copies" includes the material object, other than a phonorecord, in which the work is first fixed.

---

[3] *See also Reyes v. Equifax Info. Servs., L.L.C.*, 140 F.4th 279, 288 (5th Cir. 2025) (applying a definition from Webster's Collegiate Dictionary as "[t]he ordinary meaning" of the word "verify").

*Perfect 10* based its server test on what it means for a copy to be fixed under the Act. 508 F.3d at 1160–61. Section 101 declares:

> A work is "fixed" in a tangible medium of expression when its embodiment in a copy or phonorecord, by or under the authority of the author, is sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration.

Emmerich's content is fixed in Emmerich's websites; the District Court found that Particle's customers were viewing "*Emmerich's* content on *Emmerich's* website." ROA.72039, R.E. Tab 2 (emphasis in original). Section 101 is clear that "copies" include the original works fixed in the websites. Accordingly, by connecting its customers to the original works fixed within Emmerich's websites, Particle was displaying the copyrighted works within the plain language of § 106(5).

*Perfect 10*, however, holds there is no liability unless the alleged infringer has fixed its own copy of the work in its own computer:

> Because Google's computers do not store the photographic images, Google does not have a copy of the images for purposes of the Copyright Act. In other words, Google does not have any "material objects . . . in which a work is fixed . . . and from which the work can be perceived, reproduced, or otherwise communicated" and thus cannot communicate a copy.

508 F.3d at 1160–61. This, then, is the key question to be resolved: can Particle display Emmerich's work only when it possesses its own copy of

26

that work, or does it display Emmerich's work when it connects the viewer's computer to the copies fixed on Emmerich's websites?

*Perfect 10*'s requirement that the alleged infringer possess its own copy is not found anywhere in the statute. 508 F.3d at 1160–61. Not a word of § 106(5) says that the infringer must possess a copy of the work it displays. Neither § 101's definition of copies nor any other definition suggests that the alleged infringer must possess the copy it displays. Here, Particle opened a window into Emmerich's websites and displayed to the viewer the copies fixed in the websites. The Act requires nothing further to establish liability. The server test's requirement that the displayed copy must be possessed by the alleged infringer finds no support in the statutory language. The answer to the question this Court has agreed to address, then, is that the server test is not the proper standard for valuating infringement of the display right under § 106(5).

Indeed, not only does an infringing display not require possession of a copy, but also the creation of a copy violates a separate right of the copyright owner. Under § 106(1), the copyright owner has the exclusive right "to reproduce the copyrighted work in copies or phonorecords." The infringement is complete upon the making of the copy, whether or not it

27

is ever displayed to anyone else. To require reproduction to constitute a display violates the basic canon of statutory construction *expressio unius est exclusio alterius*. *See Duke v. Univ. of Tex. at El Paso*, 663 F.2d 522, 526 (5th Cir. 1981). This maxim embodies a sensible insight into the manner in which language is used to communicate ideas. Simply stated, "generally when people say one thing they do not mean something else." *Id.* (quoting 2A C. Sands, *Statutes and Statutory Construction* § 47.24 (4th ed. 1973)). When Congress expressly enumerated the display right in § 106(5) of the Copyright Act, it distinguished that right from the separate reproduction right enumerated in § 106(1). To say that an unlawful display requires keeping a copy of the protected work on one's server is to necessitate a reproduction in order to achieve the display. That merger of two intentionally distinct and enumerated rights would be in violation of a fundamental canon of construction. The server test contradicts Congress's plain language.

## B.    The Server Test is Inconsistent with the Broad Protection Intended by Congress in Adopting the 1976 Act.

While the statutory text is sufficient to resolve this issue, the server test is also inconsistent with the legislative intent of the Copyright Act. "[T]he legislative history reveals that the drafters of the 1976

28

Amendments intended copyright protection to broadly encompass new, and not yet understood, technologies." *Goldman*, 302 F. Supp. 3d at 589. Whether the material is hosted on a server or embedded is irrelevant. This fundamental unfairness is contrary to the Act's intent to prevent infringers from unfairly profiting from their infringement. *See* H.R. Rep. No. 94-1476, at 161. "[O]n the first page of the House Report, the drafters proclaimed that the Amendments were necessary in part because 'technical advances have generated new industries and new methods for the reproduction and dissemination of copyrighted works[.]'" *Goldman*, 302 F. Supp. 3d at 589. Congress intended a flexible act that could adapt to prevent unfair infringements as technology evolved, rather than "freez[ing] the scope of copyrightable subject matter at the present stage of communication technology." *Id.* (quoting H.R. Rep. 94-1476, at 51).

"Specifically, in considering the display right, Congress cast a very wide net, intending to include '[e]ach and every method by which the images . . . comprising a . . . display are picked up and conveyed,' assuming that they reach the public." *Id.* (emphasis omitted) (quoting H.R. Rep. No. 94-1476, at 64). In that same report, Congress noted that under the Act, "'display' would include the projection of an image on a

29

screen or other surface by any method, the transmission of an image by electronic or other means, and the showing of an image on a cathode ray tube, or similar viewing apparatus connected with any sort of information storage and retrieval system." H.R. Rep. No. 94-1476, at 64. An infringement of the display right could occur "if the image were transmitted by any method (by closed or open circuit television, for example, or by a computer system) from one place to members of the public elsewhere." *Id.* at 80.

