# United States Court of Appeals

### for the

# Fifth Circuit

---

Case No. 25-60550

---

EMMERICH NEWSPAPERS, INCORPORATED,

*Plaintiff-Appellant,*

v.

PARTICLE MEDIA, INCORPORATED, doing business as Newsbreak,

*Defendant-Appellee.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI, CASE NO. 3:23-CV-26

**BRIEF FOR *AMICI CURIAE* NEWS/MEDIA ALLIANCE, ALABAMA PRESS ASSOCIATION, AMERICA'S NEWSPAPERS, ARKANSAS PRESS ASSOCIATION, GEORGIA PRESS ASSOCIATION, LOUISIANA PRESS ASSOCIATION, MISSISSIPPI PRESS ASSOCIATION, NEW YORK NEWS PUBLISHERS ASSOCIATION, TENNESSEE PRESS ASSOCIATION, AND TEXAS PRESS ASSOCIATION IN SUPPORT OF APPELLANT AND REVERSAL**

LINDA STEINMAN
DAVIS WRIGHT TREMAINE LLP
*Attorneys for Amici Curiae*
1251 Avenue of the Americas,
   42nd Floor
New York, New York 10020
(212) 489-8230
lindasteinman@dwt.com

## SUPPLEMENTAL CERTIFICATE OF INTERESTED PARTIES

### *Emmerich Newspapers, Inc. v.*
### *Particle Media, Inc. d/b/a/ Newsbreak*; No. 25-60550

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

1.     *Amici Curiae* **for Plaintiff-Appellant and Reversal**:

Pursuant to 5th Cir. R. 28.2.1:

The News/Media Alliance ("N/MA") states that it is a non-profit organization under the laws of Virginia, with its principal place of business in Arlington, Virginia, that does not have any parent corporations or issue stock and, consequently, there exists no publicly held corporation which owns 10% or more of its stock.

The Alabama Press Association states that it is a non-profit organization under the laws of Alabama, with its principal place of business in Hoover, Alabama, that does not have any parent corporations or issue stock and, consequently, there exists no publicly held corporation which owns 10% or more of its stock.

America's Newspapers states that it is a non-profit organization under the laws of the District of Columbia, with its principal place of business in Tallahassee, Florida, that does not have any parent corporations or issue stock and, consequently, there exists no publicly held corporation which owns 10% or more of its stock.

The Arkansas Press Association states that it is a non-profit organization under the laws of Arkansas, with its principal place of business in Little Rock, Arkansas, that does not have any parent corporations or issue stock and, consequently, there exists no publicly held corporation which owns 10% or more of its stock.

The Georgia Press Association states that it is a non-profit organization under the laws of Georgia, with its principal place of business in Marietta, Georgia, that does not have any parent corporations or issue stock and, consequently, there exists no publicly held corporation which owns 10% or more of its stock.

The Louisiana Press Association states that it is a non-profit organization under the laws of Louisiana, with its principal place of business in Baton Rouge, Louisiana, that does not have any parent corporations or issue stock and, consequently, there exists no publicly held corporation which owns 10% or more of its stock.

Mississippi Press Association states that it is a non-profit organization under the laws of Mississippi, with its principal place of business in Jackson, Mississippi, that does not have any parent corporations or issue stock and, consequently, there exists no publicly held corporation which owns 10% or more of its stock.

The New York News Publishers Association states that it is a non-profit organization under the laws of New York, with its principal place of business in Albany, New York, that does not have any parent corporations or issue stock and,

consequently, there exists no publicly held corporation which owns 10% or more of its stock.

The Tennessee Press Association states it is a nonprofit organization under the laws of Tennessee, with its principal place of business in Knoxville, Tennessee, that does not have any parent corporations or issue stock and consequently there exists no publicly held corporation which owns 10% or more of its stock.

The Texas Press Association states that it is a non-profit organization under the laws of Texas, with its principal place of business in Austin, Texas, that does not have any parent corporations or issue stock and, consequently, there exists no publicly held corporation which owns 10% or more of its stock.

