NO. 25-60550

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT



EMMERICH NEWSPAPERS, INCORPORATED,

*Plaintiff-Petitioner,*

v.

PARTICLE MEDIA, INC., d/b/a Newsbreak,

*Defendant-Respondent.*

—————————————

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF MISSISSIPPI
NO. 3:23-cv-00026-TSL-MTP

**BRIEF OF AMERICAN PHOTOGRAPHIC ARTISTS, NATIONAL PRESS PHOTOGRAPHER'S ASSOCIATION, AND SEVEN OTHER ORGANIZATIONS AS *AMICI CURAE* IN SUPPORT OF PETITIONER**

**Stephen M. Doniger**
Doniger Burroughs PC
603 Rose Avenue
Venice, CA 90291
Tel: (310) 590-1820
stephen@donigerlawfirm.com
*Counsel for American Photographic Artists*

**Thomas Maddrey**
4 Embarcadero Center, Suite 1400
San Francisco, California 94111
Tel: (214) 701-1875
maddrey@asmp.org
*Counsel for Amicus Curiae*

**Mickey H. Osterreicher**
*General Counsel*
**Alicia Wagner Calzada**
*Deputy General Counsel*
*National Press Photographers Association*
120 Hooper St.
Athens, GA 30602
(716) 983-7800
lawyer@nppa.org
advocacy@nppa.org
*Counsel for National Press Photographers Association.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1, AMERICAN PHOTOGRAPHIC ARTISTS, NATIONAL PRESS PHOTOGRAPHER'S ASSOCIATION, AMERICAN SOCIETY OF MEDIA PHOTOGRAPHERS, PROFESSIONAL PHOTOGRAPHERS OF AMERICA, and THE GRAPHIC ARTIST GUILD state that each are non-profit 501(c)(4) organizations and do not have a parent corporation and that no publicly held corporation owns 10% or more of any stock.

Pursuant to Fed. R. App. 26.1, THE AMERICAN SOCIETY FOR COLLECTIVE RIGHTS LICENSING, INC. state that it is a non-for-profit corporation and does not have a parent corporation and no publicly held corporation owns 10% or more of any stock.

Pursuant to Fed. R. App. 26.1, THE DIGITAL MEDIA LICENSING ASSOCIATION state that it is a non-profit 501(c)(6) organization and does not have a parent corporation and that no publicly held corporation owns 10% or more of any stock.

Date: December 22, 2025

/s/ *Stephen M. Doniger*
Stephen M. Doniger, Esq.
**DONIGER / BURROUGHS PC**
Counsel for American Photographic Artists
603 Rose Avenue
Venice, California 90291
Telephone: 310-590-1820
stephen@donigerlawfirm.com
*COUNSEL FOR AMICUS CURIAE*

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT...........................................................1

INTEREST OF AMICI CURIAE……………………………………………………6

INTRODUCTION………………………………………………………………...10

I.   PETITIONER'S EVIDENCE WAS SUFFICIENT FOR A PRIMA

FACIE CASE OF INFRINGEMENT OF THE DISPLAY RIGHT………….14

    A. Unauthorized "framing" can violate a copyright holder's

       display right…………………………………………………………....14

    B.  The server test undermines the goals of the Copyright Act………...19

    C. Whether an unauthorized display results from copying or

       framing may help determine fair use, but Particle did not

       argue fair use…………………………………………………….......23

II.    CONCLUSION…………………………………………………………....25

CERTIFICATE OF SERVICE………………………………………………...27

CERTIFICATE OF COMPLIANCE…………………………………….....28

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*American Broadcasting Cos. v. Aereo, Inc.*,

