# United States Court of Appeals for the Fifth Circuit

### No. 25-60550

EMMERICH NEWSPAPERS, INCORPORATED,
PLAINTIFF - APPELLANT

V.

PARTICLE MEDIA, INCORPORATED, DOING BUSINESS AS NEWSBREAK,
DEFENDANT - APPELLEE

On Appeal from the United States District Court
for the Southern District of Mississippi

## BRIEF OF APPELLEE PARTICLE MEDIA, INCORPORATED, DOING BUSINESS AS NEWSBREAK

Stephen J. Carmody, MSB #8345
Karen E. Howell, MSB #102243
BRUNINI, GRANTHAM,
GROWER & HEWES, PLLC
Post Office Drawer 119
Jackson, Mississippi 39205
Telephone: (601) 948-3101
Facsimile: (601) 960-6902
Email:   scarmody@brunini.com
         khowell@brunini.com

*Counsel for Appellee Particle Media, Inc.*

February 23, 2026

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made so the judges of this court may evaluate possible disqualification or recusal.

**APPELLEE**

Appellee is Particle Media, Inc., d/b/a Newsbreak.

**ATTORNEYS FOR APPELLEE:**

Stephen J. Carmody, MSB #8345
Karen E. Howell, MSB #102243
BRUNINI, GRANTHAM, GROWER
& HEWES, PLLC
Post Office Drawer 119
Jackson, Mississippi 39205
Telephone: (601) 948-3101
Facsimile: (601) 960-6902
Email:      scarmody@brunini.com
            khowell@brunini.com

**APPELLANT:**

Appellant is Emmerich Newspapers, Inc.

**ATTORNEYS FOR APPELLANT:**

Wilson H. Carroll
WILSON CARROLL, PLLC
2506 Cherry Street
Vicksburg, Mississippi 39180
Tel: 601-953-6579
wilsoncarroll59@gmail.com

Michael B. Wallace
Charles E. Cowan
WISE CARTER CHILD &
CARRAWAY, P.A.
401 E Capitol St.
Jackson, Mississippi 39201

Tel: 601-968-5500
Email: mbw@wisecarter.com

Don W. Barrett
BARRETT LAW GROUP, P.A.
404 Court Square North
Lexington, Mississippi 39095
Tel: 662-834-9168
Email: donbarrettpa@gmail.com

Christian E. Hudson
CUNEO GILBERT & LADUCA,
LLP
222 Livingston Street
Second Floor
Brooklyn, New York 11201
Tel: 202-789-3960
Email: christian@cuneolaw.com


s/ *Stephen J. Carmody*

Stephen J. Carmody

*Counsel for Appellee Particle
Media, Inc.*

# STATEMENT REGARDING ORAL ARGUMENT

This appeal presents straightforward questions of statutory interpretation. Nevertheless, because Appellant Emmerich Newspapers, Inc. ("Emmerich") advances arguments that exceed this Court's jurisdiction and mischaracterizes how the NewsBreak website and applications work in important respects, Appellee Particle Media, Inc. ("Particle") agrees that oral argument may assist the Court.

**TABLE OF CONTENTS**

Page

CERTIFICATE OF INTERESTED PERSONS .....................................i

STATEMENT REGARDING ORAL ARGUMENT ...........................iii

TABLE OF CONTENTS..................................................................iv

TABLE OF AUTHORITIES ............................................................vi

INTRODUCTION ........................................................................ 1

STATEMENT OF JURISDICTION ...................................................5

STATEMENT OF ISSUES ...............................................................6

STATEMENT OF THE CASE AND FACTS........................................6

      A.     Copyright Law's Display and CMI Rights .........................6

      B.     The NewsBreak Website and App...................................12

      C.     Proceedings Below ..........................................................17

SUMMARY OF ARGUMENT ..........................................................20

STANDARD OF REVIEW ...............................................................25

ARGUMENT ................................................................................26

I.     Emmerich's Direct Infringement Claims Are Meritless...........26

      A.    The district court was correct to apply the server test. ....26

      B.    Even without the server test, Particle should prevail. .....35

      C.    Emmerich's counterarguments fail.................................38

II.    Emmerich's CMI Claims Are Also Meritless. ...........................48

    A.      URLs are not CMI. ...........................................................48

    B.      Even if URLs were CMI, failure to display them would not violate §1202(b)................................................54

    C.      Emmerich's counterarguments again fail........................56

CONCLUSION...............................................................................65

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases**

*ABC, Inc. v. Aereo, Inc.*,
  573 U.S. 431 (2014)………………………………………………....passim

*Art of Design, Inc. v. Pontoon Boat, LLC*,
  2017 WL 3608219 (N.D. Ind. Aug. 22, 2017)………………….…………62

*Bell v. Wilmott Storage Servs., LLC*,
  12 F.4th 1065 (9th Cir. 2021)………………………………………………..31

*BWP Media USA, Inc. v. T & S Software Assocs., Inc.*,
  852 F.3d 436 (5th Cir. 2017)…………………………………….....26, 32

*Columbia Pictures Indus., Inc. v. Pro. Real Est. Invs., Inc.*,
  866 F.2d 278 (9th Cir. 1989)………………………………….……..28

*Dow Jones & Co., Inc. v. Harris*,
  749 F. Supp. 3d 776 (W.D. Tex. 2024)………………………………55

*Energy Intel. Grp., Inc. v. Kayne Anderson Cap. Advisors, LP*,
  948 F.3d. 261 (5th Cir. 2020)…………………….………….……passim

*Falkner v. Gen. Motors LLC*,
  393 F. Supp. 3d 927 (C.D. Cal. 2018)…………………………….……55

*Fashion Nova, LLC v. Blush Mark, Inc.*,
  2023 WL 4307646 (C.D. Cal. June 30, 2023)………………….…………62

*Fischer v. Forrest*,
  286 F. Supp. 3d 590 (S.D.N.Y. 2018), *aff'd*,
  968 F.3d 216 (2d Cir. 2020)……………………………………………11

vi

*Fischer v. Forrest,*
  968 F.3d 216 (2d Cir. 2020)........................................................52, 53

*Fisher v. Halliburton,*
  667 F.3d 602 (5th Cir. 2012)..........................................................56

*Flava Works, Inc. v. Gunter,*
  689 F.3d 754 (7th Cir. 2012)..................................................9, 10, 32

*Food Mktg. Inst. v. Argus Leader Media,*
  588 U.S. 427 (2019)..................................................................41, 42

*FurnitureDealer.Net, Inc v. Amazon.com, Inc.,*
  2022 WL 891473 (D. Minn. Mar. 25, 2022)...................................52

*Goldman v. Breitbart News Network, LLC,*
  302 F. Supp. 3d 585 (S.D.N.Y. 2018).....................................passim

*Hunley v. Instagram, LLC,*
  73 F.4th 1060 (9th Cir. 2023).................................................passim

*IMAPizza, LLC v. At Pizza Ltd.,*
  965 F.3d 871 (D.C. Cir. 2020)........................................................33

*In re Ultra Petroleum Corp.,*
  943 F.3d 758 (5th Cir. 2019)..........................................................33

*Johnson v. Chesapeake La., LP,*
  87 F.4th 305 (5th Cir. 2023)..........................................................26

*Leader's Institute, LLC v. Jackson,*
  2017 WL 5629514 (N.D. Tex. Nov. 22, 2017).............................36, 37

*Lewis Galoob Toys, Inc. v. Nintendo of Am., Inc.*,
  964 F.2d 965 (9th Cir. 1992)........................................................41

*Live Face on Web, LLC v. Biblio Holdings LLC*,
  2016 WL 4766344 (S.D.N.Y. Sept. 13, 2016)............................35

*McGucken v. Valnet, Inc.*,
  2024 WL 5166624 (9th Cir. Dec. 19, 2024),
  *cert. denied*, 145 S.Ct. 1965 (2025)........................................31

*McRorey v. Garland*,
  99 F.4th 831 (5th Cir. 2024).......................................................53

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
  545 U.S. 913 (2005).............................................................10, 48

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,
  545 U.S. 967 (2005)..............................................................7, 8

*Nguyen v. Am. Com. Lines LLC*,
  805 F.3d 134 (5th Cir. 2015)........................................................6

*Nicklen v. Sinclair Broad. Grp., Inc.*,
  551 F. Supp. 3d 188 (S.D.N.Y. 2021)........................................36

*Niz-Chavez v. Garland*,
  593 U.S. 155 (2021)....................................................................46

*Pearson Educ., Inc. v. Ishayev*,
  963 F. Supp. 2d 239 (S.D.N.Y. 2013)........................................35

*Perfect 10, Inc. v. Amazon.com, Inc.*,
  508 F.3d 1146 (9th Cir. 2007)...............................................passim

viii

*Pers. Keepsakes, Inc. v. Personalizationmall.com, Inc.*,
  2012 WL 414803 (N.D. Ill. Feb. 8, 2012).........................51, 52, 64, 65

*Silverthorne Seismic, LLC v. Sterling Seismic Servs., Ltd.*,
  125 F.4th 593 (5th Cir. 2025)..........................................25, 56, 58, 59

*Sirius Sols., LLLP v. Comm'r of Internal Revenue*,
  165 F.4th 374 (5th Cir. 2026)........................................................41

*Society of Holy Transfiguration Monastery, Inc. v. Gregory*,
  689 F.3d 29 (1st Cir. 2012)...............................................9, 10, 32

*Sony Corp. of Am. v. Univ. City Studios, Inc.*,
  464 U.S. 417 (1984).........................................................6, 27, 34

*Texas v. Bondi*,
  149 F.4th 529 (5th Cir. 2025)......................................................53

*Tomelleri v. Zazzle, Inc.*,
  2015 WL 8375083 (D. Kan. Dec. 9, 2015)...........................58, 64, 65

*UMG Recordings, Inc. v. Grande Commc'ns Networks, LLC*,
  118 F.4th 697 (5th Cir. 2024)......................................................32

*United States v. Golestan*,
  151 F.4th 634 (4th Cir. 2025)........................................................8

*Urbanimage Media Ltd., v. IHeartMedia, Inc.*,
  793 F. Supp. 3d 852 (W.D. Tex. 2025) .......................................37, 38

*VHT, Inc. v. Zillow Grp., Inc.*,
  918 F.3d 723 (9th Cir. 2019)........................................................31

*Wakefield v. ViSalus, Inc.*,
  51 F.4th 1109 (9th Cir. 2022)........................................................34