During hearings preceding the passage of the Act, the Register of Copyrights testified that "'[t]he definition [of the display right] is intended to cover every transmission, retransmission, or other communication of [the image],' beyond the originating source that might store the image, but including 'any other transmitter who picks up his signals and passes them on.'" *Goldman*, 302 F. Supp. 3d. at 589 (quoting *H. Comm. On the Judiciary*, 89ᵀᴴ Cong., *Copyright Law Revision 6: Supplementary Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law: 1965 Revision Bill*, at 25 (Comm. Print. 1965) (alterations in original)). The Register emphasized the importance of the display right in light of changing and evolving

30

technology, warning that "information storage and retrieval devices . . . [] linked together by communication satellites or other means . . . could eventually provide libraries and individuals throughout the world with access to a single copy of a work by transmission of electronic images" and therefore that "a basic right of public exhibition should be expressly recognized in the statute." *Id.* (emphasis omitted) (quoting *1965 Revision Bill*, at 20). The display right in its final form encompasses "not only the initial rendition or showing, but also any further act by which that rendition or showing is transmitted or communicated to the public." H.R. Rep. 94-1476, at 63.

The District Court's narrow reading of the display right, wherein embedding is excluded, is completely contradictory to the concept of display intended in the Copyright Act. Particle concedes that it showed Emmerich's articles using a framed, or embedded, view. Particle took "active steps to put a process in place that resulted in a transmission of the [copyrighted works] so that they could be visibly shown." *Goldman*, 302 F. Supp. 3d at 588. Particle's code is an information retrieval system permitting Emmerich's articles to be seen by the public, transmitting them through a manner clearly counter to the basic right of public

31

exhibition expressly intended to be protected under the Copyright Act. Particle's acts of embedding fall squarely in violation of Emmerich's own statutory display right.

### C. The Supreme Court Has Given a Broad and Practical Reading to the 1976 Act, As Even the Ninth Circuit Recognizes.

While the Supreme Court has not dealt directly with the right of display, it has carefully considered the right of performance, as expressed in § 106(4). In *Aereo* the Supreme Court evaluated copyright infringement claims against Aereo, which, for a monthly fee, offered subscribers access to broadcast television programming over the Internet almost simultaneously as it was being broadcast. 573 U.S. at 436. Often, the programming was copyrighted work. *Id.* at 431. The Court held that, in its broadcasts, Aereo performed the works publicly within the meaning of "transmit" in § 101 and therefore had violated the Copyright Act. *Id.* at 444–49. In that ruling, the Supreme Court stated that the technological complexity concerning the "behind-the-scenes" delivery of works did not exclude Aereo's conduct from the Copyright Act: such technicalities did not "render Aereo's commercial objective any different

from that of cable companies.  Nor do they significantly alter the viewing experience of Aereo's subscribers." *Id.* at 446.

Importantly, the Court read the language of the Act broadly in accordance with the Congressional purpose as found in the legislative history.  The Court explained "[c]onsidered alone, the language of the Act does not clearly indicate when an entity 'perform[s]' (or 'transmit[s]') . . . . But when read in light of its purpose, the Act is unmistakable: An entity that engages in activities like Aereo's performs*." Id.* at 438–39 (alterations in original).  Likewise, in evaluating Aereo's activity, it considered the practical effect of those activities in the real world. Recognizing that Aereo's technology differed somewhat from a traditional cable television system, the Court reasoned:

> But this difference means nothing to the subscriber.  It means nothing to the broadcaster.  We do not see how this single difference, invisible to subscriber and broadcaster alike, could transform a system that is for all practical purposes a traditional cable system into "a copy shop that provides its patrons with a library card."

*Id.* at 444. *See also id.* at 446.  *Aereo's* interpretation of the Copyright Act reflects the sweeping nature of copyright protections, and the extension of their coverage regardless of the invisible technological processes invisible to users.

33

The Ninth Circuit in *Hunley* distinguished *Aereo* by emphasizing the distinction between the display and performance rights of the Copyright Act, ignoring that essential language about technical process in *Aereo*. *Compare Hunley*, 73 F.4th at 1073, *with Aereo,* 573 U.S. at 446. *Hunley* also acknowledged *Aereo*'s emphasis on "user perception" as being important to the purpose of the Act, but declined "to read too much into this passage." *Hunley*, 73 F.4th at 1075. By contrast, in *Goldman*, the Southern District of New York stated, "this Court reads *Aereo*, while not directly on point, as strongly supporting plaintiff's argument that liability should not hinge on invisible, technical processes imperceptible to the viewer." 302 F. Supp. 3d at 595.

Because the *Hunley* court believed it had sufficiently distinguished *Aereo*, it was not free to disavow *Perfect 10*. "Even if we thought, in retrospect, that *Perfect 10* created some inconsistencies with other provisions of the Copyright Act, we are not free to overrule *Perfect 10* outside of an *en banc* proceeding unless there has been a change in the statute or intervening Supreme Court decision." *Hunley*, 73 F.4th at 1072. Although *Hunley* was obliged to follow *Perfect 10*, it hardly gave it a ringing endorsement. Indeed, the *Hunley* court concluded by

34

emphasizing "that the Server Test applies only to embedding in its current technological format." *Id.* at 1076. Of course, *Perfect 10* discourages the development of "future technologies that configure retransmission in a new way." *Id.* As long as embedding does not violate the Act, there is no reason for any developer to take a chance on a new technology.

### D. The Server Test Has Adversely Affected the Constitutional and Statutory Goal of Promoting the Useful Art of Writing.

The most prominent goal of the Copyright Act is to protect creators and their work from those who seek unearned profit. In this objective, the Act serves as an encouragement to journalists, writers, and photographers to present their ideas for public appreciation, and as a promise of protection. The Copyright Act became law in 1976, but the idea that authors should have the exclusive rights to their own written work is set into Article I, Section 8, Clause 8 of the U.S. Constitution. That Article grants Congress the enumerated power "to promote the progress of science and useful arts, by securing for limited times to authors and inventors the exclusive right to their respective writings and discoveries." The Copyright Act is an exemplar of this power in action. With it, Congress intended for the Act's rights and protections to

35

maintain their vitality through advancing technology while still holding true to constitutional principles.