2.      **Counsel for *Amici Curiae* for Plaintiff-Appellant**: Linda Steinman of Davis Wright Tremaine, LLP; and Sternberg, Naccari & White, LLC (counsel to Louisiana Press Association).

3.      **Plaintiff-Appellant**: Emmerich Newspapers, Inc. No publicly held corporation owns 10% or more of its stock, and it has no parent corporation.

4.      **Counsel for Plaintiff-Appellant**: Wilson H. Carroll of Wilson Carroll, PLLC; Michael B. Wallace and Charles E. Cowan of Wise Carter Child & Carraway, P.A.; Don W. Barrett of Barrett Law Group, P.A.; Christian E. Hudson of Cuneo Gilbert & LaDuca, LLP.

5.    **Defendants-Appellees**: Particle Media, Inc. No publicly held corporation owns 10% or more of its stock, and it has no parent corporation.

6.    **Counsel for Defendants-Appellees:** Steven Carmody and Karen Howell of Brunini, Grantham, Grower & Hewes, PLLC.

> By: /s/ Linda Steinman
> Linda Steinman
> DAVIS WRIGHT TREMAINE LLP
> 1251 Avenue of the Americas, 42nd Floor
> New York, New York 10020-1104
> Phone: (212) 489-8230
> Fax: (212) 489-8340
> Email: lindasteinman@dwt.com
>
> *Attorneys for Amici Curiae*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................... ii

INTEREST OF AMICI CURIAE ......................................................... 1

SUMMARY OF ARGUMENT ............................................................... 5

ARGUMENT ....................................................................................... 8

   I.   The Current State of the News Industry And the Role of Technology Companies In Harming News Publishers Form An Important Backdrop To This Case ..................................................................................................... 8

   II.   The Court Should Reject Newsbreak's Reliance on the Server Test ......... 11

CONCLUSION ................................................................................... 17

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alcatel USA, Inc. v. DGI Techs., Inc.*,
166 F.3d 772 (5th Cir. 1999) ...............................................................5

*American Broadcasting Cos, Inc. v. Aereo, Inc.*,
573 U.S. 431 (2014)...............................................................13, 14

*Associated Press v. Meltwater U.S. Holdings, Inc.*,
931 F. Supp. 2d 537 (S.D.N.Y. 2013) .....................................9, 12, 14

*Goldman v. Breitbart News Network, LLC*,
302 F. Supp. 3d 585 (S.D.N.Y. 2018) ................................7, 11, 13, 16

*Great Bowery v. Best Little Sites*,
2024 WL 3416038 (D. Utah July 15, 2024).......................7, 11, 12, 13

*Infinity Broad. Corp. v. Kirkwood*,
150 F.3d 104 (2d Cir. 1998) ...............................................................14

*Los Angeles News Service v. Tullo*,
973 F.2d 791 (9th Cir. 1992) ...............................................................14

*Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc.*,
166 F.3d 65 (2d Cir. 1999) ...............................................................14

*Pacific and Southern Co., Inc. v. Duncan*,
744 F.2d 1490 (11th Cir. 1984) .........................................................14

*Perfect 10, Inc. v. Amazon.com, Inc.*,
508 F.3d 1146 (9th Cir. 2007)........................................................*passim*

*Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.*,
342 F.3d 191 (3d Cir. 2003) ...............................................................14

## Statutes

17 U.S.C. § 101 ...............................................................12, 13

17 U.S.C. § 106 ...............................................................11

17 U.S.C. § 107 .................................................................................................17

**Other Authorities**

Computer & Communications Industry Association ("CCIA") and Internet
    Association, Initial Written Comments in Response to U.S. Copyright Office's
    Publishers' Protection Study: Notice and Request for Public Comment, 86 Fed.
    56721 (Oct. 12, 2021), *available at*
    https://www.copyright.gov/policy/publishersprotections/initial-
    comments/CCIA-IA%20-%20Initial%20Comment.pdf ....................................11

*Embed from TikTok*, TikTok, https://developers.tiktok.com/doc/embed-videos/
    (last visited Dec. 15, 2025) ................................................................................16