   134 S. Ct. 2498 (2014).............................................................. 13, 17, 18

*Arista Records, LLC v. Doe 3*,

   604 F.3d 110 (2d Cir. 2010) ................................................. 10

*Flava Works, Inc. v. Gunter*,

   2011 WL 3876910 (N.D. Ill. 2011) ....................................... 16

*Goldman v. Breitbart News Network, LLC*,

   302 F. Supp. 3d 585 (S.D.N.Y. 2018) ............................. 16, 17

*Great Bowery v. Best Little Sites*,

   2024 WL 3416038 (D. Utah July 15, 2024) .......................... 16

*Leader's Inst., LLC v. Jackson*,

   2017 WL 5629514 (N.D. Tex. Nov. 22, 2017)...................... 16

*Level 12 Productions, LLC v Mediate, LLC*,

   2025 WL 3523115 (S.D.N.Y. December 9, 2025) ................. 15

*McGucken v. Newsweek LLC*,

   2022 WL 836786 (S.D.N.Y. Mar. 21, 2022)......................... 16

*New York Times Co. v. Tasini*,

   533 U.S. 483 (2001).............................................................. 17

*Nicklen v. Sinclair Broadcast Grp., Inc.*,

   551 F. Supp. 3d 188 (S.D.N.Y. 2021) ................................................................. 16

*Perfect 10, Inc. v. Amazon.com, Inc.*,

   508 F.3d 1146 (9th Cir. 2007) ................................................. 10, 13, 15, 18, 20, 24

*Prepared Food Photos Inc. v. Chicken Joes, LLC*,

   2024 WL 382529 (S.D.N.Y. Feb. 1, 2024) ........................................................... 16

*Sanchez v. Hacienda Recs. & Recording Studio, Inc.*,

   42 F. Supp. 3d 845 (S.D. Tex. 2014) .................................................................. 11

*Urbanimage Media LTD. v. IHeartMedia, Inc.*,

   793 F. Supp. 3d 852 (W.D. Tex. 2025) ............................................................... 16

*VHT, Inc. v. Zillow Grp., Inc.*,

   918 F.3d 723 (9th Cir. 2019) ............................................................................. 25


**Statutes**

17 U.S.C. § 101 ....................................................................................... 14, 17

17 U.S.C. § 106 ........................................................................................... 10

17 U.S.C. § 106(4) ......................................................................................... 17

17 U.S.C. § 106(5) ..................................................................................... 14, 17

17 U.S.C. § 107(1) ......................................................................................... 24

17 U.S.C. § 108 ........................................................................................... 23

**Rules**

Fed. R. App. P. 26.1 .................................................................................. 1

Fed. R. App. P. 29(a)(4)(E) ....................................................................... 6

Fed. R. App. P. 29(a)(5) ........................................................................... 28

Fed. R. App. P. 32(a)(5) ........................................................................... 28

Fed. R. App. P. 32(a)(6) ........................................................................... 28

Fed. R. App. P. 32(a)(7)(B) ...................................................................... 28

Fed. R. App. P. 32(f) ................................................................................ 28

**Other Authorities**

H.R. Rep. No. 94-1476, 94th Cong., 2d sess. (1976) ............................. 11



## INTEREST OF *AMICI CURIAE*[1]

American Photographic Artists ("APA") is a leading nonprofit organization run by, and for, professional photographers since 1981. Recognized for its broad industry reach, APA works to champion the rights of photographers and image-makers worldwide.

The American Society of Media Photographers ("ASMP") is a 501(c)(6) not-for-profit trade association, established in 1944 to protect and promote the interests of professional photographers who earn their living by making photographs intended for publication, licensing fees and other compensation derived from the bundle of rights arising under the Copyright Act. With more than 5,600 members nationwide working in every genre of commercial photography, ASMP is a leading trade organization representing professional photographers' interests.

Graphic Artists Guild, Inc. (GAG) has advocated on behalf of illustrators, graphic designers, and other graphic artists for fifty years. The Guild educates graphic artists on best practices through webinars, Guild e-news, resource articles, and meetups. The *Graphic Artists Guild Handbook: Pricing & Ethical Guidelines*

---

[1] Pursuant to Fed. R. App. P. 29(a)(4)(E), no counsel for a party authored this brief in whole or in part, no party or party's counsel contributed money that was intended to fund preparing or submitting this brief, and no person other than amici, their members, or counsel contributed money intended to fund preparation or submission of this brief.

raises industry standards and provides graphic artists and their clients guidance on best practices and pricing standards.

The National Press Photographers Association ("NPPA") is a 501(c)(6) non-profit organization dedicated to the advancement of visual journalism in the creation, editing and distribution of copyrighted works. NPPA's members include television and still photographers, editors, students, and representatives of businesses that serve the visual journalism industry. Since its founding in 1946, NPPA has vigorously promoted and defended the rights of photographers and journalists, including intellectual property rights and freedom of the press in all its forms, especially as it relates to visual journalism.

Professional Photographers of America (PPA), the world's largest photographic trade association, represents over 33,000 photographers and photographic artists from dozens of specialty areas including portrait, wedding, commercial, advertising, and art. The professional photographers represented by the PPA have been the primary caretakers of world events and family histories for the last 150 years and have shared their creative works with the public secure in the knowledge that their rights in those works would be protected.