*Yates v. United States,*
   574 U.S. 528 (2015)……………………………………………………………41


**Statutes**

U.S. Const. art. I, §8, cl. 8……………………………………………………33, 34

17 U.S.C. §101………………………………………………………………passim

17 U.S.C. §106………………………………………………………………….6

17 U.S.C. §106(1)…………………………………………………………….40

17 U.S.C. §106(5)………………………………………………………passim

17 U.S.C. §504(c)…………………………………………………………….34

17 U.S.C. §1202(b)………………………………………………………..passim

17 U.S.C. §1202(c)………………………………………………………passim

28 U.S.C. §1292(b)……………………………………………………….6, 25

28 U.S.C. §1331…………………………………………………………….5

Fed. R. Civ. P. 56(a)……………………………………………………….26


**Other Authorities**

*Alter,*
   Merriam-Webster.com…………………………………………………...54

*Convey,*
   Merriam-Webster.com……………………………………………………………51

*Domain,*
   Merriam-Webster.com……………………………………………………………57

*Domain Name,*
   Merriam-Webster.com……………………………………………………………57

Google Amicus Br., *Hunley*…………………………………………………...38

H. Comm. on the Judiciary, 105TH Cong.,
   *WIPO Copyright Treaties Implementation and On-Line Copyright Infringement Liability Limitation*, H.R. Rep. No. 105-551 (1998)……..63

H. Comm. on the Judiciary, 94TH Cong.,
   *Copyright Law Revision*, H.R. Rep. No. 94-1476 (1976)………………...42

*Link,*
   Merriam-Webster.com……………………………………………………….63

Michael P. Goodyear,
   *The Server Test Quandary and Embedding Permission Culture*, 75 Okla. L. Rev. 263, 273 (2023)…………………………………………...32, 47

*Overview of HTML,*
   Web.Dev……………………………………………………………………...7

*Remove,*
   Black's Law Dictionary (10th ed. 2014)………………………………………54

*Remove,*
   Merriam-Webster.com……………………………………………………………54

S. Comm. on the Judiciary, 105ᵀᴴ Cong.,
  *The Digital Millennium Copyright Act of 1998*, S. Rep. No. 105-190
  (1998)..............................................................................…..11


**Treatises**

Arnold S. Jacobs,
  5B Disclosure & Remedies Under the Sec. Laws §6:20 (2025).…..……41

William F. Patry,
  5 Patry on Copyright §15:7.……………………….……………….passim

# INTRODUCTION

Websites and Apps as diverse as Apple Maps, Facebook, Google Images, and X use software code that allows a user's device to view content that a publisher publicly displays on its own computer servers. Using software code to help users find content and then allow them to access it from another party's server is a building block of the internet. It happens billions of times daily and no court has ever held it—without more—to constitute copyright infringement.

If the law were as Emmerich posits, every web browser, every App with built-in web-browsing functionality, indeed, every search engine, would infringe and the internet would grind to a screeching halt. But parties who provide directions to content, enabling a *user* to view content *directly from a copyright holder* who publicly displays the content on its own server, do not themselves display the copyright holder's content. That basic but critical distinction is controlling here.

The newspaper industry has been shrinking for decades, while television and the internet have become most Americans' dominant sources of news. In the face of such industry contraction Particle seeks to promote local and national news and information to a new generation of

readers. To do that, Particle has developed a specialized search engine called NewsBreak. NewsBreak helps users find local and national news of interest based on the entry of zip codes and other preferences users provide. Particle has partnered with hundreds of publisher groups (representing thousands of websites) to host their content and share in advertising revenue. NewsBreak's search tools also allow users to directly access content that Particle does not host or transmit—content and articles from other publishers—either through a user's own external web browser (in the case of NewsBreak's website) or industry-standard built-in web browsers that are deployed within NewsBreak's Apps (as they are within hundreds of other Apps). In all of this, NewsBreak plays a passive role, simply helping the user decide what the user want to see. By empowering users to seek out content on publishers' sites, NewsBreak has become one of the top news referral sources in the country.

Whether the user views the publisher's content through a stand-alone web browser or an App's built-in web browser, the user is directed to the publisher's unaltered content from the publisher's server as the publisher has chosen to publicly display it, complete with the publisher's own revenue-generating ads. That content is not hosted on NewsBreak's

servers, routed through NewsBreak's servers by NewsBreak, or displayed by NewsBreak itself.

Nonetheless, Emmerich contends that this conduct—no different from what any other web browser does—violates copyright law. In so doing, Emmerich twists the language of the Copyright Act, arguing that facilitating a "connecti[on]" between a user's computer and a publisher's server, or "caus[ing]" a user to be able to view the content a publisher has chosen to publicly display from its own server, by directing the user to the publisher's public server, is the same as NewsBreak itself "publicly displaying" that content.

Make no mistake, under Emmerich's theory, essentially every browser is unlawful. Directing viewers to content using a browser—the conduct Emmerich challenges—does not publicly display content. Instead, a viewer sees the copyright holder's *own* display of the holder's *own* copy transmitted from the holder's *own* server. *E.g.*, *Hunley v. Instagram, LLC*, 73 F.4th 1060, 1070-71 (9th Cir. 2023). That is why every court of appeals to consider the issue—the First, Seventh, and Ninth Circuits—endorses the "server test" to assess what entity is publicly displaying the content. This Court should do the same.

3

The district court correctly recognized that despite Emmerich's efforts to complicate the issues, the question here is simple: Under the Copyright Act's plain terms, can a party like Particle, who does not host or transmit the alleged copyrighted content, nonetheless directly infringe someone else's public display rights by providing the technological equivalent of a roadmap for a user to find the publisher's own public display? That is the core question, because NewsBreak's browser function merely points to the source website's display of the publisher's own publicly available copy from the publisher's own server.

Even apart from the server test, however, the Court should affirm. Emmerich points to a handful of district court decisions, none of which change the result here. Unlike the defendants in the cases Emmerich cites, NewsBreak is a specialized search engine whose browser takes users to publishers' websites upon the users' request, with those websites clearly identified by domain name. Nor—contrary to Emmerich's insinuation—does NewsBreak cost Emmerich advertising revenue. Like any browser, NewsBreak helps viewers see Emmerich's own display, including any ads Emmerich shows.

No doubt recognizing the weaknesses of its direct infringement

4

theory, Emmerich also argues that its uniform resource locators ("URLs").—*i.e.*, web addresses pointing to Emmerich's websites that browsers sometimes display when the address bar is visible to the user—constitute copyright management information ("CMI") under the Digital Millennium Copyright Act of 1998 ("DMCA"). But Emmerich asks the Court to exceed its jurisdictional bounds. The district court has made a factual determination that these URLs are not CMI. On an interlocutory appeal, this Court *cannot* revisit the district court's factual assessment of the record. Even if the Court could reach this issue, however, no court agrees with Emmerich's CMI theory, which, like its display theory, makes a hash out of statutory law, punishes routine internet conduct, and ignores the *functional* nature of URLs. Emmerich's theory could render legions of ubiquitous URL-shortening techniques DMCA violations. Neither the DMCA's text nor its purpose support finding that URLs are CMI or that not displaying them in an address bar or otherwise is a DMCA violation.

## STATEMENT OF JURISDICTION

The district court granted Particle's motion for partial summary judgment under, *inter alia*, 28 U.S.C. §1331. After that court certified its

order, this Court granted Emmerich leave to file an interlocutory appeal. This Court may review the certified order under 28 U.S.C. §1292(b), but jurisdiction "only extends to controlling questions of law." *Nguyen v. Am. Com. Lines LLC*, 805 F.3d 134, 138 (5th Cir. 2015) (quotation omitted).

## STATEMENT OF ISSUES

1. Whether a defendant's offering of a news search engine App with standard web-browsing functionality, which uses software code to point viewers to publicly available content on a copyright holder's server so that the user may then view that publicly available content on her own device, constitutes public display of the copyrighted material by the defendant.

2. Whether a URL, functioning as a web address for directing internet traffic, can constitute CMI, and if so, whether failing to make the URL visible constitutes "removal" of CMI.

## STATEMENT OF THE CASE AND FACTS

### A.    Copyright Law's Display and CMI Rights

**1.** The Copyright Act of 1976 grants copyright owners limited "monopoly privileges" by giving them six exclusive rights over the use of their works. *Sony Corp. of Am. v. Univ. City Studios, Inc.*, 464 U.S. 417, 429 (1984); 17 U.S.C. §106. As relevant here, §106(5) grants a copyright

owner the exclusive right "to *display* the copyrighted work *publicly*."

To "display" a work is to "to show a *copy* of it, either directly or by means of … a device or process." 17 U.S.C. §101. A copy is a version of a work that is "fixed." *Id.* For a work to be "fixed," it must be "sufficiently permanent" such that it "can be perceived, reproduced, or otherwise communicated." *Id.* For a display to be public, a person must "perform or display it at a place open to the public or at any place where a substantial number of persons … is gathered," or "transmit or otherwise communicate" the work to the public. *Id.*

**2.** Because the internet is increasingly the focus of public expression, copious litigation has arisen about how the Copyright Act applies online. With respect to §106(5)'s display right, courts generally apply the "server" test. *E.g.*, *Hunley*, 73 F.4th at 1070-71.

We start with how computers display websites. "HyperText Markup Language, or HTML, is the standard markup language for describing the structure of documents displayed on the web." *Overview of HTML*, https://web.dev/learn/html/overview. A website uses HTML code to provide instructions to a user's browser, which then interprets that code and renders the website in human-readable form. This allows the user to

7

view content from other servers that the user's computer retrieves using standard web protocols. *See, e.g.*, *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 987 (2005).

A website's code identifies images and other content a user can view by pointing the user's computer to a computer operated by the content provider (called a server) where content is available. *See, e.g.*, *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1161 (9th Cir. 2007). The code points to the content provider's server through standard web protocols, which provide rules for routing and sending data across networks. *See id.*; *Brand X*, 545 U.S. at 987. Those protocols use Internet Protocol ("IP") addresses that are mapped to unique, human-readable addresses used to access websites (*i.e.*, URLs), providing the location of content. *See, e.g.*, *United States v. Golestan*, 151 F.4th 634, 638 (4th Cir. 2025).

Some websites "provide[] HTML instructions that direct a user's browser to a website publisher's computer"—*i.e.*, a server—"that stores" the publisher's content. *Perfect 10*, 508 F.3d at 1161. A website may "frame" content by using HTML code to instruct the user's computer where to find one server's display of that content and another server's display of other content. *Id.* "The process by which the webpage directs a

user's browser to incorporate content from different computers into a single window is referred to as 'in-line linking,'" *i.e.*, embedding, while "'framing' refers to the process by which information from one computer appears to frame and annotate the in-line linked content from another computer." *Id.* (quotation omitted).