The server test permits original content to be displayed by non-owners and allows theft based on a hair-splitting distinction not based in the text or intention of the Copyright Act. *See* Daniel Reinke, *The Incorporation Test: Putting the Public Display Right Back Online*, 47 AIPLA Q.J. 579, 581 (2019) ("The server test reads exceptions into the statute that do not exist, and were never intended by Congress."). In *Perfect 10*, the Ninth Circuit determined that whether a website publisher is directly liable for infringement turns on whether the image is embedded or linked from a third-party server or saved on the publisher's own server. 508 F.3d 1146. The server test is contrary to the plain meaning of the Copyright Act, and it has emboldened the creation of an Internet premised on theft.

Nearly twenty years have passed since *Perfect 10* was decided on December 3, 2007. Since then, the Internet has rapidly evolved. Unlike the Copyright Act, which was drafted with the specific intent that its provisions apply through advances in technology, the server test has become even more unwieldy as applied by courts to a changing digital

landscape. Infringement through embedding and scraping was either not possible or not widespread at the time *Perfect 10* was decided. Now, many widely used online services rely almost entirely on unauthorized embedding and linking. The server test "excises from the scope of copyright's exclusive rights unauthorized displays of online content archived through framing or embedding hyperlinks." Jane C. Ginsburg & Luke Ali Budiardjo, *Embedding Content or Interring Copyright: Does the Internet Need the "Server Rule"?*, 32 COLUM. J. L. & ARTS 417, 420 (2019) (hereinafter "Embedding Content or Interring Copyright"). Through these processes, violators display the copyrighted works of others without the need to possess the works physically, thus avoiding culpability for infringement and reaping profits that rightfully belong to creators. By "converting the display right into an atrophied appendage of the reproduction right, the server [test] ignores Congress's endeavor to ensure that the full 'bundle' of exclusive rights will address evolving modes of exploitation of works." *Id.* at 430.

The incentive to create original work crumbles in a world of rampant unauthorized use of original material. Photographers have long argued that "Google's Image Search service (the subject of the Ninth

37

Circuit's decision in *Perfect 10*) eliminates the need to navigate to the source page by displaying high-resolution embedded photographs directly within the Image Search results." Embedding Content or Interring Copyright at 433. The server test injures individuals who create content by removing the consumer's incentive to visit the creator's website where the original image lives. The Digital Media Licensing Association has argued that under the server test, by "[u]sing a line or two of simple HTML code, companies can populate entire websites with content they do not own or license and generate substantial ad revenue from posting the content, all without any economic benefit to the content creators or their authorized distributors." Initial Comments in Response to the U.S. Copyright Office Notice of Inquiry Regarding Copyright Protection for Certain Visual Works, DIGITAL MEDIA LICENSING ASS'N, 80 Fed. Reg. 23054 (July 23, 2015), https://www.aipla.org/docs/default-source/advocacy/documents/aiplacommentstocopyrightofficeonvisualworks.pdf.

Emmerich's papers receive no advertising revenue from views of their articles on Particle's sites. ROA.2610–11. Particle's siphoning of Emmerich's advertising revenue and web traffic, upon which Emmerich's

publications rely for the majority of their profit, is a further blow to those already beleaguered local publications. The server test creates a loophole in the legislative foundation of copyright that exploiters like Particle gladly skip through. Emmerich's publications, which employ hundreds of photographers and writers, are the creators that the Copyright Act and the Constitution were written to protect. They should be encouraged to create, to write, and to continue to inform the public, and be compensated for their original work. The server test should not be allowed to dismantle what has been foundational for centuries.

### E. The District Court's Reliance on Transmission Is Not Part of the Server Test and Does Not Preclude Particle's Liability.

The District Court acknowledged that several other courts have already rejected the server test. ROA.72044, R.E. Tab 2 (citing *Goldman,* 302 F. Supp. 3d at 590 (rejecting the server test as not adequately grounded in text of Copyright Act), and *Great Bowery*, 2024 WL 3416038, at *8–9 (concluding "that a defendant who embeds a copyrighted image on a webpage, without hosting the image on its servers, may infringe the copyright holder's display rights")). The District Court disagreed with those opinions, primarily because those defendants

did not actually transmit the copyrighted works, but merely sent instructions to the viewers' computers for connecting to websites where that work could be found.  ROA.72044–45, R.E. Tab 2.  The District Court did not suggest that this transmission requirement is part of the server test devised in *Perfect 10.*  As already noted, *Perfect 10* relies on where a copy is fixed, not whether or how it is transmitted.  For this reason, this Court can answer the certified question in the negative without addressing the District Court's further observation.

In any event, the statutory language, which the District Court did not address, does not support the District Court's result.  Section 106(5) does not require transmission to constitute infringement, but it does require that the copyrighted work be displayed "publicly."  That word, according to § 101, may be satisfied in several ways, including transmission.  Section 101 says that to "display a work 'publicly' means . . . (2) to transmit or otherwise communicate a . . . display of the work . . . to the public by means of any device or process."  Further, the Transmit Clause of § 101 declares:

> To "transmit" a performance or display is to communicate it by any device or process whereby images or sounds are received beyond the place from which they are sent.

The facts of the case fit comfortably within this language. By sending instructions to its customers' computers Particle has caused Emmerich's computers "to communicate" the copyrighted works so that its "images or sounds are received from beyond the place which they are sent." Nothing in either § 101 or § 106(5) says that the alleged infringer must be the one who communicates the copyrighted work. Moreover, courts have consistently recognized embedding as constituting transmission by the alleged infringer, relying on statutory provisions not considered here by the District Court.