"How Google Abuses Its Position as a Market Dominant Platform to Strong-Arm
    News Publishers and Hurt Journalism," News Media Alliance (June 2020),
    *available at* https://www.newsmediaalliance.org/wp-
    content/uploads/2022/09/NMA-White-Paper_REVISED-Sept-2022.pdf .........10

Investigation of Competition in Digital Markets: Majority Staff Report and
    Recommendations, U.S. House of Representatives Subcommittee on Antitrust,
    Commercial, and Administrative Law of the Committee on the Judiciary (July
    2022), *available at* https://www.congress.gov/committee-print/117th-
    congress/house-committee-print/47832 ..........................................................9, 10

Local Journalism: America's Most Trusted News Sources Threatened, U.S. Senate
    Committee on Commerce, Science, and Transportation (Oct. 2020), *available at*
    https://www.cantwell.senate.gov/imo/media/doc/Local%20Journalism%20Repo
    rt%2010.26.20_430pm.pdf ......................................................................6, 9, 10

*YouTube Embedded Players and Player Parameters*, YouTube,
    https://developers.google.com/youtube/player_parameters (last visited Dec. 17,
    2025) ...................................................................................................................16

## INTEREST OF AMICI CURIAE[1]

Amici are trade groups of news organizations dedicated to the protection of journalism in this country. They submit this amicus brief in support of Plaintiff-Appellant Emmerich Newspapers, Incorporated ("Emmerich Newspapers") and reversal.

In 2007, the Ninth Circuit established what is known as the "server test," which holds that "the owner of a computer that does not store and serve the electronic information to a user is not displaying that information [under the Copyright Act], even if such owner inline links to or frames the electronic information." *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1159-60 (9th Cir. 2007). In the nearly two decades since that decision, several courts have questioned or rejected the server test. As this case evidences, broad application of the server test—beyond what was originally contemplated—applied to shield technology companies seeking to free-ride on news publisher websites in place of their own offerings would have a strong negative impact on the vitality of the news industry and should not be condoned.

At the same time, in the years following *Perfect 10,* some news publications have considered periodically relying on the server test as a means to display

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), no party or party's counsel authored this amicus brief in whole or in part or contributed money toward the preparation of this brief. Further, no person other than Amici, their members, or their counsel, contributed money intended to fund this brief.

copyright-protected works in their reporting without seeking prior authorization when commenting upon news of public interest. In short, news publishers have a strong interest in the outcome of this litigation because their businesses are on both sides of the question before the Court. The Fifth Circuit should not bless Newsbreak's systematic, unauthorized, and unattributed use of Emmerich Newspapers's content based on the inconsequential fact that the articles are framed in Newsbreak's application. However, it is also critical to approach this case with sensitivity to the many nuances it presents and to minimize disruption for responsible news publishers.

Pursuant to Federal Rule of Appellate Procedure 29(a)(2), all parties have consented to the timely filing of this amicus brief. Amici include the following organizations:[2]

The News/Media Alliance ("N/MA") is a Virginia-based nonprofit organization. It represents over 2,200 newspaper, magazine, and digital media publishers in the United States, ranging from the largest news and magazine publishers in the country to hyperlocal newspapers, and from digital-only outlets to papers that have printed news since the nation's founding. Covering all subject

---

[2] Pursuant to FRAP 26.1 and 5th Cir. R. 28.2.1, no Amici organization has a parent corporation and no publicly held corporation owns 10% or more of its stock. Additionally, Emmerich Newspapers is a member of the News/Media Alliance, America's Newspapers, and Mississippi Press, and is not a member of any other Amici organization. Emmerich Newspapers owns and publishes The Dumas Clarion, which is a member of the Arkansas Press Association.

matters and political viewpoints, the N/MA's membership accounts for nearly 90 percent of the daily newspaper circulation in the United States, over 500 individual magazine brands, and dozens of digital-only properties.

The Alabama Press Association is the state's non-profit trade association of daily and weekly newspapers. Its active membership includes 105 newspapers and associate members, which represent newspaper vendors, colleges and universities, and other organizations allied to the newspaper industry.