The American Society for Collective Rights Licensing, Inc., (ASCRL) is the largest visual materials trade association in the United States. ASCRL distributes millions of dollars in collective rights remuneration each year to tens of thousands

of photographers, illustrators, and fine artists. ASCRL is a zealous defender of the primary rights of its constituents and is a leading proponent of collective licensing systems domestically and around the globe as an alternative means of advancing and expanding the marketplace for visual material authors.

The Digital Media Licensing Association ("DMLA") is a not for profit 501(c)(6) trade association that represents digital media businesses engaged in the licensing and distribution of still and motion imagery. Founded in 1951, DMLA's membership includes image and video libraries, agencies, technology providers, and other organizations serving editorial and commercial markets worldwide. DMLA's members collectively represent thousands of individual creators and license millions of copyrighted images, illustrations, film clips, and other digital media assets each year on their behalf. Members range from large general libraries to smaller specialty organizations, all of which support and provide livelihoods to visual artists and content creators. Over the years, DMLA has developed licensing standards, promoted ethical business practices, and actively advocated for copyright protection, transparency, and responsible innovation as technology and market dynamics continue to evolve. In addition, DMLA educates and informs its members on issues including technology, legal and policy developments, and changes in the digital media licensing marketplace.

Each of these entities represent copyrights-holding content creators whose

works appear displayed to websites such as Particle's. The livelihoods of many of those members depend on the full protections of U.S. Copyright law, including a copyright holders' exclusive "display right," and each *amici* has a compelling interest in ensuring the equitable and correct application of U.S. copyright law to the Internet with a uniform and consistent approach across all federal Circuits.

*Amici* submit this brief to aid the Court's understanding as to why this case carries significant implications for their members. If the Fifth Circuit does not overturn the district court's dismissal of Petitioner's infringement claims as to Particle's 748 frame-viewed articles based on the Ninth Circuit's "server test," a copyright holder's right to relief will be largely based on geographic location, and small business copyright holders in Louisiana, Texas and Mississippi will be at a distinct disadvantage compared to their counterparts in most other states. It would allow another form of unchecked immunity against copyright infringement and permit the rights-grab of potentially millions of copyrighted photos, illustrations, animations, and other works of visual art, thus depriving holders of economic rights flowing from the display right under the Copyright Act.



## INTRODUCTION

The Copyright Act does not just protect copyright owners against the making of illicit copies. Rather, 17 U.S.C. § 106 imbues a copyright owner with a bundle of rights including "the exclusive right[s] to—or to license others to—reproduce, perform publicly, display publicly, prepare derivative works of, and distribute copies of, his copyrighted work." These rights are discrete and "[t]he word 'copying' is shorthand for the infringing of any of the copyright owner's five exclusive rights described in section 106" of the Copyright Act. *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 117 (2d Cir. 2010) (cleaned up). Thus, one can violate the right to prepare derivative works without making an actual copy of the protected work, violate the distribution right by selling or disseminating illicit copies despite not having made those copies, violate the right to make reproductions without violating the public displaying right, and so on.

Yet under the widely panned "server test"—the Ninth Circuit's nearly two decade-old declaration that "where the image remains on third-party's server and is not fixed in the memory of the infringer's computer . . . embedding is not display"[2]—one apparently cannot violate the display right without first also

---

[2] *Perfect 10, Inc. v. Amazon.com, Inc.,* 508 F.3d 1146, 1159 (9th Cir. 2007).

violating the copyright holder's reproduction right. The "server test" makes no sense logically and is at odds with both the plain language of the Act and Supreme Court precedent interpreting it. Equally troubling, it has become an affront to the principle that enforcement and protection of copyright be applied uniformly across the country.[3] It has been nearly uniformly rejected by courts outside the Ninth Circuit, including by two district courts in this Circuit, such that the ability to protect a copyright from unauthorized display accomplished through embedding now depends on where the case is brought.

In this case, the district court bucked the near universal trend outside the Ninth Circuit of rejecting the server test, instead granting impunity to Particle for the unauthorized aggregation and display of 748 articles that its NewsBreak service "framed" through embedding. That finding critically undermines the Act's goals to (1) compensate copyright owners for losses suffered from infringements while (2) deterring and preventing third-parties from unfairly benefitting from those infringements. H.R. Rep. No. 94-1476, at 161 (1976).