Of course, even when content from one server is not "embedded" or "framed" by content from another server, to be readable by a human it must be viewed within a browser, and the browser itself may have visible features—whether in the form of control settings, bookmarks, or even additional advertisements. *E.g.*, ROA.69511. Mobile Apps commonly use in-App browsers, which are browsers inside the App's interface that take a URL as the input and retrieve a web page just as stand-alone browsers like Chrome or Safari do. ROA.71757. The publisher's server directly transmits and communicates the content to users. ROA.71757.

Based on the Copyright Act's text, courts have applied the server test to hold that a defendant's creation of a website, web browser, or App that uses code to direct a user's computer to content publicly displayed by someone else's server is not direct infringement of the copyright

9

holder's display right under §106(5).[1] *E.g.*, *Perfect 10*, 508 F.3d at 1160-61; *Society of Holy Transfiguration Monastery, Inc. v. Gregory*, 689 F.3d 29, 55 (1st Cir. 2012); *Flava Works, Inc. v. Gunter*, 689 F.3d 754, 757-58 (7th Cir. 2012).

The Copyright Act's definitions of "copy" and "display" require that the copy being displayed itself be "'fixed' in a manner that is 'sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration.'" *Perfect 10*, 508 F.3d at 1160 (quoting 17 U.S.C. §101). But content on a *publisher's* website and server is not "fixed" on the *defendant's* server, and thus is not displayed by or from the defendant's server, merely because the defendant's website or App gives the user's computer directions to the website owner's own public display of the work. *E.g.*, *id.* at 1160-61. Instead, the copy is fixed on the *website owner's* server, and even then only to the extent the website owner keeps it displayed there—if the website owner changes the content or removes it, the user would view the

---

[1] Facilitating a user's access to infringing content might conceivably violate the Copyright Act for reasons apart from §106(5). *E.g.*, *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 929-30 (2005). Contributory liability, however, is not at issue here.

changed content or perhaps receive an error message. *Id.* Websites and Apps that provide the user's computer with directions to the website owner's own public display therefore do not infringe on the display right because they do not themselves display the content. *Id.* at 1159.

**3.** Congress enacted the DMCA to reinforce the Copyright Act's protections in response to the "expansion of the speed and capacity of the Internet." S. Rep. No. 105-190, at 8 (1998). Under certain circumstances, it prohibits the unauthorized removal or alteration of CMI, which consists of identifying information "conveyed in connection with" the copyrighted work. 17 U.S.C. §1202(c). CMI should "inform the public that a work is copyrighted and by whom." *Fischer v. Forrest*, 286 F. Supp. 3d 590, 610-11 (S.D.N.Y. 2018), *aff'd*, 968 F.3d 216 (2d Cir. 2020). Anyone who intentionally removes or alters CMI to facilitate infringement may be subject to liability. 17 U.S.C. §1202(b).

> As relevant here, §1202(c) says the following qualify as CMI:
>
> (1) The title and other information identifying the work, including the information set forth on a notice of copyright. …
> (3) The name of, and other identifying information about, the copyright owner of the work, including the information set forth in a notice of copyright. …
> (7) Identifying numbers or symbols referring to such information or links to such information.

17 U.S.C. §1202(c).

## B.    The NewsBreak Website and App

**1.**    Particle operates a free website and free Apps called NewsBreak that provide a specialized search engine. ROA.4408-09; ROA.68974-86. NewsBreak identifies a selection of local and national news content available on the internet based on the user's stated preferences in a single continuous page or newsfeed, and it also allows users to conduct manual searches for content. ROA.4408-09; ROA.68974-86. Like Google News, NewsBreak's feed only contains a snippet of each article. ROA.4409. For example:



ROA.69940; ROA.69029. The news feed is not at issue in this appeal.

From their news feed, users can click on any link to view its content. ROA.69029. How NewsBreak App users see content (and what they see) depends on whether the content comes from one of NewsBreak's publishing partners—one of the groups with whom Particle has licensing agreements—or a non-partner publisher. Publishing partners allow NewsBreak to host their articles on Particle's servers in exchange for, among other benefits, shared ad revenue. *E.g.*, ROA.4408. Thus, when clicking on content from them, the user views the full article hosted on Particle's server and displayed by Particle. ROA.4409.

For non-partner publications, the NewsBreak App user views the article through an industry-standard web browser directly from the publisher's *own* server. ROA.4409; ROA.69029; ROA.69499. The built-in browser, known as a "WebView" component (a standard component provided to App developers by Google and Apple), opens the link to the publisher's website and the user then views the content that the publisher's website and server publicly display. ROA.4409; ROA.69029; ROA.69499. In other words, the WebView component is a browser inside the App's interface that takes the source URL as the input. ROA.71757. The publisher's server then fulfills the App's browser request and its

webpage is retrieved, just as with other browsers like Chrome or Safari. ROA.69035; ROA.69494 ("just as if I were running Safari on my … phone or Chrome on my computer, everything is rendered on the referencing technology"); ROA.71757; ROA.72199. The content is served directly from the publisher's domain and server. *E.g.*, ROA.69029-36; ROA.69086; ROA.69468-82; ROA.72199.[2]

Using WebView functionality to view webpages within an App is a common feature, both in Android and Apple iOS Apps. ROA.69499; ROA.69461-62. NewsBreak "merely gives the address" of the source's content to the user, who can choose to "interact[] with the computer that stores" the content, including the advertisements that the publisher includes with their publicly-available content. *Perfect 10*, 508 F.3d at 1161. NewsBreak thus acts like a museum docent, guiding visitors through a collection and directing them to works they want to view more closely—works which the museum, not the docent, made publicly

---

[2] Emmerich's brief includes a slew of misrepresentations regarding the NewsBreak App, usually citing no evidence and other times citing "evidence" that does not support Emmerich's assertions. For one example (among many), regarding the built-in browser, unrefuted evidence shows that the user is not on a NewsBreak URL or website and that the source domain is visible at the top of the screen. ROA.69029-36; ROA.69086; ROA.69511-13; ROA.72199.

available for viewing.

NewsBreak's in-App browser does not alter the publisher's content, and the publisher's webpage and domain name are visible. ROA.69511-13. Because the browser appears within an App, there is a small Newsbreak "N" at the top left of the screen to direct the user back to the NewsBreak news feed or search result list, as well as like, comment, and share buttons and potential ads from the App itself outside the WebView component (not to the exclusion of the publisher's buttons and ads on its webpage):



ROA.69511-13. The publisher's ads—one of its revenue sources—remain

available to the user in WebView and any paywalls limiting the availability of content remain intact. ROA.71072-83; ROA.72199.

For non-partner, web-based content, because NewsBreak links to content hosted on and displayed from a source website's server, what the user sees when clicking on the link in NewsBreak will change if the publisher changes the content. For example, if the publisher changes a linked-to article stating that one team won the Super Bowl, so it instead says a different team won, a user who clicks on the App's link will see the current, changed article, because they are seeing it from the publisher's server. *E.g.*, 5 Patry on Copyright §15:7 (providing examples).

**2.** Emmerich owns newspaper publishers and associated websites. ROA.4406. Because Emmerich was not a publishing partner, when NewsBreak identified an Emmerich story responsive to an App user's search and the user clicked on that story, NewsBreak directed the user to Emmerich's website using the process described above. ROA.69030. The user would view Emmerich's publicly available content—including the publisher's name, article title, and any ads Emmerich displayed—directly from Emmerich's servers using the WebView browser. ROA.69511-13.

During periods between 2019 and 2021, however, there was admittedly a glitch that could affect NewsBreak's Android App—not its website nor its Apple iOS App. ROA.69030-31. That glitch resulted in content from some non-partner websites, including some of Emmerich's, inadvertently being displayed in full-text to Android users from NewsBreak's own servers. ROA.69030-31.[3] Particle quickly put a fix in place to address the issues when it became aware of them. ROA.69030-31.

In 2021, Particle ceased providing links to any articles from Emmerich's publishers, through WebView or otherwise. ROA.69031.

## C. Proceedings Below

**1.** In January 2023, Emmerich sued Particle for copyright infringement and violations of the DCMA with respect to thousands of articles. ROA.41. Emmerich alleged, *inter alia*, that Particle (1) infringed its public display rights because users could view its articles through

---

[3] Despite Emmerich's attempt to falsely couch it as one of "two options" NewsBreak users were given for viewing Emmerich's articles, *see* Opening (Op.) Br.7, 9, Particle did not intend for the self-hosted full text display to be a feature of the Android App or a continued practice, and it was not an "option" users could choose. ROA.69030; ROA.72199. The user was not on a NewsBreak URL or website. *E.g.*, ROA.69086-88; ROA.69129; ROA.69941-46.

NewsBreak's App and (2) removed and altered Emmerich's CMI in violation of the DMCA by allegedly replacing Emmerich's URLs. ROA.40-58. Because Emmerich could not show proof of copyright registration for many of those articles, it later substantially reduced the number of articles at issue. ROA.4425-26; ROA.72013. In June 2023, Emmerich filed a second case alleging the same claims as to articles for which it obtained copyright registration certificates after filing the first case. ROA.2258-59. The district court consolidated the cases. ROA.2260-61.

Emmerich subsequently dismissed its claims as to "27,100 of the over 33,000 articles on which its complaints were originally based." ROA.72013. That left in part only 746 articles claimed to have been displayed through the built-in WebView browser in NewsBreak's Apps, and 5,409 articles whose URLs Particle allegedly removed or altered. ROA.72014-15.

**2.** Emmerich and Particle each sought partial summary judgment as to the remaining articles. Relevant here, Particle moved for summary judgment on Emmerich's copyright infringement and CMI claims. ROA.72013. The district court ruled in part for Particle, holding that (1) applying "the server test to the framed-view/WebView articles

18

compels a conclusion that Particle" did not infringe Emmerich's display right and (2) Emmerich's URLs are not CMI. ROA.72045, 72068.

As to Emmerich's infringement claim, the district court assumed as true that the use of WebView "frame[d]" Emmerich's content. ROA.72038.[4] The court nonetheless held the server test controls and "compels" the conclusion that this conduct is not infringing. ROA.72045. Because NewsBreak App users were only viewing content publicly displayed by and from Emmerich's own servers, Particle did not infringe "Emmerich's exclusive right to display its copyrighted content." ROA.72045. The court disagreed that the server test contravenes the Copyright Act's text and legislative history. ROA.72044.