In the earliest such case, *Leader's Institute, LLC v. Jackson,* the Northern District of Texas relied on the broad scope of the term "process" in § 101's definitions of "publicly" and "display," a term also found in the Transmit Clause and other portions of the Act. 2017 WL 5629514, at *10. As here, the defendant transmitted instructions that took the viewer directly to plaintiff's website. In that matter the court explained:

> By framing Magnovo's copyrighted works, the plaintiffs displayed the works by "show[ing] a copy" of the works via a "process." 17 U.S.C. § 101. That process was the instructing of users' web browsers to display Magnovo's copyrighted works when those users visited one of the accused TLI domain names. And the plaintiff displayed the copyrighted works publicly. By instructing users' web browsers to display Magnovo's content upon accessing TLI's publicly-accessible

41

websites, the plaintiffs "transmit[ed] . . . a display of the [defendants'] work . . . to the public." *Id.*

*Leader's Inst.,* 2017 WL 5629514, at *10. This logic is consistent with the meaning of show in the definition of display, which includes "caus[ing] . . . to be seen." *Show*, MERRIAM-WEBSTER.COM (Dec. 11, 2025), https://www.merriam-webster.com/dictionary/show. The infringer's instructions thus caused a display to be transmitted to the public.

The *Goldman* court agreed with *Leader's Institute* and offered further explanation, cementing a view of the term "transmit" that encompasses Particle's conduct. *Goldman* noted that "the drafters of the 1976 Amendments intended copyright protection to broadly encompass new, and not yet understood technologies." 302 F. Supp. 3d at 589. In *Aereo* the Supreme Court had protected the copyright owner from "novel technologies." *Id.* With these principles in mind, the court relied on § 101's definitions of "display" and "transmit," *id.* at 593, explaining why embedding constitutes an infringing display:

> It is clear, therefore, that each and every defendant itself took active steps to put a process in place that resulted in a transmission of the photos so that they could be visibly shown. Most directly this was accomplished by the act of including the code in the overall design of their webpage; that is, embedding. Properly understood, the steps necessary to embed a Tweet are accomplished by the defendant website;

42

these steps constitute a process. The plain language of the copyright Act calls for no more.

*Id.* at 594. Once again, consistent with the meaning of "show," it is enough that the infringer's acts "resulted" in the work being "visibly shown." Thus, even if it is necessary to transmit in order to violate the copyright's protection of display, Particle's conduct is still a violation of the law.

The most recent case within this Circuit, *Urbanimage Media Ltd. v. IHeartMedia, Inc.*, 793 F. Supp. 3d 852 (W.D. Tex. 2025) relied on § 101's definition of "publicly" to conclude that the embedded link "communicated a display of the Photograph to the public." *Id.* at 865. Particle's embedded links are identical.

These cases properly rely on a broad construction of the Copyright Act to bring embedded content within the protection of § 106(5). Here, it is indisputable as a matter of common English that Emmerich's copyrighted works have been displayed publicly. A broad application of the definitions in § 101, which the District Court here did not consider, makes clear that Particle is responsible for causing those displays to be seen by the public.

43

**F.     The Court Should Join Those That Have Rejected the Server Test.**

Courts have repeatedly rejected the server test as an improper interpretation of the Copyright Act. The District Court here even acknowledged that the question of whether the server test is the proper analysis of the display right under § 106(5) is one that is unsettled in this Circuit and is widely debated among federal district courts. ROA.72044, R.E. Tab 2. *See, e.g.*, *Goldman*, 302 F. Supp. 3d at 594 (rejecting the server test as not adequately grounded in text of the Copyright Act); *Great Bowery*, 2024 WL 3416038, at *10 (concluding "that a defendant who embeds a copyrighted image on a webpage, without hosting the image on its servers, may infringe the copyright holder's display rights"); *Prepared Food Photos, Inc. v. Chicken Joes, LLC*, No. 23-CV-3895-JGLC, 2024 WL 382529, at *1 (S.D.N.Y. Feb. 1, 2024) ("[T]he Court joins other courts in this district in finding that embedding a work such as an image constitutes 'display' that is actionable for infringing a copyright in the image.").

Notably, every district court within the Second Circuit that has considered the issue has rejected the server test. "[T]he Fifth Circuit has deemed the Second Circuit to be 'the *de facto* Copyright Court of the

44

United States,' *Easter Seal Soc. For Crippled Children and Adults of Louisiana Inc. v. Playboy Enter.*, 815 F.2d 323, 325 (5th Cir. 1987), and as such, the Second Circuit exerts particular persuasion in matters of copyright." *Compaq Computer Corp. v. Ergonome Inc.*, 210 F. Supp. 2d 839, 843 (S.D. Tex. 2001); *accord, Looney Ricks Kicks Architects, Inc. v. Bryan*, No. CIV.A. 07-572, 2010 WL 4068885, at *6 (W.D. La. Oct. 14, 2010).