America's Newspapers is a 501(c)(6) national trade association that provides educational services, training, and advocacy for its 1,600 members across the United States.

The Arkansas Press Association ("APA"), founded in 1873, is the oldest trade association in the state. The primary function of APA is to serve its member newspapers and promote local journalism by providing information and training opportunities to allow them to grow, develop, and compete in the marketplace. APA serves the public by helping protect basic freedoms of press, speech, and the Freedom of Information Act.

The Georgia Press Association ("GPA") is a trade association that represents newspapers throughout Georgia. GPA is a 501(c)(6) not-for-profit association, which is governed by a Board of Directors.

The Louisiana Press Association ("LPA") is the official trade organization for Louisiana's newspapers. The LPA provides advice, guidance, and periodic representation for Louisiana newspapers and reporters in various matters that concern freedom of speech, freedom of the press, and access to government records and places. The LPA also advocates to the Louisiana Legislature and various local governmental bodies on issues of general interest to its members, such as public notices, access to public records, libel, privacy and open meetings.

Mississippi Press, founded in 1866, is the trade organization for more than 100 print and digital newsrooms in Mississippi. It promotes values of strong, objective journalism and represents the business interests of members both at the state Capitol and beyond. A 501(c)(6) organization, Mississippi Press is governed by a nine-member volunteer Board of Directors.

The New York News Publishers Association ("NYNPA") is a trade association representing newspapers throughout the State of New York. NYNPA is a 501(c)(6) not-for-profit association, which is governed by a Board of Directors.

The Tennessee Press Association ("TPA") is the statewide non-profit trade organization for Tennessee's daily and non-daily newspapers and their digital counterparts. Founded around 1870, TPA champions a free and independent press, open government, and strong local journalism through its advocacy at the state level,

professional training, press credentials, networking, and programs that recognize excellence in journalism.

The Texas Press Association is a non-profit industry association representing more than 350 daily and weekly newspapers across the state of Texas. The Texas Press Association, founded in 1880, performs numerous services on behalf of its members, including sponsoring and promoting legislation and taking legal action to protect First Amendment freedoms and open government.

## SUMMARY OF ARGUMENT

Amici support Emmerich Newspapers and oppose Newsbreak's unauthorized, unattributed use of Emmerich's content. At its core, United States copyright law is intended to create incentives to spur the development of creative works. *See Alcatel USA, Inc. v. DGI Techs., Inc.*, 166 F.3d 772, 787 (5th Cir. 1999) ("The purpose of copyright law is to promote and protect creativity."). These last decades have seen a drastic reduction in the number and staff size of news organizations, including local newspapers, as technology companies have siphoned off their readers and advertising revenues. *See* "Local Journalism: America's Most Trusted News Sources Threatened," U.S. Senate Committee on Commerce, Science, and Transportation (Oct. 2020) ("Senate Committee Report"), *available at* https://www.cantwell.senate.gov/imo/media/doc/Local%20Journalism%20Report %2010.26.20_430pm.pdf. In this setting, it is all the more important that courts

reject efforts by technology companies to engineer their way out of common sense liability based on "behind the curtain" theories such as the server test. The server test, born in a different technological era, has since been exploited by large companies to excuse mass taking of creative content, often without attribution, based myopically on the specifics of underlying technical architecture as opposed to functional, real-world appearance and impact—thus depriving news publishers of home page traffic and revenue streams. In short, given the current landscape, the server test in the hands of defendants such as Newsbreak, who offer a substitutional service, has proven to be a dangerous threat to a robust press, which is in turn central to a functioning democracy.