News organizations regularly license the work their journalists create including articles, photographs and illustrations, and there is an active market for this work. As applied in this case, the server test all but destroys the licensing

---

[3] *See Sanchez v. Hacienda Recs. & Recording Studio, Inc.*, 42 F. Supp. 3d 845, 853 (S.D. Tex. 2014) ("Congressional intent to have national uniformity in copyright laws is clear.") (citation omitted).

market for copyright protected works that can be "framed" by potential licensees. It thus frustrates the ability of rightsholders to secure compensation for unauthorized displays of their work, permits infringers to unfairly benefit from such unauthorized uses, and disincentivizes the creation of new authorship—why undertake the effort to create what can be found online and embedded without permission or compensation? Like other creators of copyrighted works, a news organization that pays to create articles and photographs cannot survive if competitors are allowed adopt a business model to steal those works and use them at no cost. The Supreme Court recognized this in this historic case of *Int'l News Serv. v. AP*, 248 U.S. 215, 248, 39 S. Ct. 68, 75 (1918)[4]

The implications of this case are of critical importance. The Act was specifically designed to protect the creative efforts of media companies, web designers, and other content creators from the unfair unauthorized exploitation of the fruits of their labor. And both content creators and users need to know whether

---

[4] *See also NBA v. Motorola, Inc.*, 105 F.3d 841, 853 (2d Cir. 1997) (citing *INS v. AP* and explaining the "hot news" misappropriation doctrine that "If services like AP were not assured of property rights in the news they pay to collect, they would cease to collect it. The ability of their competitors to appropriate their product at only nominal cost and thereby to disseminate a competing product at a lower price would destroy the incentive to collect news in the first place. The newspaper-reading public would suffer because no one would have an incentive to collect 'hot news'.").

and when copyright holder authorization is necessary to display copyright protected works through framing.

Ultimately, the server test is fundamentally flawed. A stand-alone *per se* rule that framing is not "display" and can never violate the display rights of copyright owners does not square with current jurisprudence and the Copyright Act. Whether an alleged infringer displays a copyrighted work by making a copy or by framing should not determine the viability of a display right allegation. As the Supreme Court reasoned in *American Broadcasting Cos. v. Aereo, Inc*., 134 S. Ct. 2498, 2507 (2014): "We do not see how this single difference, invisible to subscriber and broadcaster alike, could transform" an actionable infringing use to one over which a copyright owner has no control.

*Amici* recognize that server test considerations may be part of a proper fair use analysis and submit that so long as the fair use doctrine is properly applied, the server test is not necessary as a stand-alone test to protect uses such as search engines. Indeed, even the Ninth Circuit implicitly recognized this in *Perfect 10* in "conclud[ing] that Google's use of Perfect 10's thumbnails is a fair use." *Perfect 10, Inc. v. Amazon.com, Inc.,* 508 F.3d 1146, 1168 (9th Cir. 2007).

Amici respectfully request that this Court find the "server test" to be unsound, clarify that the Act affords no *de jure* license for third parties to embed copyrighted

works they would otherwise be required to license from the rightsholder, and reverse the district court.

## I. PETITIONER'S EVIDENCE WAS SUFFICIENT FOR A PRIMA FACIE CASE OF INFRINGEMENT OF THE DISPLAY RIGHT

### A. Unauthorized "framing" can violate a copyright holder's display right

The server test is a judicially-created concept invented by the Ninth Circuit. It does not exist or find support in the plain language of the Copyright Act. Rather, Section 106 of the Copyright Act (the "Act") grants copyright holders the exclusive public display right for their original works that fall within the subject matter of copyright, which includes literary works. 17 U.S.C. § 106(5) (setting forth the exclusive right to "display the copyrighted work publicly") And one displays a work when he or she "show[s] a copy of it, either directly or by means of … any … device or process." 17 U.S.C. § 101. Importantly, there is nothing in the Act requiring that the party "show[ing] a copy" of a work—a.k.a. the infringer—have made or be storing that copy for it to be infringing.

In *Perfect 10, Inc. v. Amazon.com, Inc.* the Ninth Circuit reached a contrary conclusion by drawing a non sequitur out of the Act's definitions of "display" and "copy." Specifically, it reasoned that under Section 101: (1) "[t]o 'display' a work means to show a copy of it either directly or by means of a film, slide, television image, or any other device or process…," and (2) "'Copies' are material objects… in which a work is fixed… and from which the work can be perceived, reproduced,

or otherwise communicated," therefore (3) one cannot directly display / communicate a copy of a work if one "does not have any 'material objects ... in which a work is fixed." 508 F.3d 1146, 1160-1161 (9th Cir. 2007).