On the DMCA claims, the district court held that Emmerich's URLs do not qualify as CMI. The court noted that "there is no authority for the proposition that a URL appearing in the address bar above copyrighted content constitutes CMI." ROA.72068. Noting the functionality of URLs, it held that, at most, Emmerich's URLs are "akin to a roadmap to data on the Internet." ROA.72068-69. The court also explained that,

---

[4] Contrary to Emmerich's claims regarding alleged concessions and admissions by Particle, Op.Br.11,31, the district court noted that Particle disputes Emmerich's characterizations of WebView. *E.g.*, ROA.72038-39.

regardless, the "URLs fail to provide notice that any of the statutory information is associated with a particular (copyrighted) work that appears at the online location indicated in the URL." ROA.72068-71. After all, URLs are functional references to "where information can be retrieved, at a given time, but not necessarily permanently." ROA.72070. Indeed, "many of the URLs" Emmerich claims are CMI "no longer work" or direct the viewer to a page that includes content that may not even belong to Emmerich in the first place and thus could not signify ownership of anything in particular on that page. ROA.72070.

3.    Emmerich sought an interlocutory appeal, and the district court certified two questions: "(1) [w]hether the 'server test' is the proper standard for evaluating infringement on the copyright holder' s exclusive display right under 17 U.S.C. §106(5) … and (2) whether under §1202 a URL can be considered [CMI], and, if so, whether a URL's intentional removal constitutes a violation of §1202(b)(1)." ROA.72162. This Court agreed to hear those questions.

## SUMMARY OF ARGUMENT

The Court should see Emmerich's theories for what they are: attacks on the internet. Neither theory is supported by statutory

language and adopting either would render unlawful basic web-browsing and App use that occurs *billions* of times per day online. The district court rightly rejected Emmerich's theories.

**I.** Emmerich does not and cannot dispute that providing users with links to publicly available content on another party's servers is a ubiquitous practice that essentially all web browsers do. Emmerich thus concedes that its copyright theory for the "WebView articles" fails under the server test articulated by the Ninth Circuit and endorsed by the First and Seventh Circuits. That test holds that a party does not infringe a copyright holder's display rights under §106(5) when it points a user's computer to the copyright holder's own publicly available copy of its content, which is displayed by and from the copyright holder's own server. The server test is compelled by the Copyright Act's text and structure, as well as common sense, and the Court should adopt it.

But the Court need not adopt the server test to affirm. Even under the handful of district court decisions Emmerich highlights, Particle does not violate copyright law. Particle provides a specialized search engine that powers the NewsBreak App, which in turn uses industry-standard browsing technology (just like countless other Apps) to help viewers find

21

content that publishers publicly display. No court, including those cited by Emmerich, holds that using a *web browser* to point to content on a copyright holder's server constitutes infringement, much less where—as here—that browser identified the source domain. If offering a browser that directs users' computers to a copyright holder's server violates §106(5), then essentially every browser—whether built into an App or standalone—is unlawful, as is essentially every search engine used on a browser. Emmerich does not offer a limiting principle but instead admits that under its theory, Google Images violates §106(5). No court has adopted such an extreme position.

Emmerich offers the Court a scattershot of atextual counterarguments, none of which is persuasive. Emmerich's claims require proving that Particle itself "display[ed]" Emmerich's "copyrighted work publicly." 17 U.S.C. §106(5). But Emmerich engages in sleight of hand, arguing that NewsBreak (like any other web browser) "*caused*" Emmerich's work to be displayed, Op.Br.41-42, or "*connect[ed]*" users "to the original works fixed within Emmerich's websites," Op.Br.26. But just saying that shows that *NewsBreak* did not display Emmerich's works at all; Emmerich was the only one publicly displaying them. NewsBreak

22

merely provided directions to users' computers, at the user's request, so the user could view Emmerich's own public display from its own server.

Emmerich's policy arguments are likewise backwards. Websites and Apps like Newsbreak *increase* traffic (and with it, advertising revenue) for news websites. *E.g.*, ROA.68937-40; ROA.68965 (noting that NewsBreak ranked fourth for total referrals and was surpassed only by sources like Google and Facebook). Regardless, Congress's language speaks for itself: using code to point a user's computer to someone else's server does not violate §106(5)'s public display right.

**II.** Emmerich's CMI arguments fare no better. The Court should hold that URLs are not CMI. URLs are functional—they *identify a location*. As the district court reasoned, URLs are "akin to a roadmap to data on the internet." ROA.72069. A URL is an internet address that a computer uses to find stored data. *Id.* That is why there is no shortage of services that provide proxies for lengthy or unwieldy URLs (like Bitly and TinyURL)—they all serve the functional purpose of directing a visitor to a specific location. Yet under Emmerich's theory, providing a URL proxy comes with potential DMCA liability. Conversely, because URLs are functional addresses, if content is hosted at a different location

from the publisher's website (rightly or wrongly), the URL associated with that different location must necessarily be different too. Moreover, website owners often deactivate URLs and move or replace content at a given URL. At best, URLs are proxies for *locations*, not CMI.

In all events, a URL does not "convey[] [anything] in connection" with a copyrighted work. ROA.72070. The URL does not indicate that any of the information in §1202(c)(1)-(8) is associated with a particular copyrighted work; indeed, a given URL will direct a viewer to a page with a variety of content, which may not even belong to the host, much less be copyrighted. Nor does a domain name indicate the copyright owner. Likewise, words in URLs do not correspond to titles of works. Instead, a URL is itself just a "reference directing a user to [a] place on the Internet where information can be retrieved." ROA.72069-70.

And while URLs provide addresses, the URL is not itself a "link" as described in §1202(c)(7), which refers to "links *to such [CMI]*" on a website. Emmerich conflates things. An *address* for content is not the same as a *link* to a page displaying the name of the copyright owner or work or other copyright-identifying information. Masking the URL may mask the *location* of the content, but the DMCA is only concerned with

removing the content *at the link*, when that content actually puts a viewer on notice of a copyright. Emmerich cannot transform URLs into CMI by calling them "links."

Finally, not making a URL visible does not violate §1202(b)(1). URLs may or may not be visible when a user views a webpage. If failing to display a URL in whole or in part violates §1202(b)(1), common browsing practices could suddenly violate the law. Emmerich again offers no limiting principle, nor can it because its view defies both text and common sense.

Although Emmerich offers a flurry of counterarguments, they all fall far short. Many of the CMI issues Emmerich raises are fact-specific and so do not constitute a "controlling question of law" under 28 U.S.C. §1292(b). *See Silverthorne Seismic, LLC v. Sterling Seismic Servs., Ltd.*, 125 F.4th 593, 598 (5th Cir. 2025). In any event, Emmerich does not address the fundamental defects with its theory, let alone provide the Court a rational basis to reverse the district court's well-reasoned decision.

## STANDARD OF REVIEW

This Court reviews a grant of summary judgment *de novo. See*

*Johnson v. Chesapeake La., LP*, 87 F.4th 305, 308 (5th Cir. 2023). Summary judgment is proper if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). This Court interprets statutes *de novo. See BWP Media USA, Inc. v. T & S Software Assocs., Inc.*, 852 F.3d 436, 438 (5th Cir. 2017).

## ARGUMENT

### I. Emmerich's Direct Infringement Claims Are Meritless.

#### A. The district court was correct to apply the server test.

Emmerich concedes that its direct infringement theory fails if the server test applies. Under the server test, a defendant providing a web browser, App, or website does not directly infringe a copyright holder's display rights under §106(5) merely by pointing a user to a copyright holder's own server, so that the user may view content the copyright holder has chosen to publicly display.

That is so for the fundamental reason that the defendant's servers are not the ones publicly displaying the copyright holder's content. The server test reflects the reality of how the internet works, and every relevant tool of interpretation supports its application—as does uniform appellate authority and common sense. To be sure, if a defendant's

conduct causes consumer confusion or loss of business it may be actionable under state or federal law, but "'the Copyright Act, unlike the Trademark Act, does not protect a copyright holder against acts that cause consumer confusion.'" ROA.72045 n.16 (quoting *Perfect 10*, 508 F.3d at 1161). Simply put, there is no reason to contort the Copyright Act and abandon the server test, particularly when Emmerich's alternative would grind the internet to a halt. The district court correctly adopted the server test and this Court should do the same.

1.     Because "the protection given to copyrights is wholly statutory," infringement analysis must begin with the statutory language. *Sony*, 464 U.S. at 431. Here, Emmerich invokes one right under the Copyright Act: the right "to *display* the copyrighted work *publicly*." 17 U.S.C. §106(5) (emphasis added).

"To 'display' a work means to show a copy of it, either directly or by means of a film, slide, television image, or any other device or process[,]" with "copies" defined as "material objects … in which a work is fixed …." *Id.* §101. To display a work "publicly" means "to transmit or otherwise communicate" it "to the public, by means of any device or process." *Id.* As relevant here, "transmit" means "to communicate … by any device or

27

process whereby images or sounds are received beyond the place from which they are sent." *Id.* Congress did not define "otherwise communicate," but it must "at least involve[] sending out some sort of signal via a device or process to be received by the public at a place beyond the place from which it is sent." *Columbia Pictures Indus., Inc. v. Pro. Real Est. Invs., Inc.*, 866 F.2d 278, 280, 282 (9th Cir. 1989).

Given that statutory language, using a browser to point users to content on someone else's server is not direct infringement for at least three reasons.

*First*, for there to be direct infringement, the infringer must "display" a "fixed" copy of a copyrighted work. Yet the NewsBreak App does not do that; instead, it tells a computer where to look for the copyright holder's own publicly available work. The built-in browser's input of the source URL is not itself a copy of the copyrighted work—it just provides an address for a server location that hosts content. *E.g.*, *Perfect 10*, 508 F.3d at 1161 ("HTML instructions are lines of text, not a photographic image."). If that location is the accused infringer's, then the accused infringer is the one doing the displaying. But if the location is the copyright holder's own publicly accessible server, the only party

publicly displaying content at that location is the copyright holder itself. In that case, the user's computer follows the code's instructions to look for content *the copyright holder has publicly displayed*. *Id.* And if, at any time, the copyright holder removes the content or puts something else in its place, that content will not appear because the instructions point to a location—not a copy of a work. Because using code to point a computer to *someone else's display* on *someone else's server* does not display a copy of anything, no infringement is possible as a matter of law. *Id.*

*Second*, pointing someone to the copyright owner's *own* copy by providing an address cannot be infringement because it does not involve transmitting or communicating any works "*beyond the place from which they are sent.*" 17 U.S.C. §101 (emphasis added). A built-in browser does not "transmit" the content—at most it provides an address for the user's computer to know *where* to make a request, so that the *copyright holder's server* may send data to the user's computer. But using code to identify the location of content does not move any content. It is the hosting website with its associated server, not NewsBreak, that is doing the transmission or communication. *E.g.*, *Perfect 10*, 508 F.3d at 1161 ("Instead of communicating a copy of the image, Google provides HTML

instructions that direct a user's browser to a website publisher's computer that stores the full-size photographic image.").[5]

And *third,* using code to provide the user with the location for content does not itself display a "copy," that is to say, a "material object[] … in which a work is fixed." 17 U.S.C. §101. As between Particle and Emmerich, in the WebView context, the only place where the work was "fixed" was on *Emmerich's server. E.g., Perfect 10,* 508 F.3d at 1160-61 (quoting 17 U.S.C. §101). Thus:

> [T]o infringe the section 106(5) right, the defendant must have publicly displayed the work from a copy; that is, from a fixation of the work. … If the display in question is not from a copy of the work, but is instead the result of merely sending instructions to the place where the copy in question resides, there can be no infringement of the Section 106(5) right. … Instructions, such as HTML instructions to a browser or app, are not material objects in which the work is fixed, and thus cannot be infringing. The definition of "display a work publicly" requires that the direct infringer be the one who is

---

[5] Emmerich claims issues regarding transmission are not part of the server test. *See* Op.Br.39. *Perfect 10*'s own language shows that is wrong. 508 F.3d at 1161, n. 7 ("Google's activities do not meet [the] definition [of displaying a work 'publicly'] because Google transmits or communicates only an address which directs a user's browser to the location where a copy of the full-size image is displayed. Google does not communicate a display of the work itself."). Regardless, the district court reasoned liability is impossible if a website "merely sent instructions to the viewers' computers for connecting to websites where that work could be found." *See* Op.Br.40. In all events, the Court addresses this issue *de novo.*

transmitting the display of the work from a copy.