While the Second Circuit Court of Appeals has yet to consider the viability of the server test, all of the district courts within the Second Circuit evaluating the server test have found it contradictory to the plain text and legislative history of the Copyright Act. *See, e.g.*, *Goldman*, 302 F. Supp. at 593 ("The plain language of the Copyright Act, the legislative history undergirding its enactment, and subsequent Supreme Court jurisprudence provide no basis for a rule that allows the physical location or possession of an image to determine who may or may not have 'displayed' a work within the meaning of the Copyright Act."); *Nicklen v. Sinclair Broad. Grp., Inc.*, 551 F. Supp. 3d 188, 194 (S.D.N.Y. 2021) ("The Copyright Act's text and history establish that embedding a video on a website 'displays' that video, because to embed a video is to show the

45

video or individual images of the video nonsequentially by means of a device or process."); *McGucken v. Newsweek LLC*, No. 19 CIV. 9617 (KPF), 2022 WL 836786, at *6 (S.D.N.Y. Mar. 21, 2022) ("The Ninth Circuit's approach, under which no display is possible unless the alleged infringer has also stored a copy of the work on the infringer's computer, would seem to make the display right merely a subset of the reproduction right."); *Prepared Food Photos*, 2024 WL 382529, at *1 ("[T]he Court joins other courts in this district in finding that embedding a work such as an image constitutes 'display' that is actionable for infringing a copyright in the image."). Insofar as the Fifth Circuit finds the law of the Second Circuit particularly persuasive in matters of copyright law, the language of those district courts should offer clear instruction. *See Playboy Enter.*, 815 F.2d at 325 ("the Second Circuit–the *de facto* Copyright Court of the United States").

District courts within this Circuit have twice considered the issue and both times rejected the server test as improper. *See Leader's Inst.*, 2017 WL 5629514, at *10–11, and *Urbanimage Media*, 793 F. Supp. 3d at 852. Most recently, the district court in *Urbanimage Media* rejected

46

the server test as contrary to the text and legislative history of the Copyright Act. *Id.* at 864. The court explained:

> The Court sees no textual reason to exclude "embedding" from the Act—a photograph may be "fixed" in an embedded code in a "sufficiently permanent or stable [manner]," such that a visitor to IHeartMedia's website perceives the Photograph for a "period of time more than transitory duration."

*Id.* at 863 (alteration in original). As here, the defendant in *Urbanimage Media* argued that under the server test it had not infringed on the copyright holder's display right because the content displayed was embedded on its website and was not "fixed" in the defendant's servers. *Id.* The district court found that the text of the Copyright Act did not support the server test's requirements and ruled that the embedded content violated the plaintiff's display right. *Id.* at 864.

Absent the server test, the plain text of the Copyright Act is clear. An analysis of whether a particular online action constitutes a copyright-implicating "display" turns on whether the actor has "show[n] a copy of" the work "by means of . . . any . . . device or process." 17 U.S.C. § 101. Emmerich maintains that Particle's embedding and framing of its content was a display under this provision. This Court should resolve the issue by rejecting the server test.

47

## II.    Emmerich's URLs Qualify as Copyright Management Information.

The DMCA, 17 U.S.C. §§ 1201 *et seq.*, which was enacted in 1998, "backed with legal sanctions the efforts of copyright owners to protect their works from piracy behind digital walls such as encryption codes or password protections." *Energy Intel.,* 948 F.3d at 276 (quoting *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 458 (2007)). "In short, the DMCA was enacted primarily to address long-standing concerns about technological circumvention of copyright protection." *Id.*

In pertinent part, the DMCA establishes a category of data known as "copyright management information" ("CMI"), which cannot be removed or altered by any third party. 17 U.S.C. §1202. Section 1202 safeguards the integrity of CMI, which is defined, in part, as information conveyed in connection with copies of a work, including the title of the work, the author of the work, the name of the copyright owner, and link to any such information. 17 U.S.C. § 1202(c).

The second question before this Court thus rests upon a straightforward application of statutory construction. The issue presented is whether URLs may be considered CMI as defined by the DMCA, and, if so, whether that URL's intentional removal thus

48

constitutes a violation of 17 U.S.C. § 1202(b)(1). This Court construes the applicable language according to its "plain and unambiguous meaning." *Orellana*, 405 F.3d at 365 (citation omitted); *see also Sutton*, 819 F.2d at 1292. Notably, this Court has already ruled that the definition of CMI is broadly construed, and that digital filenames can be CMI. *Energy Intel. Grp.,* 948 F.3d at 277 (holding that "a PDF's file name may be CMI if it is 'conveyed in connection with copies' of the underlying work"). Nevertheless, the District Court applied a narrow interpretation and crafted a groundless and unsupportable distinction between URLs and digital filenames. Emmerich's URLs are obviously digital file names and thus constitute CMI.

This question pertains to the Full-Text View set of articles; those articles for which Particle republished the entirety of the full text of an Emmerich article on NewsBreak, including the Emmerich article's title and complete contents.[4] The publication of these full-text articles

---

[4] The District Court acknowledged that Emmerich had also argued that Particle violated § 1202(b) with regard to Framed-View displays and the use of Particle's share button to create URLs different from Emmerich's URLs. ROA.72064, R.E. Tab 2. Because the District Court had used the server test to remove those practices from the case, it did not address Emmerich's CMI arguments as applied to those matters. Should this Court reject the server test, the District Court should then review all aspects of Emmerich's claims under § 1202(b).

stripped out the URLs that appeared in a user's address bar alongside each of the articles when was conveyed on Emmerich's websites.

## A.    Emmerich's URLs Are CMI Under the Plain Text of the DMCA.

The definition of CMI is set forth in § 1202(c), which states as follows:

(c) Definition.—As used in this section, the term "copyright management information" means any of the following information conveyed in connection with copies or phonorecords of a work or performances or displays of a work, including in digital form, except that such term does not include any personally identifying information about a user of a work or of a copy, phonorecord, performance, or display of a work:

The title and other information identifying the work, including the information set forth on a notice of copyright.

[ . . . ]

(3) The name of, and other identifying information about, the copyright owner of the work, including the information set forth in a notice of copyright.

[ . . . ]

(7) Identifying numbers or symbols referring to such information or links to such information.