In the first decade following *Perfect 10,* many responsible news publishers pragmatically relied on the server test, which was endorsed by several courts, to frame and link works in the context of their reporting, and built their archives based on good faith compliance with that test for individual articles that generally embedded content as part of larger stories while providing attribution to the source. The legal tide turned with such decisions as *Goldman v. Breitbart News Network, LLC*, 302 F. Supp. 3d 585 (S.D.N.Y. 2018), and *Great Bowery v. Best Little Sites*, 2024 WL 3416038 (D. Utah July 15, 2024), which carefully examined the broad definition of "display" under the Copyright Act and presciently reflected on the artificiality of the distinctions drawn by the server test, given that users cannot

discern whether content has been embedded or not. While the *Goldman* court cast strong doubt on the server test, it appropriately recognized that embedding by news organizations often will qualify as fair use or be permitted by the terms of use governing the source social media platform. *Goldman*, 302 F. Supp. 3d at 596. The practices of news publishers are in stark contrast with defendants like Newsbreak, who merely seek to exploitatively free-ride on the creative works of others on a systematic scale. The server test is an embodiment of the problematic notion of "technological differences" that are "invisible to the subscriber" being the lynchpin on which copyright liability lies.

In sum, we encourage the Court to reject the server test as a "get out of jail free" card for exploitative uses, while minimizing disruption by (i) affirming that other legal doctrines such as fair use will often protect news publisher websites that use attributed, embedded content for their news reporting, and (ii) carefully considering and preserving legitimate past reliance interests on existing law to protect publishers who, for public information purposes, embedded content to make a reportorial point and invest in original journalism. On the other hand, if the Court adopts the server test, we implore the Court to take into account the context facing news publishers and take all necessary steps to limit the negative impact of the decision on the news industry, including local newspapers. It is likewise critical that the Court not explicitly or implicitly authorize any extension of the server test that

could be exploited through the use of creative engineering to further harm the news publishing industry and erode copyright protections in this age of rapidly changing technology.

## ARGUMENT

## I.    The Current State of the News Industry And the Role of Technology Companies In Harming News Publishers Form An Important Backdrop To This Case

Two facts form the critical backdrop to this case, namely the importance of a thriving press to an effective democracy and the current imperiled state of the news industry, largely as a result of uncompensated use of their content by technology companies. News websites require certainty to sustain their investments, as well as protection against predatory copying by large platforms.

The importance of the press as the "fourth estate" and a check on over-reaching government or corporate power cannot be overstated. It is broadly recognized that "[l]ocal journalism is essential for healthy communities, competitive marketplaces, and a thriving democracy." Senate Committee Report at p. 1. As one court observed in a similar case in which a technology company likewise offered a modern-day equivalent of a news clipping service to subscribers without compensating the news publishers:

> Paraphrasing James Madison, the world is indebted to the press for triumphs which have been gained by reason and humanity over error and oppression. Investigating and writing about newsworthy events occurring around the

> globe is an expensive undertaking and enforcement of the
> copyright laws permits [the Associated Press] to earn the
> revenue        that        underwrites        that        work.
> Permitting [defendant] to take the fruit of AP's labor for its
> own profit, without compensating AP, injures AP's ability
> to perform this essential function of democracy.

*Associated Press v. Meltwater U.S. Holdings, Inc.,* 931 F. Supp. 2d 537, 553

(S.D.N.Y. 2013).

Congress also has documented that "the local news industry is being

decimated in the digital age," which is "due both to the rapid proliferation of online

news content as well as unfair market practices by some of the world's largest

technology companies that reuse local news' content . . ." Senate Committee Report

at 1.  As of 2020, "Newspapers ha[d] been forced to let go more than 40,000

newsroom employees, a full 60 percent of the journalistic workforce that creates

unique local content."  *Id.* at 2; *see also* "Investigation of Competition in Digital

Markets: Majority Staff Report and Recommendations," U.S. House of

Representatives Subcommittee on Antitrust, Commercial, and Administrative Law

of the Committee on the Judiciary (July 2022) ("House Subcommittee Report"),

*available at* https://www.congress.gov/committee-print/117th-congress/house-

committee-print/47832 at 48 ("the United States has lost nearly 1,800 newspapers

since 2004").  "These losses are leading to news deserts . . . . , a problem that is

particularly acute in the South."  Senate Committee Report at 2.