But the Ninth circuit fails to convincingly explain why the HTML instructions used to embed do not constitute a "process" through which a "copy" of a work stored on a third-party server is displayed. *Perfect 10* held that "[p]roviding these HTML instructions is not equivalent to showing a copy [because they]… do not themselves cause infringing images to appear on the user's computer screen." In other words, ignoring that the job of HTML embedding instructions is to cause a copy displayed at one URL to be displayed at another URL, the Ninth Circuit concludes that cause of the display is *really* the user's browser interacting with the server hosting the image—even though it only the process created by the offending embedding instruction that causes that interaction.

Seeing the logical flaws underlying the server test, courts outside the Ninth Circuit have nearly uniformly rejected it, recognizing that it erroneously collapses the display right into the reproduction right and destroyed the ability of a copyright holder to control the display of copyright-protected works by potential licensees—or worse, by free-riding competitors such as Particle.[5] This includes multiple courts

---

[5] *See, e.g.*, *Level 12 Productions, LLC v Mediate, LLC,* 2025 WL 3523115 at *3 (S.D.N.Y. December 9, 2025) ("courts in this Circuit have overwhelmingly rejected

in this Circuit.[6]

In recognizing that framing can violate a copyright holder's display right, these courts relied on the language of the Copyright Act and the teachings of the

_____

the Ninth Circuit's server test as 'contrary to the text and legislative history of the Copyright Act.'"); *Great Bowery v. Best Little Sites*, 2024 WL 3416038, at *9–10 (D. Utah July 15, 2024) (conclusion that server test is "unpersuasive" is "compelled by the text of the Copyright Act"); *Prepared Food Photos Inc. v. Chicken Joes, LLC*, 2024 WL 382529, at *1 (S.D.N.Y. Feb. 1, 2024) (rejecting server test); *McGucken v. Newsweek LLC*, 2022 WL 836786, at *5–6 (S.D.N.Y. Mar. 21, 2022) (in declining to apply the server test, explaining that "[t]he Ninth Circuit's approach, under which no display is possible unless the alleged infringer has also stored a copy of the work on the infringer's computer, would seem to make the display right merely a subset of the reproduction right"); *Nicklen v. Sinclair Broadcast Grp., Inc.*, 551 F. Supp. 3d 188, 194–95 (S.D.N.Y. 2021) (rejecting server test as "contrary to the text and legislative history of the Copyright Act"); *Goldman v. Breitbart News Network, LLC*, 302 F. Supp. 3d 585, 595–96 (S.D.N.Y. 2018) ("[T]his Court is skeptical that *Perfect 10* correctly interprets the display right of the Copyright Act[.]"); *Flava Works, Inc. v. Gunter*, 2011 WL 3876910, at *4 (N.D. Ill. 2011) (disagreeing with Ninth Circuit).

[6] *See, e.g.*, *Urbanimage Media LTD. v. IHeartMedia, Inc.*, 793 F. Supp. 3d 852, 863–64 (W.D. Tex. 2025) (rejecting "server test" argument that "the embedded video remains on a third-party's server and is not fixed in IHeartMedia's servers and thus is not a display" as "contrary to the text and legislative history of the Copyright Act": "IHeartMedia published on its website an 'in Memoriam' article that embedded a third-party's YouTube video which caused the Photograph to appear on IHeartMedia's website. A reader interacting with the article would have seen the Photograph even if the reader took no action to retrieve or navigate to the YouTube video. Under the plain meaning of 'display,' IHeartMedia 'showed' the Photograph by embedding it in a way that a user would see the image while reading the article thus infringing on Plaintiff's exclusive right to display the Photograph."); *Leader's Inst., LLC v. Jackson*, 2017 WL 5629514, at *10–11 (N.D. Tex. Nov. 22, 2017) (rejecting server test: "Thus, by framing the defendants' copyrighted works, the plaintiffs impermissibly displayed the works to the public[.]").