5 Patry on Copyright §15:7.

**2.** Such straightforward analysis is the heart of the server test. "[B]ased on the plain language of the statute," pointing a user to publicly available content found on someone else's server cannot be infringement. *Perfect 10*, 508 F.3d at 1160. "[A] computer owner that stores an image as electronic information and serves that electronic information directly to the user … is displaying the electronic information in violation of a copyright holder's exclusive display right," but "the owner of a computer that does not store and serve the electronic information to a user is not displaying that information, even if such owner in-line links to or frames the electronic information." *Id.* at 1159.

Unsurprisingly, every appellate court to consider the issue endorses the server test. The Ninth Circuit has repeatedly reaffirmed this test in unanimous opinions. *E.g.*, *McGucken v. Valnet, Inc.*, 2024 WL 5166624, at *1-2 (9th Cir. Dec. 19, 2024), *cert. denied*, 145 S.Ct. 1965 (2025); *Hunley*, 73 F.4th at 1070-71; *Bell v. Wilmott Storage Servs., LLC*, 12 F.4th 1065, 1073 (9th Cir. 2021); *VHT, Inc. v. Zillow Grp., Inc.*, 918 F.3d 723, 736 (9th Cir. 2019). The Ninth Circuit denied the rehearing petition

in *Hunley*—without dissent. In short, as Judge Bybee explained, "embedding" via HMTL code (much less linking through a web browser) does not "display a 'copy' of … copyrighted images as that term is defined in the Copyright Act." *Hunley*, 73 F.4th at 1069.[6]

The Seventh Circuit also has endorsed the server test, reasoning that "giving web surfers addresses" for websites via an "embed code" is no more infringement than the *New Yorker*'s "listing plays and giving the name and address of the theaters where they are being performed." *Flava Works, Inc.*, 689 F.3d at 761 (citing, *inter alia*, *Perfect 10*, 508 F.3d at 1159-61). The First Circuit too has endorsed it. *Gregory*, 689 F.3d at 55 (citing, *inter alia*, *Perfect 10*, 508 F.3d at 1160). Indeed, except for a smattering of inapplicable district court decisions (discussed below), courts have "unanimously upheld the server test." Michael P. Goodyear, *The Server Test Quandary and Embedding Permission Culture*, 75 Okla. L. Rev. 263, 273 (2023). The server test thus "should be maintained." *Id.* at 267.

---

[6] The Court has not had occasion to decide whether to adopt the server test but it has favorably cited *Perfect 10. See UMG Recordings, Inc. v. Grande Commc'ns Networks, LLC*, 118 F.4th 697, 715-16 (5th Cir. 2024); *BWP Media USA*, 852 F.3d at 439.

Analogous precedent also supports the server test. For example, in *IMAPizza, LLC v. At Pizza Ltd.*, 965 F.3d 871 (D.C. Cir. 2020), Judge Ginsburg explained that "ephemeral transmission of a picture across the internet" does not constitute a "copy." *Id.* at 877. Even more so, providing instructions to a browser to view content from the copyright holder's own server cannot violate the copyright laws. Similarly, the court observed that "a transmission involves two potentially infringing acts, the unauthorized uploading and the unauthorized downloading of a file," which requires looking at the computers on either end of the connection. *Id.* If the defendant's computer servers are on neither end of that connection, then the defendant cannot infringe.

This Court is "always chary to create a circuit split." *In re Ultra Petroleum Corp.*, 943 F.3d 758, 763 (5th Cir. 2019) (quotation omitted). Rejecting the server test, however, would do just that. For almost 20 years, the tech industry—overwhelmingly based in the Ninth Circuit—has relied on this test. If this Court were to reject it now, plaintiffs could sue every tech defendant subject to jurisdiction within this Circuit.

**3.** Finally, common sense backs the server test. "The purpose of copyright law is '[t]o promote the Progress of Science and useful Arts,'

and to serve 'the welfare of the public.'" *Perfect 10*, 508 F.3d at 1163 (quoting U.S. Const. art. I, §8, cl. 8 and *Sony*, 464 U.S. at 429 n.10). Facilitating the public's ability to find content that a copyright holder has *chosen* to make publicly available does not discourage innovation; to the contrary, it *expands* viewership and thus enhances the copyright owner's ability to generate revenue from its content.

If there were doubt, constitutional avoidance squelches it. Whether through linking, framing, embedding, or otherwise, countless parties direct viewers to a copyright holder's own materials, publicly displayed from the copyright holder's own servers, because the Copyright Act, as written, does not forbid it. But even if the Act were ambiguous, the Court should not lose sight of copyright law's significant statutory damages. Even wholly innocent infringement may require "the award of statutory damages to a sum of not less than $200." 17 U.S.C. §504(c)(2). Given the billions of connections happening over the internet daily, the Court should not read the Copyright Act to invite a constitutional challenge. *See, e.g.*, *Wakefield v. ViSalus, Inc.*, 51 F.4th 1109, 1120 (9th Cir. 2022) (excessive statutory damages may violate due process).

## B. Even without the server test, Particle should prevail.

Although the Copyright Act's plain language compels applying the server test, it is not necessary for the Court to adopt that test here to affirm. As noted, every court of appeals considering the server test has endorsed it. A handful of district court decisions disagree. But even under their analyses, Emmerich's theory fails because NewsBreak's App uses the industry-standard WebView functionality provided to App developers to facilitate in-App web browsing. No court has found infringement under §106(5) with respect to a browser, let alone a platform that does not pass off copyrighted content as its own.

Consider the Southern District of New York's decision in *Goldman v. Breitbart News Network, LLC*, a case about photos shared on social media. 302 F. Supp. 3d 585 (S.D.N.Y. 2018). Other New York judges have endorsed the server test. *Pearson Educ., Inc. v. Ishayev*, 963 F. Supp. 2d 239, 250-51 (S.D.N.Y. 2013); *Live Face on Web, LLC v. Biblio Holdings LLC*, 2016 WL 4766344, at *3-5 (S.D.N.Y. Sept. 13, 2016). *Goldman*, however, reasons that "*Perfect 10* was heavily informed by two factors" that were not present in *Goldman*—"the fact that the defendant operated a search engine, and the fact that the user made an active choice to click

35

on an image before it was displayed." 302 F. Supp. 3d at 595; s*ee also*

*Nicklen v. Sinclair Broad. Grp., Inc.*, 551 F. Supp. 3d 188, 195 (S.D.N.Y.

2021).

NewsBreak satisfies both conditions. *First*, it is specialized search engine designed to help users find news content. *E.g.*, ROA.68974-86. And *second*, any user who visited one of Emmerich's websites via the NewsBreak App's browser did so only after clicking a news feed or search result item. A user thus affirmatively navigated to Emmerich's website and knew that Emmerich's website provided the content—just like computer users do with respect to any number of the thousands of Apps with similarly integrated in-App browsers. *E.g.*, ROA.69036. This Court should not be the first court ever to hold that web browsing infringes §106(5).

In *Leader's Institute, LLC v. Jackson*, the copyright holder claimed that the alleged infringer caused its websites to "frame" the holder's website, surrounding the holder's content with the infringer's content, to make it appear as one, which the court described as "display[ing]" the "content as if it were its own." 2017 WL 5629514, at *3, *11 (N.D. Tex. Nov. 22, 2017). Because there was an element of deception, the court

reasoned that any reliance on *Perfect 10* was misplaced. *Id*. at *11. *Leader's Institute* is doubly wrong because framing is not inherently deceptive, and regardless, deception is covered by *other* laws—not the Copyright Act. *See Perfect 10*, 508 F.3d at 1161. Putting that aside, Particle did not suggest Emmerich's content was anyone's but Emmerich's. When Emmerich's website was viewable through NewsBreak, *the domain name was identified* and the website was fully functional. Even Emmerich has admitted Particle did not "instruct[] the user's browser to display Emmerich's website under Particle's web address." ROA.6386.[7]

Finally, Emmerich relies on *Urbanimage Media Ltd., v. IHeartMedia, Inc.*, 793 F. Supp. 3d 852 (W.D. Tex. 2025). The plaintiff there alleged that the defendant displayed its photograph on defendant's

---

[7] *Leader's Institute* also misunderstood *Perfect 10* as holding there cannot be infringement unless the infringer has a copy, observing that "a person [who] went into a movie theater and used a video camera connected to the internet to broadcast a movie to the public would clearly be committing copyright infringement even though the person did not herself have a copy of the movie." 2017 WL 5629514, at *11. But that would be retransmission and "[t]here is all the difference in the world, legally, from transmitting instructions to a place (what the referring site does) and transmitting the instructions that actually display the work (what [the owner's] website does)." 5 Patry on Copyright §15:7.

website by embedding a YouTube video containing the photograph in connection with an article. *Id.* at 855. The court concluded the embedded link "communicated a display of the Photograph to the public." *Id.* at 865. That atextual analysis is wrong, but also irrelevant, because nothing like that happened here. As cases like *Goldman* (on which *Urbanimage Media* heavily relied) make clear, liability does not extend to a browser.