The analysis turns on the question of whether Emmerich's URLs accord with the statute.  Thus, it is relevant to walk through a typical Emmerich URL. Take the following URL:

> https://www.pressregister.com/jonestown-studies-speed-bumps-safety-concerns

The first part of the URL is the text "https://," the protocol. The protocol is the methodology by which data is sent between a web browser on a user's computer and that website that the user is viewing. The next part of the URL, "www.pressregister.com," the domain name. If a user simply types in the protocol and the domain name, he or she would be directed to the homepage of the domain. Here, if a user typed in just "https://www.pressregister.com," he or she would be directed to the homepage of the Emmerich publication, the Press Register. Next, following the slash there may be additional terms with slashes. There are none in this URL, but those slashes would indicate directories and subdirectories, akin to a filing system chosen by website administrators for where webpages will be housed on their domain. Finally, the remainder of the URL is the filename, in this case "jonestown-studies-speed-bumps-safety-concerns." Any directories, subdirectories, and the filename are chosen by Emmerich's newspapers in order to reflect the content that will be reflected on the webpage once a user types in the URL.

### 1.　　The Domain is the Copyright Owner.

As defined in § 1202(c)(3), "CMI includes the name of, and other identifying information about, the author or copyright owner of a work, [and] 'the information set forth on a notice of copyright[.]'" *Wright v. Miah*, No. 22-CV-4132-CBA-JRC, 2023 WL 6219435, at *6 (E.D.N.Y. Sep. 7, 2023) (quoting *Business Casual Holdings, LLC v. TV-Novosti*, No. 21-CV-2007, 2023 WL 1809707, at *6 (S.D.N.Y Feb. 8, 2023)). *See also* 17 U.S.C. §§ 1202(c)(1), (2), (3); *BanxCorp v. Costco Wholesale Corp.*, 723 F. Supp. 2d 596, 609 (S.D.N.Y. 2010) (The DMCA defines CMI as the "title or identifying information of the work, author or copyright owner, the terms and conditions of use of the work, and identifying numbers or symbols referring to such information.").

Emmerich's domains, the websites reflecting the homepages for its subsidiary newspapers, are its copyright owners. A notice of copyright for the example URL shown above would include the Press Register as the owner of the copyright. Emmerich chooses to post its articles in accordance with the domain, or subsidiary newspaper, that owns the newspaper. The Press Register, as a subsidiary, assign its interests in its copyrights to its parent company, Emmerich Newspapers Inc.–such

52

assignment does not negate that the Press Register is the original holder of the copyright. *See BMG Rights Management (US) LLC v. Cox Communications, Inc.*, 149 F. Supp. 3d 634, 645 (E.D. Va. 2015) (referencing the proposition that "[t]here is no basis for [the] argument that the chain of title must relate back to the author instead of the original claimant. The weight of authority supports finding the latter sufficient.")). Ownership of a copyright can be evinced from the original copyright holder, which in Emmerich's cases would be the individual newspapers–or domains–prior to transfer of their copyright interests to Emmerich. *See Montgomery Cty. Ass'n of Realtors, Inc. v. Realty Photo Master Corp.*, 878 F. Supp. 804, 809–10 (D. Md. 1995) (quoting 3 Melville B. Nimmer and David Nimmer, Nimmer on Copyright § 13.01[A] (1993) for the proposition that the evidence of chain of . . . title is "from the original copyright registrant"). The first portion of the URL satisfies 1202(c)(3).

### 2.    File Names are Titles.

CMI includes "[t]he title and other information identifying the work." *Energy Intel.*, 948 F.3d at 277 (alteration in original) (quoting 17 U.S.C. § 1202(c)(1)). In the example article from Emmerich's publication

"jonestown-studies-speed-bumps-safety-concerns," the title of the article is identical, with a change of using hyphens rather than spaces to meet the convention of URLs, which do not permit spaces. The title of the relevant article, "Jonestown Studies Speed Bumps, Safety Concerns," is identical to this filename at the end of the article with one mere tweak to reflect the difference of conventions between URLs.

In fact, Particle's own expert, Blake Sell, defined this same portion of a URL as the "Filename." ROA.6264. Sell stated that this portion of the URL is the "filename . . . used for this page." ROA.6264. This Court has unambiguously held that filenames may fall under § 1202(c)(1). *Energy Intelligence Group* stated that "CMI is defined broadly" and that "[n]othing in § 1202 indicates that a digital file name cannot be CMI." 948 F.3d at 277. Moreover, it stated that a "file name may be CMI if it . . . contains a 'title and other information identifying the work.'" *Id.* (quoting 17 U.S.C. § 1202(c)(1)). Here, there is no difference between the file names in *Energy Intelligence*—those hand selected identifiers for the relevant content that function as a digital title, and the URLs—which include that same hand selected digital title which Particle even concedes is a file name. *See* ROA.6264.

54

The District Court stated that "[w]hile it is perhaps conceivable that Emmerich could have named some kind of file (data) using the same information/characters contained in a URL, Emmerich has never purported to identify the type of file, *i.e.*, data, to which it has assigned a URL-file name." ROA.72069, R.E. Tab 2. Such is an inaccurate construction of the record. Emmerich has always asserted that it specifically utilizes the latter half of its URLs to include the title of its articles, functioning as a clear assignment of the type of file—*i.e.* the named article itself—to which it has assigned a URL-file name. ROA.2515-18; ROA.6807. Thus, the name of the file is clearly and expressly contained within this filename section of the URL.