As is widely established, a central reason for the decline in news organizations are the various means by which technology companies have unfairly usurped their content without compensation. *See, e.g.,* Senate Committee Report at 3, 27-34 ("The platforms' continued practices of taking publishers' online content without proper compensation, diverting user traffic away from local news websites, and using formats like AMP to obtain data about local news consumers are unfair and abusive practices…"); "How Google Abuses Its Position as a Market Dominant Platform to Strong-Arm News Publishers and Hurt Journalism," News Media Alliance (June 2020), *available at* https://www.newsmediaalliance.org/wp-content/uploads/2022/09/NMA-White-Paper_REVISED-Sept-2022.pdf; House Subcommittee Report at 46-48, 56 ("By keeping people inside a 'walled garden,' platforms can monetize their attention through ads, creating a strong economic incentive to minimize outbound referrals that lead to a decline in users' attention and engagement."). This case presents yet another example of "unfair market practices by" a "technology compan[y] that reuse[s] local news' content" (Senate Report at 1) without payment[3]—this time, by relying on *Perfect 10*'s controversial adoption of

---

[3] *See also* Computer & Communications Industry Association ("CCIA") and Internet Association, Initial Written Comments in Response to U.S. Copyright Office's Publishers' Protection Study: Notice and Request for Public Comment, 86 Fed. 56721, at 3-4 (Oct. 12, 2021), *available at* https://www.copyright.gov/policy/publishersprotections/initial-comments/CCIA-IA%20-%20Initial%20Comment.pdf (CCIA references the server test in *Perfect 10, Inc. v. Amazon.com, Inc.* to support its statement that embedding by "issuing instructions to the user's computer to fetch the content from servers . . . has generally been held by courts not to constitute infringement.")

the server test.  Newsbreak's platform is designed to usurp any views and clicks and, in that process, eliminate revenue that would be directed to the news publishers.

## II.    The Court Should Reject Newsbreak's Reliance on the Server Test

Especially given this important backdrop, technology companies like Newsbreak or the large platforms should not have a categorical exemption from copyright law to republish full webpages with no added value based solely on the location of the server that hosts content for which they have failed to procure a license.  As recent holdings have underscored, courts should take into account consumer perception and user experience.  *See Goldman,* 302 F. Supp. 3d at 595-96; *Great Bowery*, 2024 WL 3416038 at *9-10; 17 U.S.C. §106.  Here, Newsbreak users who can read an Emmerich Newspapers article on Newsbreak's site would have little to no idea that the article, surrounded by Newsbreak's advertisements, was not sitting on Newsbreak's server.  Critically, Newsbreak is using framing to display entire pages of Emmerich Newspapers's content (and the content of other news organizations) within Newsbreak's mobile application without visible links to the news organizations' websites, and with the only additions being Newsbreak's ads and buttons including "share" buttons, which generate Newsbreak URLs, not those of the originating publisher's website.  *See generally*, Pl's Mem. of Supp. of Its Amended Motion for Summary Judgment.  In short, Newsbreak is impermissibly employing framing to engage in the systematic exploitation of works developed

through the investment of others. *Id.* "[T]his is the central feature of its business model and not an incidental consequence of the use to which it puts the copyrighted material." *Associated Press*, 931 F. Supp. 2d at 552. Unauthorized mass-scale uses of full articles without visible links to the publishers' websites and only adding Newsbreak's ads and buttons (including a redirect share button to Newsbreak's application) diminish the economic incentives underlying our copyright laws. This is in contrast to common practices such as those used on social media sites, where the nature of the embed provides the viewer with information to identify the original content creator, and social platforms often entreat content providers to allow embedding to drive traffic back to the original site.