Supreme Court of the United States that, to determine whether a work is infringed under the Copyright Act, the offending use should be viewed "as presented to, and perceptible by, [a] user." *New York Times Co. v. Tasini*, 533 U.S. 483, 499 (2001) (citing 17 U.S.C. §§ 101–102). The Copyright Act is not concerned with the "behind-the-scenes way" that content is delivered to the recipient, *Am. Broad. Cos. v. Aereo, Inc.*, 134 S. Ct. 2498, 2507-08 (2014), as such technical considerations are "not adequate to place [the defendant's] activities outside the scope of the act" (*id.* at 2511).[7] *See also id.* at 573 U.S. at 448, 451 (rejecting any distinction between different technological means, reasoning it "means nothing to the subscriber" as the technology was "invisible to subscriber and broadcaster alike" and by which Aereo "perform[ed] the same work"; "show[ed] the same images and ma[de] audible the same sounds"); *Goldman*, 302 F. Supp. 3d at 595 (determining this reasoning in *Aereo* "strongly support[s]" rejecting server test).

The server test is squarely at odds with *Tasini* and *Aero* because it immunizes

---

[7] Although *Aero* addressed the Copyright Act's public performance right, the Act's definitions of "display" and "perform" under the exclusive display and performance rights are nearly identical. *Compare* 17 U.S.C. § 101 (defining "perform" as "to recite, render, play, dance, or act [a work], *either directly or by means of any device or process* ..." (emphasis added)), with *id.* (defining "display" as "to show a copy of [a work], *either directly or by means of ... any ... device or process* ..." (emphasis added)). Further, the enumerated exclusive rights of "display" and "performance" that are protected by the Copyright Act are also nearly identical. *Compare* 17 U.S.C. § 106(5) ("...*to display the copyrighted work publicly*" (emphasis added) with § 106(4) ("...*to perform the copyrighted work publicly*" (emphasis added)).

certain infringers based on *how* they display a copyrighted image on a website:

> • If a website publisher displays an article by "using a computer to fill a computer screen with a copy of the photographic image fixed in the computer's memory", that is infringement. *Perfect 10*, 508 F.3d at 1160.
>
> • If, on the other hand, the same website publisher shows exactly the same article to exactly the same user by "embedding" a link to it—an invisible technological process by which the website's backend HTML code "gives the address of the image to the user's browser" and the browser "interacts with the [third-party] computer that stores the" computer code that represents the image—that is not infringement. *Id*. at 1161.

In other words, the fixation requirement undergirding the server test rests on the nature of the behind-the-scenes background technological process, specifically, on the technicality that an embedded link points a user's web browser to an author's image "fixed" elsewhere (rather than to a file on the operator's own computer server)—a distinction that was rejected as immaterial in *Aereo*.

This case presents this Court with an opportunity to confirm that violation of a copyright holder's reproduction right is not a predicate to violation of its display right and that the "server test" does not create a *de jure* license for free use of any work through embedding. While there may be remaining questions as to whether Particle's 748 frame-viewed articles were infringing, the district court erred in

declining to address those questions based solely on the application of the fundamentally flawed server test.

## B. The server test undermines the goals of the Copyright Act

Professional creative work–whether literary, photography, videography, musical composition, illustrations, and other creative endeavors–does not happen without investment, time, training, experience, skill and talent. The protections afforded by the Copyright Act are meant to promote such investment as a means of ensuring a constant flow of new creative authorship to enrich everyone. But the server test hobbles those protections and threatens that flow.

Copyright industries collectively contribute trillions of dollars in value to the U.S. gross domestic product ("GDP").[8] According to an annual report prepared for the International Intellectual Property Alliance in 2024, the value added by copyright industries to the U.S. economy has increased steadily in recent years and, in 2023, accounted for about 12.3% of the U.S. GDP.[9] These copyright industries together

---

[8] *Copyright Industries in the U.S. Economy: The 2024 Report*, by Jéssica Dutra and Robert Stoner of Secretariat, prepared for the International Intellectual Property Alliance (IIPA), (December 2024), at 4, https://www.iipa.org/files/uploads/2025/02/IIPA-Copyright-Industries-in-the-U.S.-Economy-Report-2024_ONLINE_FINAL.pdf .

[9] Stoner & Dutra, Copyright Industries in the U.S. Economy: The 2020 Report at 1, 6.

employ approximately 21 million people—nearly 10% o total U.S. employment.[10] The creative economy contributed $3.3 trillion to the U.S. economy in 2023.[11]

And with respect to the flow of information, the Copyright Office has recognized that "[a] majority of Americans now get their news from digital devices, and a majority of those who do say their primary source is not a newspaper's website, but a search index, a social media feed, or a specialized service that aggregates news from other sources. Digital distribution enables these 'news aggregators' to provide links to and snippets of others' published reporting at low cost and with a wide reach." *Copyright Protections for Press Publishers*, U.S. Copyright Office, (June 30, 2022); *see also* Elisa Shearer, *More Than Eight-in-Ten Americans Get News From Digital Devices*, PEW RSCH. CTR. (Jan. 12, 2021), https://www.pewresearch.org/fact-tank/2021/01/12/more-than-eight-in-ten-americans-get-news-fromdigital-devices/.[12]

What this means, practically, is that the creators and creatives behind our news

---

[10] *Id.* at 12.