## C. Emmerich's counterarguments fail.

1. Emmerich begins its argument with the word "show" in §101. Op.Br.23. But Particle did not "show a copy," 17 U.S.C. §101, of Emmerich's work by pointing someone to Emmerich's *own* display of its *own* content from its *own* server. The only "copy" was Emmerich's, which Emmerich showed the world.

No other reading of the statute makes sense. "If it were otherwise," for example, "tour guides would be infringing when they lead their charges to see specific copyrighted works in a museum." Google Amicus Br., *Hunley*, *supra* at 10. All instructions do is "offer[] directions to locate a copy of a work that is *already* being publicly displayed by a third party." *Id.*; *see also* 5 Patry on Copyright §15:7. Indeed, that is why Emmerich elides the statutory text, conflating "connect[ions]" and "caus[ing]" to be

displayed with the act of displaying. Op.Br.26, 41.

No doubt recognizing that the word "show" cannot carry the weight Emmerich needs, Emmerich also points to the phrase "by means of … any other device or process." Op.Br.25 (quoting 17 U.S.C. §101). But NewsBreak merely provided an address that the In-App browser used to request that *Emmerich*, not NewsBreak, share its content directly with the user. Emmerich controlled the device from which it publicly displayed its content, and Emmerich's server was the one that provided the process for sharing that content. Again, all NewsBreak's code did was tell the user's device where to go to ask Emmerich for content. And again, if Emmerich changed or removed the content, the user's request would be denied. Although Congress has updated the Copyright Act from time to time, the type of *conduct* that counts as infringement has not changed to encompass merely pointing to someone else's public display of their work—whether physically or virtually.

Emmerich thus finds itself arguing that providing the built-in browser infringes Emmerich's copyrights by pointing to "*Emmerich's* content on *Emmerich's* website." Op.Br.26 (ROA.72039). But that's Particle's point: Pointing a user to someone else's public display is not

itself displaying a copy. Emmerich's conclusion that "by *connecting* its customers to the original works fixed within Emmerich's websites, Particle was displaying the copyrighted works within the plain language of §106(5)," *id.* (emphasis added), is pure question-begging. Nothing in the Copyright Act supports liability for pointing to Emmerich's own display. "Connecting" is not "displaying," and Emmerich's efforts to conflate different concepts is proof positive that Emmerich's theory is wrong.

There is a fundamental distinction between "displaying" and "causing a display." *E.g.*, Op.Br.42, 25-26. In some sense, any webpage or search engine that provides a link to another page can be said to *cause* the latter's display. But giving someone a reason to choose to see something is not the same as being the one who actually *displays* it. Emmerich's contrary argument contorts the words, structure, and sense of the statute.

Finally, Emmerich falls back on "*expressio unius est exclusio alterius*" to argue that "[w]hen Congress expressly enumerated the display right in §106(5) of the Copyright Act, it distinguished that right from the separate reproduction right enumerated in §106(1)." Op.Br.28.

But "[n]othing in the Copyright Act prevents the various rights protected in section 106 from overlapping." *Perfect 10*, 508 F.3d at 1161 (citing *Lewis Galoob Toys, Inc. v. Nintendo of Am., Inc.*, 964 F.2d 965, 967 (9th Cir. 1992)). Overlap, moreover, is common for complicated statutory schemes—for example, "overlaps among securities provisions are neither unusual nor unfortunate." Arnold S. Jacobs, 5B *Disclosure & Remedies Under the Sec. Laws* §6:20 (2025). Emmerich's own cited authority confirms that Congress is not averse to "belt-and-suspenders caution." *Yates v. United States*, 574 U.S. 528, 562 (2015).

Regardless, the reproduction right and the display right are meaningfully different. True, making a copy of someone's work may violate the reproduction right, but damages could be greater if that infringer *also* uses that illicit copy to publicly display the work.

2.     Emmerich also dedicates an entire section of its brief to legislative history. Of course, "legislative history is 'generally of dubious value in statutory interpretation.'" *Sirius Sols., LLLP v. Comm'r of Internal Revenue*, 165 F.4th 374, 385 (5th Cir. 2026) (quotation omitted). Where, as here, a statute's text answers the question, "judges must stop." *Id.* (quoting *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 436

(2019)).

Regardless, the legislative history does not support Emmerich. Section 106(5)'s history does not include a single example suggesting liability for someone who does not transmit or retransmit anything. To the contrary, legislative history offers the following examples of conduct that could be infringing: "a broadcasting network is performing when it *transmits* his or her performance (whether simultaneously or from records); a local broadcaster is performing when it *transmits* the network broadcast; [and] a cable television system is performing when it *retransmits* the broadcast to its subscribers." H.R. Rep. No. 94-1476, at 63 (1976) (emphasis added). These examples tie infringement to the act of "transmitting" or "retransmitting," which is consistent with the 1976 House Report's statement that "[e]ach and every method by which the images or sounds comprising a performance or display are *picked up and conveyed* is a 'transmission.'" *Id.* at 64 (emphasis added).

Such history has nothing to do with how NewsBreak's built-in browser works; rather than "transmitting" or "retransmitting" a signal, let alone picking anything up or conveying it anywhere, all that the in-app browser does is tell a user's computer where to view the work that

42

the source website is publicly displaying on its own server. Again, an infringer may violate copyright law by taking a picture of a painting and transmitting it to the public, but a tour guide does not infringe any copyright by taking someone to the address of the painting where they may see it for themselves.

Emmerich emphasizes that "the drafters of the 1976 Amendments intended copyright protection to broadly encompass new, and not yet understood, technologies." Op.Br.28-29 (quoting *Goldman*, 302 F. Supp. 3d at 589). But reliance on *Goldman* fails because *Goldman* would not extend its rule to browsers. *See* pp.35-36, *supra*. Nor is it true that "Particle took 'active steps to put a process in place that resulted in a transmission of the [copyrighted works] so that they could be visibly shown,'" Op.Br.31 (quoting *Goldman*, 302 F. Supp. 3d at 588), much less that Particle's "code is an information retrieval system permitting Emmerich's articles to be seen by the public, transmitting them through a manner clearly counter to … the Copyright Act." *Id.* at 31-32. The only one who transmitted or communicated copyrighted works was *Emmerich*.

**3.** Emmerich also misunderstands *ABC, Inc. v. Aereo, Inc.*, 573 U.S. 431 (2014). There, the Supreme Court did not address the "display"

right at all but instead considered whether an online subscription service that first copied and then streamed copyrighted television programs "publicly performed" the works. *Id.* at 449.[8] The facts alone are a fundamental distinction. Aereo dedicated a specific antenna to each subscriber, copied the over-the-air broadcast onto a server, and transmitted that data from its server to the subscriber over the internet. *Id.* Aereo thus copied and retransmitted copyrighted works via servers, antennae, and other equipment that it owned and controlled. *Id.* at 436-37; *see also* 5 Patry on Copyright §15:7. Aereo would have infringed under a server test.

Emphasizing that Congress addressed cable retransmissions of broadcast programs in 1976, the Supreme Court held, per Justice Breyer, that "Aereo's activities" were "substantially similar to those of the [cable] companies that Congress amended the Act to reach." *Aereo,* 573 U.S. at

---

[8] The two rights are distinct: "[D]isplaying a work publicly requires that the infringer display a copy of the work; and transmission of a display means that someone has transmitted a copy of the work 'to the public.' However, to infringe the public performance right, the infringer need not show or perform a copy of the underlying work." *Hunley*, 73 F.4th at 1074 (quoting 17 U.S.C. §101).

44

442.[9] But the Court stressed that its holding was "limited" and would not "discourage or control the emergence or use of different kinds of technologies." *Id.* at 449. *Aereo* thus (1) involved infringement of the public performance right (not at issue here); (2) concerned broadcasts targeted by the 1976 amendments (also not at issue here); (3) by its own account was a "limited" holding; and, in all events, (4) involved copying and retransmission by the accused infringer itself (unlike here).

Nonetheless, Emmerich says the Supreme Court in *Aereo* "gave a broad and practical reading" to copyright law and "found the statutory language sufficient to cover the new and different technology" used by Aereo because users perceived Aero's product to be the same as cable. Op.Br.17 (citing *Aereo*, 573 U.S. at 444, 446). Emmerich thus urges the Court to "consider[] the practical effects" and "real world" consequences. *Id.* at 33. Emmerich's embrace of purpose over statutory language defeats its appeals to textualism. Nor is it a fair reading of *Aereo*. *Aereo* pointed out similarities between the defendant and traditional cable companies

---

[9] Justice Scalia (joined by Justices Thomas and Alito) dissented. In his view all that mattered was that "Aereo does not 'perform' at all," and the majority's contrary conclusion depended on "an improvised standard ('looks-like-cable-TV') that will sow confusion for years to come." *Id.* at 452.

because the 1976 amendments *targeted* cable broadcasts. *See Hunley*, 73 F.4th at 1075-76. Nothing like that applies here. The Supreme Court also did not address (let alone resolve) "what it means to transmit a copy, because the public performance right has no such requirement." *Id.* at 1074.

*Aereo* thus "may have clarified who is liable for retransmitting or providing equipment to facilitate access to a display—but unless an underlying 'copy' of the work is being transmitted, there is no direct infringement of the exclusive display right." *Id.*

Emmerich would have the Court treat *Aereo* as an open invitation to ignore how code instructions work in favor of dubious intuitions about consumer perception and real-world consequences. Courts, however, cannot ignore what statutes say even if they are technical. *See, e.g.*, *Niz-Chavez v. Garland*, 593 U.S. 155, 161 (2021). And even if this Court were to focus on perception and consequences, they provide additional reasons to affirm. No one using NewsBreak is confused about the source of content, and publishers make *more* money when NewsBreak points viewers to their websites because they see advertisements (for which publishers are paid) on those websites, no different than any other

browser. The situation thus is nothing like *Aereo*, where television companies lost money because of Aereo's retransmission.

**4.** Finally, Emmerich appeals to policy. For example, it urges the Court to ignore "hair-splitting distinctions"—in other words, statutory interpretation—and condemn NewsBreak as "theft." Op.Br.36. But it is not theft to point viewers to Emmerich's own display. If it were, any modern browser (and much else besides) would violate copyright law.

Nor are Emmerich's criticisms of web "crawling" justified. Op.Br.6. By crawling, Emmerich means that NewsBreak (like countless other search engines) searches *publicly* available information on websites. Without crawling, search engines would not be able to discover or index webpages so that interested viewers can find them in the first place.

In fact, Emmerich effectively concedes how extreme its position is when it complains that "Google Images" should be unlawful. Op.Br.37-38. If so, effectively every search engine (and countless websites) would be unlawful, too. Pointing to content displayed by someone else's server is a "ubiquitous" building block of the internet. Goodyear, *supra*, at 267.