### 3. The Entirety of the URL is a Link to Identifying Information.

The relevant analysis as to whether, additionally, URLs in their entirety are CMI falls under § 1202(c)(7), which defines CMI as "[i]dentifying numbers or symbols referring to such information or links to such information." The DMCA does not define "link," so this Court should apply its ordinary meaning. *See Yates,* 574 U.S. at 537 ("Ordinarily, a word's usage accords with its dictionary definition."). That meaning is "an identifier attached to an element in a system (such

as an index term in a database) in order to indicate or permit connection with other similarly identified elements." *Link*, MERRIAM-WEBSTER.COM (Dec. 14, 2025), https://www.merriam-webster.com/dictionary/link.[5]

Distinguishing between a URL and a file name, the District Court found that a "URL is akin to a roadmap to data on the Internet." ROA.72069, R.E. Tab 2. Yet, this analysis, focusing on the notion that URLs are a set of directions to a browser, fails to contend with the plain and clear definition of link used in 1202(c)(7). There is no difference between the District Court's view of a URL as an address, and a link, which is used to permit connection with other elements. *Compare* ROA.72069, R.E. Tab 2, *with* 17 U.S.C. § 1202(c)(7). Particle's expert stated that, "[t]he purpose of URLs is to serve as a navigation link to platforms, folders and subfolders on the Internet where content is located." ROA.41275. Once a user inputs Emmerich's URL, he or she will be directed to the page at which the article is hosted, which

---

[5] A 1998 House Report emphasized the importance of the links:
> Links, such as embedded pointers and hyperlinks, to the above information are also included. The phrase "links to such information" was included because removing or altering a link to the information will have the same adverse effect as removing or altering the information itself.

H. Comm. on the Judiciary, 105TH Cong*., WIPO Copyright Treaties Implementation and On-Line Copyright Infringement Liability Limitation*, H.R. Rep. No. 105-551, at 21 (1998).

unambiguously includes copyright information.  ROA.7474.  To use the District Court's own language, the URL is the roadmap to data on the Internet–the data of identifying symbols indicating CMI.  URLs plainly include links to CMI, and therefore constitute CMI themselves.

### 4.    The Preceding Information is Conveyed in Connection with Emmerich's Content.

Finally, the textual analysis of § 1202(c) turns to the inquiry as to whether or not URLs are "conveyed in connection with copies . . . or displays of a work, including in digital form . . . ."  17 U.S.C. § 1202(c).  The DMCA does not define "convey," so this Court should apply its ordinary meaning.  *See Yates,* 574 U.S. at 537 ("Ordinarily, a word's usage accords with its dictionary definition.").  That meaning is "to impart or communicate by statement, suggestion, gesture, or appearance."  *Convey*, MERRIAM-WEBSTER.COM (Dec. 11, 2025), https://www.merriam-webster.com/dictionary/convey.  The District Court stated that "URLs are not conveyed in connection with a copyrighted work" but did not offer further analysis in support.  ROA.72070, R.E. Tab 2.  Such a view goes against the clear text of the DMCA, which provides that the aforementioned information, which

qualifies as CMI, was communicated by Emmerich in connection with the work.

Moreover, for further support of the sweeping nature of this term, the Court may look to the congressional intent revealed in the report introducing the original provision corresponding to § 1202(c), which states that the "term 'conveyed' is used in its broadest sense and is not meant to require any type of transfer, physical or otherwise, of the information. It merely requires that the information be accessible in conjunction with, or appear with, the work being accessed."  S. Rep. No. 105-190, at 35.  Emmerich's URLs always appeared in a user's browser address bar when they viewed Emmerich's articles. Thus, they were clearly accessible in conjunction with, and appear with, the works being accessed.

### B.    The Information in Emmerich's URLs is CMI, and Provides Notice as Such.

The District Court further premised its holding on the requirement of notice of the inclusion of the information in § 1202(c)(1)–(8).  The order states in relevant part, "[a]s the URLs fail to provide notice that any of the information set out in § 1202(c) (1)–(8) is associated with a particular (copyrighted) work that appears at the online location indicated in the

URL, the court concludes the URLs . . . do not constitute CMI." ROA.72070, R.E. Tab 2. First and foremost, this rests on the District Court's surmise concerning the purpose of the statute, and does not stand in accord with this Court's principles of statutory interpretation from the text itself. *See, e.g.*, *United States v. Maturino*, 887 F.3d 716, 723 (5th Cir. 2018) ("Text is the alpha and the omega of the interpretive process. We cannot revise language (much less repeal it) under the guise of interpreting it."); *Seth B. ex rel. Donald B. v. Orleans Parish School Bd.*, 810 F.3d 961, 985 (5th Cir. 2016) (Smith, J. dissenting) (stating that "purposivism is but another name for license to refashion a statute or regulation to suit the judge's personal whims" and citing ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 20 (2012) for the principle that "[t]he most destructive (and most alluring) feature of purposivism is its pure manipulability."); *Thomas v. Reeves*, 961 F.3d 800, 826 (5th Cir. 2020) (en banc) (Willett, J., concurring) (per curiam) ("Our textualist precedent, one that prizes 'bright lines and sharp corners,' is in tension with this purposivist premise. The truest indication of what Congress intended is what Congress enacted." (quoting *Reed v. Taylor*, 923 F.3d 411, 415 (5th Cir. 2019)).

Every single case referenced by the District Court concerning the supposed requirement of notice under the DMCA rests on the supposed purpose of the statute. *See Fashion Nova, LLC v. Blush Mark, Inc.*, No. CV 22-6127-PSG-RAO, 2023 WL 4307646, at *4 (C.D. Cal. June 30, 2023) ("The central **purpose** of CMI is 'to inform the public that something is copyrighted and to prevent infringement.'" (emphasis added) (quoting *Pers. Keepsakes, Inc. v. Personalizationmall.com, Inc.*, 975 F. Supp. 2d 920, 928 (N.D. Ill. 2013)); *FurnitureDealer.Net, Inc. v. Amazon.com, Inc.*, No. 18-CV-232-JRT/HB, 2022 WL 891473, at *19 (D. Minn. Mar. 25, 2022) ("the general **purpose** of CMI[] [is] to inform the public that something is copyrighted in order to prevent infringement.")(emphasis added)); *Fischer v. Forrest*, 286 F. Supp. 3d 590, 610–11 (S.D.N.Y 2018) ("CMI exists to inform the public that a work is copyrighted and by whom." ) (citing *Pers. Keepsakes, Inc.*, 2012 WL 414803, at *6 ("[T]he **point** of CMI is to inform the public that something is copyrighted and to prevent infringement.")). Thus, the entirety of such argument hinges on a purposivist interpretation where such notice requirement is reflected nowhere within the texts of the DMCA.