Under the 1976 Copyright Act, to display a work is to "show a copy of it, either directly or by means of a film, slide, television image, or any other device or process." 17 U.S.C. §101. While the *Perfect 10* decision held that this language required the making and storage of a *new* copy by the defendant to constitute a display of the work, other decisions such as *Great Bowery* have pointed out that "the definition of 'copies' [in the Copyright Act] includes the original"[4] and noted that a party embedding a creative work is showing the original work. 2024 WL 3416038 at *6. During the hearings for the 1976 Act, the Register of Copyrights "highlighted

---

[4] The Copyright Act states that "The term 'copies' includes the material object . . . in which the work is first fixed." 17 U.S.C. §101.

the importance of the display right in light of changing technology, specifically warning that 'information storage and retrieval devices when linked together by communication satellites or other means . . . could eventually provide libraries and individuals throughout the world with access to a single copy of a work by transmission of electronic images.'" *Goldman*, 302 F. Supp. 3d at 589.   As technology companies like Newsbreak have sought to create exploitative services that substitute for news publisher websites, these concerns have come to the fore. Moreover, we urge the Court to keep in mind the rapidly evolving nature of technological development, which further threatens to interfere with the incentives for news publishers to invest in the high costs of developing news content—from reporters' and editors' salaries to their own high infrastructure costs.

The U.S. Supreme Court's decision in *American Broadcasting Cos, Inc. v. Aereo, Inc.*, 573 U.S. 431 (2014), emphasized that technological work-arounds should not obscure reality in copyright jurisprudence.   The question in *Aereo* was whether Aereo infringed the performance right by selling its subscribers a technologically complex service that allowed them to watch television programs over the Internet without authorization at approximately the same time as the programs were broadcast over the air.   The Supreme Court rejected Aereo's argument that its "technologically complex service" (*id.* at 436) altered the legal analysis, stating:   "This difference means nothing to the subscriber.   It means nothing to the

broadcaster. We do not see how this single difference, invisible to subscriber and broadcaster alike, could transform a system that is for all practical purposes a traditional cable system into [something else.]" *Id*. at 444.

Likewise, Newsbreak's sole purpose is to systematically profit off the content of news publisher websites by displaying full articles in the frame of Newsbreak's application, thus syphoning off the broader traffic to the news publisher websites and decreasing their advertising revenues—all while profiting from its own ads alongside someone else's content. Given these facts, this Court should focus on the practical realities, not the "technologically complex service." Courts have long held that "online equivalent[s] to the traditional news clipping service" are non-transformative, infringing uses (*Associated Press*, 931 F. Supp. 2d at 556-57 (citing clipping service cases))[5], and Newsbreak is nothing more than a 21st century news clipping service with a mode of delivery designed to avoid liability or royalty obligations borne by its competitors. In this context, the server test should not be a permission slip to engage in what would otherwise be clear instances of copyright infringement.

---

[5] *See also Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.,* 342 F.3d 191, 199 (3d Cir. 2003) (clip previews of movies); *Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc.*, 166 F.3d 65, 72 (2d Cir. 1999)(abstracts of news articles); *Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104, 108 (2d Cir. 1998)(radio monitoring service); *Los Angeles News Service v. Tullo,* 973 F.2d 791, 797, 799 (9th Cir. 1992) (video news clipping service.); *Pacific and Southern Co., Inc. v. Duncan,* 744 F.2d 1490, 1496 (11th Cir. 1984) (TV news clipping service).

While we urge this Court to clarify that the server test does not excuse Newsbreak's conduct, we likewise request that the Court recognize the distinctions between Newsbreak's conduct and the news industry's historic use of embedding in news articles contained in their archives for purposes of reporting and commentary. Over the years, given the state of the caselaw, news publishers have reasonably relied on the server test, among other principles, to support their online operations. Against the backdrop of the *Perfect 10* case, they have embedded content to meet user expectations of shareability, immediacy, and interactivity, generally providing attribution and commentary—often in situations where the critical nature of such commentary would preclude the likelihood of permission, if it were requested. In short, they have used embedding in individual instances to further the causes of journalism, not to rob newsrooms of their tenuous ability to survive. Additionally, news publishers' use of embedded content is often consistent with the sharing nature of interactive platforms; many social media sites, including YouTube[6] and TikTok[7] affirmatively and voluntarily offer APIs that allow content to be embedded and are advertised as ensuring that the content owner does not lose views. By contrast, Newsbreak's framing of publisher content, designed to be predatory, was

---

[6] *YouTube Embedded Players and Player Parameters* , YouTube, https://developers.google.com/youtube/player_parameters (last visited Dec. 17, 2025).