[11] *Id*.

[12] This is an entirely different world from 2006, when the Ninth Circuit felt the need to define "Internet" in *Perfect 10*. *See* 508 F.3d at 1155 ("Google's computers, along with millions of others, are connected to networks known collectively as the 'Internet.' 'The Internet is a world-wide network of networks . . . all sharing a common communications technology.'").

sources and our economy—such as Petitioner Emmerich Newspapers and *amici*'s tens of thousands of creative professional members—*must* utilize online platforms (where their work is subject to embedding) to successfully promote themselves and generate income. Without the ability to control and profit from the display of their proprietary content, they simply cannot survive with the result that we have a beleaguered news industry with fewer employed journalists and photographers and growing "news deserts" creating a crisis in rural areas.[13]

This is a profound problem for small businesses and individuals, including many of *amici*'s creative professional members who rely on news and media companies to earn their livelihood. As the server test allows open season on original content that can be copied through embedding, media companies are limited in their ability to monetize their content and resultantly limited in their ability to fund further journalism, including photojournalism. And as those media companies fold, the market for professional journalists shrinks and becomes less competitive despite

---

[13] See, e.g., "Newspapers closing, news deserts growing for beleaguered news industry" David Bauder, October 20, 2025 (Associated Press), https://apnews.com/article/newspapers-closing-media-industry-report-traffic-b0a3a14510ffe104da836d46432c2678 (reporting on the Northwestern University Medill State of Local News report (https://localnewsinitiative.northwestern.edu/projects/state-of-local-news/) findings that: "Since 2005, the numbers of newspapers published in the United States has dropped from 7,325 in 2005 to 4,490 now… [and an] estimated 365,460 people worked at newspapers in 2005, and now that number is down to 91,550."

there being ever more news and content to cover.

If small and independent creators cannot make a reasonable living off their work, they will undoubtedly have to find other means to earn a living—which is precisely the risk posed by the server test in the electronic age. Simply put, there is little to no licensing value for online uses of works that can be accessed and used by competitors through framing technology under the server test. Any website could freely frame a copyrighted work for use within their website content without seeking permission from, and never compensating, the copyright holder.

Digital infringement is just as harmful as standing outside the neighborhood Redbox and giving away pirated copies of a movie for free. By the same token, the unauthorized display of a copyright holder's work is just as harmful when it occurs through framing as it is when it occurs through making and showing a new copy. Indeed, the freedom from the liability of an infringement suit would be an incentive to engage in infringing behavior.

Additionally, an application of the server test that permits "framers" to avoid licensing fees that are paid by their competitors is fundamentally unfair to the companies that properly pay for the content they use, and the uncertainty created by the different application of laws in different jurisdictions has likely resulted in many media companies spending far more in attorneys' fees than it would have cost to simply obtain a license.

The server test must be rejected to ensure the existence of a properly functioning licensing market. Yet the district court's ruling in this case sent a loud, clear, and unacceptable message that unauthorized "framers" can deprive copyright holders of their rights to control the display of their works and obtain licensing fees for those uses in the Southern District of Mississippi—despite the ability of those copyright holders to pursue the very same claims anywhere else in the country save the Ninth Circuit. The district court's summary judgment ruling based on its endorsement of the server test should be reversed.

### C. Whether an unauthorized display results from copying or framing may help determine fair use, but Particle did not argue fair use

To the extent the server test has been justified by countervailing policy considerations, those justifications fail to create compelling support for the test. Server test proponents have argued that it is critical to ensure that the internet remains a free and open source for sharing content, and that a parade of horribles will come to pass if websites cannot embed third-party content without fear of impunity. But over the past 15+ years in which courts outside of the Ninth Circuits have nearly uniformly rejected the server test, no such parade has been seen. And there are other tools to adequately protect otherwise "unauthorized" copyright uses that are socially beneficial, such that the server test is unnecessary.