By contrast, the server test has helped foster expression by providing clear rules and legal certainty. It focuses on the entity hosting

the content, *i.e.*, the one best positioned to know if the content is lawful, with the most incentive to take it down if it is not. And third parties who direct people to infringing content still can be *secondarily* liable if additional factors, such as "purposeful, culpable" conduct to encourage infringement, are present. *Grokster*, 545 U.S. at 915-16. Against all this, Emmerich's view departs from the most natural reading of the Copyright Act and is a recipe for confusion and litigation.

## II.    Emmerich's CMI Claims Are Also Meritless.

Emmerich's CMI argument is no better. The DMCA prohibits, *inter alia*, intentionally removing or altering CMI knowing or having reasonable grounds to know it will induce, enable, facilitate, or conceal an infringement. 17 U.S.C. §1202(b)(1). It also provides that certain identifying information (*e.g.*, titles or owner names) may qualify as CMI if the information is "conveyed in connection with" the copyrighted work. *Id.* §1202(c)(1)-(8). As the district court correctly held, URLs are not CMI. Furthermore, not making a URL visible does not violate §1202(b)(1). The Court should affirm.

### A.    URLs are not CMI.

The district court held that URLs, located in an address bar above

a webpage and functioning as URLs, are not CMI as a matter of law.[10] ROA.72066-74. URLs are *functional*—they are human-readable addresses associated with the *location* of information. The court thus concluded that information in a URL, operating as a roadmap, did not qualify as any of the identifying information listed §1202(c)(1)-(8) and, even if it did, a URL does not "convey" anything in connection with a copyrighted work. ROA.72066-74; 17 U.S.C. §1202. The plain text of the DMCA and well-settled precedent support these conclusions.

*First*, URLs do not contain any of the identifying information listed in §1202(c)(1)-(8). The DMCA sets out the type of material that qualifies as CMI and includes, among other things, titles of works, the copyright owner's name, and links to such information. 17 U.S.C. §1202(c)(1), (3), (7). For example, a filename may be CMI if it is "information identifying" the work (*i.e.*, a title) and is conveyed in connection with the work. *E.g.*, *Energy Intel. Grp., Inc. v. Kayne Anderson Cap. Advisors, LP*, 948 F.3d. 261, 277 (5th Cir. 2020).

---

[10] Emmerich argued Particle violated the DMCA by using the built-in browsers, share buttons, and temporary full-text displays on the Android App. ROA.72066-67. The district court concluded the first two did not constitute infringement. *Id*. Accordingly, the only conduct at issue is the third. Op.Br.49. n.4.

A URL, however, is a "compact string of numbers, letters, and symbols that a computer uses to find a resource on a network and act upon it." ROA.72069. None of the information in a URL identifies a copyright owner, title, or any other information associated with a copyrighted work. URLs are purely functional, associated with locations. As the district court pointed out, a URL is thus fundamentally different from a filename. A filename is an "identifying name given to an electronically stored file" that is necessarily tied to the copyrighted work it stores. ROA.72068. Copyright owners can convey the CMI with the copyrighted work itself. By contrast, a URL serves a functional role: the words, phrases and numbers of a URL string tell a computer where, at a given time, to locate information on a server. ROA.72068-69.

As discussed below, there is no shortage of proxies that can be used for a URL to direct traffic to that location. Conversely, if the website owner relocates the work to a new location, the URL must change to be accessible. ROA.68941; *see also* ROA.72069-70 (URLs are not "necessarily permanent[]" because "content at the URL may be deleted or moved, or the link itself may be deactivated"). A URL therefore does not satisfy any of the categories set out in §1202(c)(1)-(8). ROA.72069.

*Second*, the DMCA requires that identifying information be "conveyed in connection" with the copyrighted work to qualify as CMI. *Energy Intel.*, 948 F.3d at 277. The statute does not define "conveyed in connection with," but the parties agree that "convey" requires that the information be "impart[ed] or communicate[ed] by statement, suggestion, gesture, or appearance" in connection with the copyrighted work. Op.Br.57 (quotation omitted); *see also Convey*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/convey; *Pers. Keepsakes, Inc. v. Personalizationmall.com, Inc.*, 2012 WL 414803, at \*6 (N.D. Ill. Feb. 8, 2012) ("[T]he point of CMI is to inform the public that something is copyrighted and to prevent infringement.").

URLs, however, do not "impart[] or communicat[e]" identifying information in connection with a copyrighted work. As the district court pointed out, the point of CMI is to convey that the information set out in §1202(c)(1)-(8) is associated with a copyrighted work. The district court explained, however, that there was "no authority" for the proposition that the mere presence of a URL in an address bar above a copyrighted work was itself "convey[ing]" §1202(c)(1)-(8) information. ROA.72068-70. No one reasonably believes that "Amazon.com" in a browser "suggest[s] that

Amazon owns copyrights with respect to every product it sells." *Pers. Keepsakes*, 2012 WL 414803, at \*6; *FurnitureDealer.Net, Inc v. Amazon.com, Inc.*, 2022 WL 891473, at \*19 (D. Minn. Mar. 25, 2022) ("CMI must at least suggest that it is associated with or linked to the copyrighted work.").

*Fischer v. Forrest*, 968 F.3d 216 (2d Cir. 2020), is instructive. There, the Second Circuit held that the mere presence of the name "Fischer's Bee-Quick" within advertising text was not conveying "Fischer's" owned the copyright in the advertising text. *Id.* at 216. So too here: no one believes the random words or phrases in a URL are "impart[ing] or communicat[ing]" to a user that the information is "in connection" with a copyrighted work.

The mere appearance of a copyright owner's name or an article title in an URL does not convey anything about a copyrighted work. As the district court reasoned, the content located at a URLs address is constantly changing: the content on URLs may be deleted, *e.g.*, ROA.44001-70 (inactive URLs); the content could be moved to a new URL, ROA.68942-43 (same content under different URLs); or a URL might even appear above multiple different types of copyrighted works,

ROA.69626-37 (URL above different types of content); ROA.72068-70. Thus, it makes no difference if a name of a copyright owner or title happens to appear in the URL. The appearance of a copyright owner or title in a URL may be fortuitous, but it does not reasonably signify to anyone a "convey[ance] in connection" with a copyrighted work. *E.g.*, *Fischer*, 968 F.3d at 224 ("[C]ontext matters.").

If URLs *did* qualify as CMI, the internet would become a DMCA quagmire overnight. Precisely because they are functional, proxies are used for URLs all the time—either to shorten them, or to share them with others. For example, users frequently use services like Bitly or TinyURL to swap out long URLs (such as, for example, https://www.bizjournals.com/denver/news/2019/09/11/bitly-denver-office.html) with a shortened URL (https://bit.ly/2QglpGx) or a customized URL (https://bitly.is/indenver) for the convenience of users. If a URL is CMI, no one could modify a URL without risking violating the DMCA. Yet lawyers often use TinyURL to shorten citations. In fact, this Court *itself* uses TinyURL for citations. *See, e.g.*, *Texas v. Bondi*, 149 F.4th 529, 546 n.2 (5th Cir. 2025); *McRorey v. Garland*, 99 F.4th 831, 838 n.14 (5th Cir. 2024).

### B. Even if URLs were CMI, failure to display them would not violate §1202(b).

If the Court concludes that URLs are CMI—something no court has suggested—it should conclude that not displaying a URL does not constitute a violation of §1202(b)(1). Section 1202(b)(1) provides that a person may not "intentionally remove or alter any [CMI] … knowing, or … having reasonable grounds to know, that it will induce, enable, facilitate, or conceal an infringement." "Remove" means to "get rid of," *Remove*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/remove, or "transfer or mov[e] a person or thing from one location, position, or residence to another," Black's Law Dictionary (10th ed. 2014). And "alter" means to "make different without changing into something else." *Alter*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/alter.

Although Emmerich's DMCA arguments on appeal are not a fount of clarity, it seems to be asserting that when Particle's Android App glitched and Particle hosted certain articles, it violated the DMCA because it failed to display Emmerich's URLs when presenting content. ROA.72066. But failing to display a URL, or even part of URL, does not "remove" the URL. Because URLs are functional internet addresses, even

if Particle hosted Emmerich's content, Emmerich's URLs still existed.

Regardless, even then, NewsBreak displayed the original domain name or at least the publisher's name with Emmerich's content (and did not remove the publisher's name or the title of the article—the information Emmerich contends was CMI). *E.g.*, ROA.69941-45. Failure to display a full URL is not an action "transfer[ing] or mov[ing]" a URL or "mak[ing] [it] different." *E.g.*, *Dow Jones & Co., Inc. v. Harris*, 749 F. Supp. 3d 776, 787 (W.D. Tex. 2024) ("Section 1202 does not cover the mere failure to add truthful CMI to a copy."); *Falkner v. Gen. Motors LLC*, 393 F. Supp. 3d 927, 938 (C.D. Cal. 2018).

To the extent Emmerich is arguing that, when the glitch occurred, content Particle self-hosted was on Particle's servers under a specific document ID rather than under Emmerich's original URL, that just proves that URLs are *purely functional*—they are addresses for internet locations. Unlike the rules governing filenames, if content is in different places, different URLs must be used to find it. That is not the "removal" of anything that can reasonably be viewed as "conveyed in connection with" a given work; that is a requirement of programming to tell a viewer's computer where content may be found.

## C.    Emmerich's counterarguments again fail.

In response to the district court's ruling, Emmerich contends that URLs can conceivably contain identifying information and that a copyright owner can convey such information in connection with a copyrighted work. As an initial matter, and as explained further below, the Court lacks jurisdiction to consider many of Emmerich's counterarguments. This Court's jurisdiction on appeal is limited to the abstract legal question of whether URLs *generally* can qualify as CMI. *Silverthorne*, 125 F.4th at 597; *Fisher v. Halliburton*, 667 F.3d 602, 609 (5th Cir. 2012). Emmerich, however, focuses on whether *its* URLs contain CMI and asks the Court for a holding that "Emmerich's URLs are CMI subject to the protection of §1202(b)." Op.Br.52-54, 63. To the extent Emmerich asks the Court to evaluate its URLs or raises other factual challenges, the Court is without jurisdiction to address those issues.

Even bracketing the jurisdictional issues, Emmerich's counterarguments also fail on their own terms. Emmerich argues that URLs can contain identifying information because the domain name can correspond to the copyright owner, the title of a work can appear in the URL, and the URLs themselves are "links to [copyright information]."

56

Op.Br.52-57. Emmerich also argues that the identifying information that appears in its URLs is "conveyed in connection" with copyrighted works because its URLs always appear above its articles. *Id.* at 57-62. None of these arguments work.