Even if this Court were to depart from its usual practice by agreeing that the plain text of the DMCA is limited by the underlying purpose of notice, and that therefore a non-textual requirement is vital to the enforcement of the DMCA, Emmerich has still met such standard. For instance, *Fashion Nova*, the quote utilized by the District Court, reads in full:

> The central purpose of CMI is "to inform the public that something is copyright and to protect infringement." (citation omitted). Thus, although file names do not automatically fall within the scope of the DMCA, they are protected by § 1202 when they include relevant identifying information. For example, in *Izmo, Inc. v. Roadster, Inc.*, the court found that the plaintiff adequately showed that file names constituted CMI because they identified works in question and directly linked the photographs to the copyright registrations. No. 18-CV-06092-NC, 2019 WL 13210561, at *3 (N.D. Cal. Mar. 26, 2019).

2023 WL 4307646, at *4. The matters in which courts have held that information is not protected by the DMCA are wholly differentiated from Emmerich's URLs. *See, e.g.*, *Fischer*, 286 F. Supp. 3d at 611 (wherein the relevant quote cited above by the District Court is in reference to "four phrases of Fischer's that Brushy modified and used" where "[n]o reader would find that the 'Fischer's' as used in the phrase 'Fischer's Bee–Quick is a safe, gentle, and pleasant way to harvest your honey' speaks to

61

copyright ownership."), *FurnitureDealer.Net,* 2022 WL 891473, at *19 ("[T]he CMI must at least suggest that it is associated with or linked to the copyrighted work."). Here, the URLs are clearly linked to the copyrighted work–they themselves are the mechanism that points the reader to the copyright notice and designate the page at which the relevant information can be found. Thus, even if the Court accepts the purposivist rationalizations of the District Court, Emmerich has clearly provided notice of its copyrights.

### C.    Particle Has Violated § 1202(b).

As to the second part of the question at issue, whether Particle violated the DMCA, the analysis proceeds to § 1202(b), which states:

> (b)    Removal or Alteration of Copyright Management Information.—No person shall, without the authority of the copyright owner or the law –
> (1)  intentionally remove or alter any copyright management information . . . .

A person violates § 1202(b)(1) when he or she (i) without the authority of the copyright owner or the law (ii) intentionally removes or alters CMI (iii) knowing or having reasonable grounds to know it would induce, enable, or conceal an infringement of the federal copyright laws. *Recif Res., LLC v. Juniper Cap. Advisors, L.P.,* No. CV H-19-2953, 2020 WL 5739138, at *10 (S.D. Tex. Sep. 24, 2020) (quoting *Gordon v. Nextel*

*Commc'ns & Mullen Advert. Inc.*, 345 F.3d 922, 927 (6th Cir. 2003)).　The relevant analysis for this Court is not the factual one; the District Court did not even reach this portion of the analysis after finding that URLs did not qualify as CMI.　Rather, it is the role of this Court to instruct that this analysis be conducted—finding that Emmerich's URLs are CMI and mandating the review of whether or not Particle's behavior violates § 1202(b) of the DMCA.

## CONCLUSION

For the foregoing reasons, Emmerich respectfully prays that this Court will reject the server test and will conclude that Emmerich's URLs are CMI subject to the protection of § 1202(b).　This Court should vacate the District Court's partial summary judgment order and remand for further consideration consistent with this Court's opinion.

RESPECTFULLY SUBMITTED, this the 15th day of December, 2025.

**COUNSEL FOR PLAINTIFF/APPELLANT**

/s/ Wilson H. Carroll
WILSON H. CARROLL

63

WILSON H. CARROLL
WILSON CARROLL, PLLC
2506 Cherry Street
Vicksburg, Mississippi 39180
Tel:        601-953-6579
Email:      wilsoncarroll59@gmail.com

MICHAEL B. WALLACE
CHARLES E. COWAN
WISE CARTER CHILD & CARRAWAY, P.A.
401 E Capitol St.
Jackson, Mississippi 39201
Tel:        601-968-5534
Email:      mbw@wisecarter.com

DON W. BARRETT
BARRETT LAW GROUP, P.A.
404 Court Square North
Lexington, Mississippi 39095
Tel:        662-834-9168
Email:      donbarrettpa@gmail.com

CHRISTIAN E. HUDSON
CUNEO GILBERT & LADUCA, LLP
222 Livingston Street
Second Floor
Brooklyn, New York 11201
Tel:        202-789-3960
Email:      christian@cuneolaw.com

## CERTIFICATE OF SERVICE

I, Wilson H. Carroll, hereby certify that I have filed the foregoing document via the Court's electronic filing system, which automatically forwarded copies to all counsel of record.

So certified, this the 15th day of December, 2025.

/s/ Wilson H. Carroll

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and 5th Cir. R. 32.2 because this brief contains 12,574 words, excluding the parts of this brief exempted by Fed. R. App. P. 32(f) and 5th Cir. R. 32.2. This brief complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5)-(6) and 5th Cir. R. 32.1 because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-Point Century Schoolbook font, with footnotes in 12-point font.

/s/ Wilson H. Carroll