[7] *Embed from TikTok*, TikTok, https://developers.tiktok.com/doc/embed-videos/ (last visited Dec. 15, 2025).

accomplished through generic framing rather than any affirmative publisher activity or opt-in mechanism.

Accordingly, if the Court rejects Newsbreak's invocation of the server test in this setting, as we would encourage, we urge the Court to clarify that embedding by news publishers in individual news articles will typically be protected conduct under separate doctrines and to avoid injecting uncertainty over past archives created before the law has settled. *Cf. Goldman,* 302 F. Supp. 3d at 596 (noting the "very serious and strong fair use defense" along with potential license/authorization, DMCA and innocent infringement defenses available to news publisher). The Court should exercise great care to avoid disrupting the following existing news industry practices:

(1) Fair use: While news publishers regularly license larger quantities of third-party content, news reporting also necessarily entails pointing to, analyzing, or commenting on content without authorization. While fair use remains a fact-specific inquiry, in light of both the First Amendment and the goals of the Copyright Act, news reporting and commentary are enumerated and favored purposes in the preamble to Section 107 of the Copyright Act (17 U.S.C. §107), and the fair use doctrine often will shield embedding by news organizations, especially with attribution and visible links.

(2) Licenses:  News publications often embed images or other content where the online or social media content is available to be shared via express and/or implied licenses, such as YouTube's past terms of use.  The Court should not create uncertainty over whether news media embedding or resharing social media content under such licenses risk copyright infringement.

Further, for news publisher website archives, especially for webpages published years ago, publisher reliance interests are strong.  As it clarifies the law, the Court should discourage opportunistic parties from lying in wait or coming out of the woodwork to challenge news reporting containing embedding, including where laches or statute of limitations should bar complaints.

Finally, if the Court rejects Emmerich Newspapers's and Amici's arguments and endorses the server test on the facts before it, we hope that the Court can avoid authorizing any extension of the server test that may be exploited to further erode copyright protections through the use of creative engineering, especially as technology continues to evolve.

## CONCLUSION

Amici respectfully request that the Court reverse the district court's reliance on the server test in this matter.

Dated: December 22, 2025          Respectfully submitted,

By: /s/ Linda Steinman
Linda Steinman

DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, New York 10020
Phone: (212) 489-8230
Fax: (212) 489-8340
Email: lindasteinman@dwt.com

*Attorneys for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on December 22, 2025, I electronically filed the foregoing document with the Clerk of the Court of the United States Court of Appeals for the Fifth Circuit using the CM/ECF system. Service of such filing will be accomplished by the CM/ECF system upon all participants.

DATED this 22nd day of December, 2025.

DAVIS WRIGHT TREMAINE LLP

By: ___/s/ *Linda Steinman*_____
Linda Steinman
*Attorney for Amici Curiae*

## ECF CERTIFICATION

I hereby certify that (i) required privacy redactions have been made pursuant to 5th Cir. R. 25.2.13; (ii) the electronic submission is an exact copy of the paper document pursuant to 5th Cir. R. 25.2.1; (iii) the document has been scanned for viruses using the most recent version of Windows Defender and is free of viruses; and (iv) the paper document will be maintained for three years after the mandate or order closing the case issues, pursuant to 5th Cir. R. 25.2.9.

DATED this 22nd day of December, 2025.

DAVIS WRIGHT TREMAINE LLP

By: ___/s/ *Linda Steinman*_____
Linda Steinman

*Attorney for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

The foregoing document complies with the word limit of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B) because, excluding the parts of the document exempted by Federal Rules of Appellate Procedure 32(f), this document contains 3,925 words.

This document complies with the typeface requirements of Federal Rules of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rules of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

DATED this 22nd day of December, 2025.

DAVIS WRIGHT TREMAINE LLP

By: _  /s/ Linda Steinman_
　　Linda Steinman
　　*Attorney for Amici Curiae*