To be sure, rejecting the server test will not imperil search engines, which may be protected under 17 U.S.C. § 108 (protecting ability of libraries and archives to

use copyright materials in specific ways without permission from the copyright holder). Protecting search engines is certainly an admirable goal, although one that almost certainly could be accomplished through the fair use doctrine or other principles. And in the context of a fair use analysis it makes sense to consider whether an unauthorized use of a work is copied or framed as part of a proper balancing of the fair use factors.

Indeed, after declaring that Google did not "display" the infringing full-sized images that it in-line linked because it did not store a copy of those images, *Perfect 10* went on to consider whether the thumbnail images of that infringing content that Google did store were infringing. 508 F.3d 1146, 1163. After weighing the fair use factors in light of the purpose of copyright, it "conclude[d] that Google's use of Perfect 10's thumbnails is a fair use." Id. at 1168.  Because a framed display relates back to an "original" post, the poster of the "original" ultimately has the ability to change or remove the work and the unauthorized display does not truly live its own life, which may significantly impact the determination of at least the third enumerated fair use factor under 17 U.S.C. § 107(1) (the amount and substantiality of the portion used). And the nature of the framing will affect the first factor (the purpose and character of the use)—depending on whether the user made intentional use of the work that is similar in purpose to the original use, and discerning choices of what to frame or, like a bona fide search engine, employed an automated process

that broadly framed and catalogued content akin to a library or catalog. Conversely, the fourth factor (effect on the market)—sometimes called the most important factor—demonstrates a major problem with the server test discussed above, i.e., that when a publisher uses framing in lieu of licensing, such as in the numerous cases that have rejected the server test, the server test wreaks heavy damage on the licensing market for uses that would never otherwise be deemed "fair." *See supra*, Section II.B(2).

By considering whether an unauthorized display results from copying or framing, fair use analysis will—as it should—parallel volitional conduct analysis, which separates automated and algorithm-based technological services that are truly transformative from infringing uses that "simply supersedes [the copyright holder's] purpose in creating the images in the first place[.]" *VHT, Inc. v. Zillow Grp., Inc.*, 918 F.3d 723, 743 (9th Cir. 2019).

Here, Particle did not argue fair use at summary judgment and *amici* see no viable argument that its use was fair. Nevertheless, amici believe that fair use considerations further clarify why the server test is unnecessary and its rejection will not genuinely threaten a functional and fair internet.

❈

## CONCLUSION

*Amici* take no position regarding whether Particle should ultimately be liable

to Petitioner, but respectfully submit that the district court's blanket insulation of Particle's 748 frame-viewed articles was error that should be reversed with instructions that unauthorized framing can serve as a basis for direct liability.

Date: December 22, 2025

/s/ *Stephen M. Doniger*
Stephen M. Doniger, Esq.
**DONIGER / BURROUGHS PC**
Counsel for American Photographic Artists
603 Rose Avenue
Venice, California 90291
Telephone: 310-590-1820
stephen@donigerlawfirm.com
*SUBMITTED ON BEHALF OF AMICUS CURIAE*

Alicia Wagner Calzada
Deputy General Counsel
**National Press Photographers Association**
Alicia Wagner Calzada, PLLC
Texas State Bar No. 24076296
926 Chulie Dr. suite 16
San Antonio, TX 78216
Tel: (210) 825-1449
Alicia@calzadalegal.com

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing AMICUS CURIAE BRIEF with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using appellate CM/ECF system on the undersigned date. All parties are represented by registered CM/ECF users and will be served by the appellate CM/ECF system.

Date: December 22, 2025

/s/ *Stephen M. Doniger*
Stephen M. Doniger, Esq.
**DONIGER / BURROUGHS PC**
Counsel for American Photographic Artists
603 Rose Avenue
Venice, California 90291
Telephone: 310-590-1820
stephen@donigerlawfirm.com
*FOR AMICUS CURIAE*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitations of Fed. R. App. P. 29(a)(5) and Fed. R. App. P. 32(a)(7)(B) and because this brief contains 4,940 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), as counted by the word processing software used to prepare this brief.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365, Times New Roman font, 14 point.

Date: December 22, 2025

/s/ *Stephen M. Doniger*
Stephen M. Doniger, Esq.
**DONIGER / BURROUGHS PC**
Counsel for American Photographic Artists
603 Rose Avenue
Venice, California 90291
Telephone: 310-590-1820
stephen@donigerlawfirm.com
*FOR AMICUS CURIAE*