1. To begin, Emmerich does not show that URLs contain, or are themselves, any of the identifying information listed in §1202(c)(1)-(8).

Emmerich first claims that the domain name in a URL identifies the copyright owner and therefore it "satisfies 1202(c)(3)." Op.Br.52-53. A "domain" refers to a "subdivision of the internet." *Domain*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/domain. A "domain name" is a part of a URL made up of a "sequence of usually alphanumeric characters" that designates the subdivision of the internet where information exists. *Domain Name*, Merriam-Webster.com https://www.merriam-webster.com/dictionary/domain%20name. In the URL "https://www.cnn.com," the domain name would be "cnn.com." ROA.68942.

Domain names do not identify the copyright owners of content that appears below them on a webpage. Rather, domain names (like URLs themselves) are functional references to where content is located on the

57

internet. To be sure, a domain name could fortuitously match the copyright owner, but that would not change the fact that the domain name is serving a purely functional purpose and not identifying the owner of the copyrighted work. *See, e.g.*, *Tomelleri v. Zazzle, Inc.*, 2015 WL 8375083, at *12 (D. Kan. Dec. 9, 2015) ("[W]hen a user visits google.com or imdb.com a number of images come up, but no user is lead to believe that the websites created or owns these images."); ROA.68955-57 (discussing third-party content on Emmerich websites).

Emmerich does not address any of these points. Instead, it argues that its own URLs (rather than URLs generally) always indicate the copyright owner of the content beneath them. Op.Br.52-53. Emmerich cites as an example the URL "https://www.pressregister.com/jonestown-studies-speed-bumps-safety-concerns," which it says includes "pressregister" in the domain name as a reference to *The Press Register*, an entity that owns the article. *Id*.

This argument fails twice over. For one thing, it asks the Court to resolve a factual question (whether Emmerich "chooses" to post articles "in accordance with the domain," *id*. at 52) that is outside the scope of this Court's jurisdiction. *Silverthorne*, 125 F.4th at 600.

For another thing, Emmerich also cites no evidence to support its argument—to the contrary it concedes the opposite. Emmerich concedes that *The Press Register* does not actually own the copyright in the articles that appear on *The Press Register*'s website. ROA.2512. So the domain name tells nothing about copyright ownership. To be clear, the DMCA defines "copyright owner" as the "owner of [a] particular right" in a copyright. 17 U.S.C. §101. *The Press Register* is a subsidiary of Emmerich and has assigned copyright ownership to Emmerich Newspapers, Inc. Op.Br.52-53. Emmerich protests that "assignment does not negate that *The Press Register* is the original holder of the copyright" and "ownership of a copyright can be evidenced from the original copyright holder." *Id*. But that is a non-sequitur because *The Press Register* admittedly is *not* the "copyright owner" of the articles.

2.      Emmerich next claims that a part of the URL references a "file name" that identifies the work by title, which part satisfies §1202(c)(1). Op.Br.53-54. In particular, Emmerich points to a statement by Blake Sell, Particle's expert, that a URL can contain a filename location. *Id*. at 54. Seizing on this statement, Emmerich cites *Energy Intel.*'s analysis that a filename "may be CMI" if it is "information identifying" the

copyrighted work. *Id.*

But *locations* are not CMI, and URLs do not contain titles or information identifying works. A URL address contains various pieces— including a protocol, domain, subdomain, directory, and subdirectory— which specify the location of information on the internet. ROA.68942. True, a URL sometimes *can* also include a reference the location of a filename. ROA.68942. An example is "index.html." So for https://www.cnn.com/2023/08/31/enternainment/taylor-swift-eras-tour-movie/index.html, the location of the copyrighted work would be at the domain "cnn," within the directory and subdirectories of "entertainment/ taylor-swift-eras-tour-movie," and located at the filename "index.html." ROA.68942.

Yet like domain names, filenames in URLs do not identify the title of content that appears below them on a webpage. As explained above, filenames are part of the larger URL and therefore only serve to reference an information's internet address on a particular server. The filename does not identify the title of the copyrighted work that appears below it, just as in the example the filename ("index.html") and directories (entertainment/taylor-swift-eras-tour-movie) do not identify the title of

the work ("Taylor Swift's tour enters her movie theater 'Era' as she brings record-breaking concert to the big screen.").

Emmerich again ignores that URLs (and each part of them) are internet addresses. Emmerich instead argues that—whatever is true of URLs generally—*Emmerich*'s URLs "specifically utilize the latter half of the URL to include the title of its article." Op.Br.55. Emmerich even disputes the district court's assessment that Emmerich had not offered evidence that it intentionally chooses URLs to match its copyrighted work; Emmerich protests that the filename portion of its URLs matches "the named article itself." *Id.* So, in Emmerich's example, it says that the "jonestown-studies-speedbumps-safety-concerns" portion of "https:// www.pressregister.com/jonestown-studies-speedbumps-safety-concerns" URL is a filename that Emmerich "hand select[s]" to match the name of Emmerich's copyrighted work. *Id.* at 54.

Emmerich's argument again misses the mark. Once more, Emmerich is asking the Court to step outside of its jurisdiction and address a *factual* question. In any event, Emmerich's argument fails for another reason. To qualify as CMI, the URL (or portion of the URL) must be "information identifying" the copyrighted work. *Energy Intel.*, 948

F.3d at 277. No portion of the URL is "information identifying" the title of the copyrighted work; it is a part of an internet address providing the location of content.

Regardless, Emmerich is wrong in suggesting that its URLs (or a portion of the URLs) match anything contained in its copyright registrations. Op.Br.61. Emmerich's registrations are group registrations covering newspapers on a monthly basis; they were not registered on an article-specific basis. *See generally* ROA.1359-1418. Furthermore, even plucking out a portion of the URL, "jonestown-studies-speedbumps-safety-concerns," that portion has a completely different syntax than the title listed on the actual article. *Accord Art of Design, Inc. v. Pontoon Boat, LLC*, 2017 WL 3608219, *5 (N.D. Ind. Aug. 22, 2017) (reference to "TAOD" was not CMI where the "the actual owners are The Art of Design, Inc. and/or Dean Loucks"); *Fashion Nova, LLC v. Blush Mark, Inc.*, 2023 WL 4307646, *5 (C.D. Cal. June 30, 2023) (filename of "FN … does not directly identify Fashion Nova pursuant to §1202(c)(2)").

**3**.    Emmerich also argues that its URLs "plainly include links to CMI," because "[o]nce a user inputs Emmerich's URL, he or she will be directed to the page at which the article is hosted," which

"unambiguously includes copyright information." Op.Br.56-57. That argument is badly misguided.

As an initial matter, the district court rejected Emmerich's contention that its URLs were links to CMI on its webpages because Emmerich failed to plead the alternate categories of CMI offered in its motions for summary judgment. ROA.72064; ROA.72069. The Court can reject Emmerich's link arguments for this reason alone.

Moreover, a "link" is related to, but distinct from a URL. A link is a clickable user computer element (text, image, button) that, when clicked, takes a user from one URL to another. *See Link*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/link; H. Comm. on the Judiciary, 105th Cong., H.R. Rep. No. 105-551, at 21 (1998) (describing "link" to refer to embedded pointers and hyperlinks). But the URL itself is just the internet address that a user can view; a link can take a viewer *to* a URL. Op.Br.5-6 (describing URLs as "the undergirding structure of links").

More fundamentally, the "link" contemplated in §1202(c)(7) is a link *from* copyrighted content *to* a page displaying CMI. CMI may include "[i]dentifying numbers or symbols referring to [copyrighted] information

or *links to such information*" if conveyed in connection with a copyrighted work. 17 U.S.C. §1202(c)(7) (emphasis added). But the URL of the page containing the copyrighted content itself is not a "link *to* such [CMI]." That would be circular—the page containing the copyrighted content does not "link" to itself, much less using its own URL.

4.    Even if Emmerich could show that its URLs contain, or are themselves, identifying information under 17 U.S.C. §1202(c)(1)-(8), it fails to show that any information is conveyed in connection with a copyrighted work. Emmerich agrees that the word "convey" requires that information is "impart[ed] or communicate[d]" by some "statement, suggestion, gesture, or appearance" in a copyrighted work. Op.Br.57. Emmerich, however, cites a Senate report for the proposition that "conveyed" should be construed "in its broadest sense" and include "information [] accessible in conjunction with, or appear[ing] with, the word being accessed." *Id.* at 57-58.

The plain text of "convey" speaks for itself. As explained, even if Emmerich is correct and that information contained in §1202(c)(1)-(8) appeared in a URL, no one would understand a name in a web address as corresponding to copyright ownership. *E.g.*, *Tomelleri*, 2015 WL

8375083, at *12; *Pers. Keepsakes*, 2012 WL 414803, at *6. And URLs do not satisfy even Emmerich's relaxed definition. URLs are not "used with," nor do they "appear with," any particular work. An article may often appear across the internet with different URLs and different filenames each time. ROA.68942-43 (examples of same content at different locations). That alone defeats Emmerich's argument.

Falling back, Emmerich protests the district court "premised" its conclusion on the fact that URLs "fail to provide notice" that any of the information in §1202(c)(1)-(8) is associated with a particular work. Op.Br.58. But the district court applied the plain text of "convey[]," concluding that URLs do not "convey[]" any information because they do not indicate that any information listed in §1202(c)(1)-(8) is "associated with a particular (copyrighted) work that appears at the online location indicated in the URL." ROA.72070. Once again, the district court simply, and correctly, followed the text.

## CONCLUSION

The Court should affirm.

February 23, 2026

Respectfully submitted,

s/ *Stephen J. Carmody*

Stephen J. Carmody, MSB #8345
Karen E. Howell, MSB #102243
BRUNINI, GRANTHAM,
GROWER & HEWES, PLLC
Post Office Drawer 119
Jackson, Mississippi 39205
Telephone: (601) 948-3101
Facsimile: (601) 960-6902
scarmody@brunini.com
khowell@brunini.com

*Counsel for Appellee Particle Media, Inc.*

# CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing appellate brief was filed electronically on February 23, 2026, and will, therefore, be served electronically upon all counsel.

 s/ *Stephen J. Carmody*
Stephen J. Carmody

## CERTIFICATE OF COMPLIANCE

The undersigned certifies that the foregoing brief complies with Fed. R. App. P. 32(a)(7)(B) and (C) because it contains 12,917 words. The brief also complies with the typeface and style requirements of Fed. R. App. P. 32(a)(5) & 32(a)(6) because it has been prepared in a proportionally spaced, roman style typeface of 14 points or more.

s/ *Stephen J. Carmody*
Stephen J. Carmody