No. 25-60550

## UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

**EMMERICH NEWSPAPERS, INC.,**
*Plaintiff-Appellant*,

v.

**PARTICLE MEDIA, INC., doing business as NEWSBREAK,**
*Defendant-Appellee.*

On Appeal from the United States District Court
for the Southern District of Mississippi
USDC No. 3:23-CV-26

**Brief *Amici Curiae* of
Google LLC, Wikimedia Foundation, Inc., and Internet Archive
in Support of Appellee and Affirmance**

MICHAEL S. KWUN
NEHA S. ANDERSON
KWUN BHANSALI LAZARUS LLP
555 Montgomery Street, Suite 750
San Francisco, California 94111
March 2, 2026                    (415) 630-2350

## Supplemental Statement of Interested Parties

No. 25-60550

*Emmerich Newspapers, Inc. v. Particle Media, Inc.*

Pursuant to 5TH CIR. R. 29.2, the undersigned counsel of record certifies that the following listed additional persons and entities as described in the fourth sentence of 5TH CIR. R. 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

1.    *Amicus curiae* Google LLC is a subsidiary of XXVI Holdings Inc., which is a subsidiary of Alphabet Inc., a publicly traded company; no publicly traded company holds more than 10% of Alphabet Inc.'s stock.

2.    *Amicus curiae* Wikimedia Foundation, Inc. is a non-profit organization with no parent corporation. No publicly held corporation owns 10% or more of its stock or other interest in the organization.

3.    *Amicus curiae* Internet Archive is a 501(c)(3) non-profit public charity with no parent corporation. No publicly held corporation owns 10% or more of its stock.

4.     The foregoing *amici curiae* are represented by Michael S. Kwun and

Neha S. Anderson of Kwun Bhansali Lazarus LLP.

March 2, 2026                              /s/ Michael S. Kwun

                                          MICHAEL S. KWUN
                                          *Attorney of record for Amici Curiae*
                                          *Google LLC, Wikimedia Foundation,*
                                          *Inc., and Internet Archive*

# Contents

Supplemental Statement of Interested Parties ..............................................i

Authorities .....................................................................................................iv

Introduction ....................................................................................................1

Interest of *Amici Curiae* ............................................................................4

Summary of Argument...................................................................................5

Argument..........................................................................................................7

    I.   This Court should adopt the server test because the plain text of the Copyright Act dictates that public display requires having either a copy or a perceptible representation of a work. ........................................................................................7

        A.   Showing a copy of a work "directly" requires having a copy............9

        B.   Showing a copy of a work "by means of a film, slide, [or] television image" requires having either a copy or a perceptible representation. ...............................................10

        C.   Showing a copy of a work "by means of . . . any other device or process" also requires having either a copy or a perceptible representation. ..................................................13

        D.   Any changes to the careful statutory scheme are for Congress to make. .............................................................14

    II.  The legislative history of the Copyright Act confirms that one cannot publicly display a work without having at least a perceptible representation of it.................................................15

    III. Instructions are not public displays.........................................17

    IV. Emmerich's dictionary-based argument is unavailing............................19

    V.  The Supreme Court's *Aereo* decision doesn't call the server test into question. ..................................................20

Conclusion......................................................................................................25

Certificate of Service....................................................................................26

Certificate of Compliance ..........................................................................26

# Authorities

## Cases

*Am. Broad. Cos. v. Aereo, Inc.*, 573 U.S. 431 (2014) ................6, 16, 20, 21, 22, 23

*BNSF Ry. Co. v. United States*, 775 F.3d 743 (5th Cir. 2015)..................................................................................20

*BWP Media USA, Inc. v. T & S Software Assocs., Inc.*, 852 F.3d 436 (5th Cir. 2017) ...........................................20

*Cotropia v. Chapman*, 978 F.3d 282 (5th Cir. 2020) ...........................................19

*Fortnightly Corp. v. United Artists Television, Inc.*, 392 U.S. 390 (1968) ...........................................15

*Goldman v. Breitbart News Network, LLC*, 302 F. Supp. 3d 585 (S.D.N.Y. 2018) ...........................................12

*Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576 (2008) ...........................................13

*Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258 (1992) ...........................................19

*Hunley v. Instagram, LLC*, 73 F.4th 1060 (9th Cir. 2023)...........................................17, 21, 23

*MAI Sys. Corp. v. Peak Comput., Inc.*, 991 F.2d 511 (9th Cir. 1993) ...........................................12

*Malbrough v. Crown Equip. Corp.*, 392 F.3d 135 (5th Cir. 2004)...........................................7

*Nicklen v. Sinclair Broad. Grp., Inc.*, 551 F. Supp. 3d 188 (S.D.N.Y. 2021) ...........................................14

*Perfect 10 v. Google, Inc.*, 416 F. Supp. 2d 828 (C.D. Cal. 2006), *aff'd in relevant part sub nom. Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007)...........................................3

*Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007) ...........................................12

*Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417 (1984) ...........................................18

iv

*Teleprompter Corp. v. Columbia Broad. Sys., Inc.*,
   415 U.S. 394 (1974) ..................................................................................15

**Statutes**

17 U.S.C. § 101 ........................................................5, 7, 8, 9, 10, 12, 13, 14, 15

17 U.S.C. § 106(1) ......................................................................................14

17 U.S.C. § 106(5) ....................................................................................7, 11

17 U.S.C. § 109(c) ......................................................................................15

17 U.S.C. § 110 ..........................................................................................15

17 U.S.C. § 110(5)(A) ............................................................................12, 15

**Legislative History**

H.R. Rep. No. 94-1476 (1976) ..............................................................11, 14, 16

**Other**

*How to Disable Images in Google Chrome*, wikiHow
   (Nov. 28, 2024),
   https://www.wikihow.com/Disable-Images-in-
   Google-Chrome ......................................................................................2

*HTML*, Wikipedia,
   https://simple.wikipedia.org/wiki/HTML .............................................1

Leomar Umpad, *How to Disable Images in Firefox*,
   Tech-Recipes, https://www.tech-
   recipes.com/internet/browsers/mozilla-firefox/how-
   to-disable-images-in-firefox/ ..................................................................2

## Introduction

The Copyright Act grants copyright owners the exclusive right to publicly display their works. The Ninth Circuit's "server test" correctly applies the statute's definition of public display to the architecture of the internet. It recognizes that to display a work publicly, one must possess either a copy or a perceptible representation[1] of it. *Amici* urge the Court to adopt the server test, but take no position on how it applies specifically to the facts underlying Emmerich's claims.

It is helpful as an initial matter to understand the relevant internet architecture. A website appears within a user's web browser as a single page, usually containing an integrated combination of text and images or videos. Those components seem to have a single source, but they often come from many sources. The user's web browser begins the process of rendering a webpage by requesting the HTML[2] file for that page. The HTML file is a markup file that includes any text to be shown to the user in addition to instructions about where to find and how

---

[1] As detailed in this brief, it is possible under the Copyright Act to publicly display a work without having a copy of it. The Act provides that a person receiving a transmitted display—for example, a shopkeeper who turns on a television in their shop—can publicly display the received transmission. Under the Copyright Act, both the broadcaster initiating the transmission and the shopkeeper receiving it can publicly display the work, even if the shopkeeper possesses only a temporary embodiment of each still image as the program is being broadcast.

[2] HTML (HyperText Markup Language) is a markup language used to create webpages. It tells web browsers what webpages should look like. *See HTML*, Wikipedia, https://simple.wikipedia.org/wiki/HTML.

1

to render other page components, including images. Those components might be on the same server as the one hosting the HTML file, but often they are not.

To address the distributed nature of the internet, HTML files include instructions to identify the different servers hosting remotely located components. If a component image is on a different server (and assuming the browser is configured, as it often will be, to automatically display the page's components[3]), the user's web browser will execute a choreographed dance involving more than one server.



---

[3] Modern browsers give users the option to disable the display of images, if they choose. *See, e.g., How to Disable Images in Google Chrome*, wikiHow (Nov. 28, 2024), https://www.wikihow.com/Disable-Images-in-Google-Chrome; Leomar Umpad, *How to Disable Images in Firefox*, Tech-Recipes, https://www.tech-recipes.com/internet/browsers/mozilla-firefox/how-to-disable-images-in-firefox/.

In the example above, there are four steps in this "dance." (1) The user's browser requests an HTML file from Server 1, which is hosting Website 1. (2) Server 1 sends that HTML file to the user's computer. (3) The user's browser interprets the instructions in the HTML file and sends a request to Server 2 to transmit the image of pink roses that is hosted on Server 2. (4) If it so chooses, Server 2 then transmits the image to the user's computer, where it is integrated into the webpage that the user sees. The assembly of a complete webpage is usually instantaneous; indeed, users might not realize that more than one server was involved in the process.[4]

The server test provides a definitive answer to whether Server 1 displayed the image of pink roses to the user: it did not. Under this standard, a server cannot display a work that it does not host, store, or possess in any perceptible form. The test disregards the user's subjective belief about the image's origin, focusing instead on the objective fact of its transmission. Because Server 1 did not—and could not—transmit the image of pink roses, it did not legally display the work. For that image, Server 1 transmitted only the HTML code containing instructions that pointed the user's browser to the image's remote location. Server 2, which hosted the image file and transmitted it to the user's browser, displayed the work.

---

[4] *See also Perfect 10 v. Google, Inc.*, 416 F. Supp. 2d 828, 833–34, 838–39 (C.D. Cal. 2006) (describing hypothetical illustrating the same process), *aff'd in relevant part sub nom. Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007).

Server 2 had a copy of the work to show. Server 1 had neither a copy nor any perceptible representation of it.

The server test isn't limited to this illustrative fact pattern. Its logic applies equally whenever a renderable component of a webpage—text, image, or video—comes not from the server hosting that webpage but from a server operated by a third party. And it applies irrespective of the particular instructions a website operator uses to identify the location of a remote component. At bottom, the server test reflects a pragmatic reality: you can't show what you don't have.

### Interest of *Amici Curiae*[5]

Google LLC is a diversified technology company whose mission is to organize the world's information and make it universally accessible and useful. Google offers a variety of products and services, including Google Search, Maps, Drive, and Gmail. Google's search offerings require Google to index billions of third-party sites, and it relies on settled precedent establishing that its practices are consistent with copyright law.

Wikimedia Foundation is a non-profit organization that operates twelve free-knowledge projects on the Internet, including Wikipedia. The Wikimedia

---

[5] No party's counsel authored this brief in whole or in part. No party or a party's counsel contributed money that was intended to fund preparing or submitting this brief. No person other than the *amici curiae*, their members, or their counsel contributed money that was intended to fund preparing or submitting this brief. *See* FED. R. APP. P. 29(a)(4)(E).

Foundation's mission is to develop and maintain factual and educational content created and moderated by volunteer contributors, and to provide this content to people around the world free of charge. Since its creation, users have created over 205 million articles on Wikipedia with a variety of licensed content.

The Internet Archive is a 501(c)(3) nonprofit public charity and federal depository library. It serves millions of people each day through its website archive.org.

All parties have consented to the filing of this brief.

## Summary of Argument

The plain language of the Copyright Act dictates the adoption of the server test. The Act states that "to 'display' a work means to show a copy of it . . . ." 17 U.S.C. § 101. The statute defines several ways to "show a copy" of a work, each of which requires having at least a perceptible representation of the work. Simply telling someone about a work, including where and how to see it, is not a display of that work under the Copyright Act. The Court should adopt the server test, reflecting that a defendant who has neither a copy nor a perceptible representation of a work doesn't display that work, and thus cannot infringe the public display right.

Nothing in the statutory text supports a contrary understanding. Congress's precision in defining infringement of the public display right counsels against

reading anything more into it. Moreover, the legislative history of the public display right created by the Copyright Act of 1976 confirms this understanding. Congress nowhere suggested that one could publicly display a work without transmitting or communicating a copy, or at least a perceptible representation, of it.

Under the server test, providing instructions for where to find a work doesn't constitute a display of that work. Such instructions merely direct a user's device to the server hosting the embedded content; they do not transmit or communicate the work itself. To expand the definition of public display beyond this technical reality would overstep the judiciary's role and encroach on Congress's authority to define the scope of an author's limited monopoly.

In the face of unambiguous statutory language, Emmerich's resort to the dictionary is particularly unpersuasive. Its attempt to sidestep the plain text of the Copyright Act through the ill-fitting application of a dictionary definition obfuscates rather than clarifies. The statutory text is plain on its face; there is no reason to resort to a dictionary definition to create ambiguity.

The Supreme Court's decision in *American Broadcasting Cos. v. Aereo, Inc.*, 573 U.S. 431 (2014), doesn't counsel a different result. *Aereo* is a public performance case that post-dates the first adoption of the server test. In that case, Aereo created digital files of audiovisual works and transmitted them to its customers. If the logic of the server test were extended to the public performance

right, Aereo's on-demand streaming of files to its subscribers would be a public performance by Aereo—the same conclusion reached by the Supreme Court. *Aereo* doesn't call the server test into question.

## Argument

*Amici* urge the Court to adopt the server test and hold that a copyright defendant cannot "display the copyrighted work publicly," 17 U.S.C. § 106(5), within the plain meaning of the Copyright Act unless it possesses a copy of the work, or at least a perceptible representation of it. *Id.* § 101 (defining "display" to mean "to show a copy"). The Court here need only address the legal question of whether to adopt the server test; any fact questions about its application are not before the Court in this interlocutory appeal. *See Malbrough v. Crown Equip. Corp.*, 392 F.3d 135, 136 (5th Cir. 2004) (limiting review in a § 1292(b) appeal to "controlling question of law").

I.   **This Court should adopt the server test because the plain text of the Copyright Act dictates that public display requires having either a copy or a perceptible representation of a work.**

The Copyright Act grants the copyright owner the exclusive right to display a work publicly. 17 U.S.C. § 106(5). To "display" a work means "to show a copy of it, either directly or by means of a film, slide, television image, or any other device or process." *Id.* § 101 (defining "display").

7

The Act defines two ways to "publicly" display a work. First, one can display it "at a place open to the public or at any place where a substantial number of persons outside of a normal circle of a family and its social acquaintances is gathered." *Id.* (defining "publicly"). Alternatively, one can display it by "transmit[ting] or otherwise communicat[ing]" it to members of the public "by means of any device or process." *Id.* Such transmission or communication is a public display whether the members of the public "receive it in the same place or in separate places and at the same time or at different times." *Id.*

The Act also specifically limits the word "copies" to "material objects" in which "a work is fixed"—i.e., in which an embodiment of the work is "sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration." *Id.* (defining "copies" and "fixed").

Under the plain meaning of the statutory text, one cannot "show a copy" of a work without *having* a copy, or at least a perceptible representation, of that work. Telling someone where a copy is, or how to ask to see a copy, is different from showing a copy; no one would say that someone who tells a friend to go to a gallery "displays" or "shows" the featured artist's paintings. A careful reading of the Copyright Act's very precise text confirms this.

8

The Act defines three ways to "show a copy" of a work. Each requires possession of at least a perceptible representation of the work. First, one cannot "directly" (*id.*) show a copy without having a copy of that work—i.e., a material object in which the work is fixed. Second, one cannot show a copy of a work "by means of a film, slide, [or] television image" (*id.*) without having at least a perceptible representation of the copy being shown—i.e., in the form of a temporary projection or received transmission on a screen. Third, one cannot show a copy "by means of any other device or process" (*id.*) without, again, having at least a perceptible representation of the copy being shown.

Nothing in the statutory text supports a contrary understanding of the public display right. Congress's precision in defining infringement of the public display right counsels against reading into it more ways to "show a copy" than the statutory text provides.

A.     **Showing a copy of a work "directly" requires having a copy.**

The first way to publicly display a work is by "directly" showing a copy of it to the public. *Id.* Directly showing a copy requires possessing a copy—a "material object[] . . . in which a work is fixed . . . ." *Id.* (defining "copies").

Using the example from this brief's introduction, whatever Server 1 might be doing when it sends instructions to the user's browser, sending those instructions doesn't "directly" show a copy of a work if that copy resides on Server 2. Server 1 cannot "directly" show a copy that Server 1 doesn't have. Only Server 2, which hosts the image file, has a copy to show. And the operator of Server 2 can remove that copy at any time (or replace it with a different work) with the effect of preventing its transmission to a user whose browser is attempting to load and render the various components of Website 1.

**B.    Showing a copy of a work "by means of a film, slide, [or] television image" requires having either a copy or a perceptible representation.**

Showing a copy "by means of a film, slide, [or] television image" (*id.*) also requires having a perceptible representation of it. Showing a copy "by means of a film, slide, [or] television image" is analytically different from "directly" showing a copy, because the viewers are literally seeing a perceptible representation[6] of the image that isn't the "copy" itself. For example, when an audience sees an image that is projected on a screen, the slide (the "copy" from which the image is projected) might be behind them. The projected image, or one illuminated on a television screen, is the representation that the viewers literally perceive, but if that

---

[6] In casual conversation, one might call an image on a screen a "copy." Because the Copyright Act expressly defines "copy" to be a material object in which a work is fixed, this brief avoids using "copy" except in the specific sense of the Copyright Act.

ephemeral image communicates a work that is elsewhere fixed in a material object (a "copy"), the "by means of" clause makes the projected image a public display in its own right.

Sometimes one who shows a copy under the "by means of" clause will possess the material object (the "copy") being shown—for example, the film or slide through which an image is projected and then seen. But it is also possible to show a copy of a work under the "by means of" clause without possessing the copy that is being shown. For example, a single frame from an audiovisual work[7] embodied in a broadcast signal can be shown by the recipient of the signal, in addition to the transmitter, even though the recipient never possesses a fixation (a "copy") of the work. *See* H.R. Rep. No. 94-1476, at 53 (1976) (fixation excludes "purely evanescent or transient reproductions such as those projected briefly on a screen, shown electronically on a television or other cathode ray tube, or captured momentarily in the 'memory' of a computer").

In a public setting like a coffee shop, a television image from an audiovisual work that is elsewhere fixed—for example, on a server belonging to Netflix or Amazon—is a public display because the television communicates the streaming

---

[7] The public display right includes the display of "individual images of a motion picture or other audiovisual work." *Id.* § 106(5).

service's copy to the shop's customers.[8] But to show a copy by means of a television image, the shopkeeper still must *have* the television image—a perceptible representation of the image from the audiovisual work, albeit an "evanescent" one.

Showing a copy of a work "by means of a film, slide, [or] television image" thus always requires possession of at least a perceptible representation of the work[9]—an image temporarily projected onto a screen or transmitted to a television. Indeed, that possession is what allows one to "transmit or otherwise communicate . . . the work . . . to the public." *See* 17 U.S.C. § 101 (defining "publicly"). Even if possession of a "copy" isn't strictly necessary to show a copy

---

[8] While Congress expressly included the "television image" example in its definition of public display, it also generally exempted from *infringement* a "communication of a transmission embodying a performance or display of a work by the public reception of the transmission on a single receiving apparatus of a kind commonly used in private homes . . . ." 17 U.S.C. § 110(5)(A). The existence of that exemption nonetheless confirms that even though the shopkeeper who turns on the television might not have a "copy" of anything shown on the screen, a television image in a public setting can be a public display. *See Goldman v. Breitbart News Network, LLC*, 302 F. Supp. 3d 585, 595 (S.D.N.Y. 2018) (discussing the server test and 17 U.S.C. § 110(5)(A)).

[9] The Ninth Circuit's explanation of the server test has at times focused on whether the defendant possesses a "copy" of the work. *See, e.g., Perfect 10, Inc. v. Amazon.com, Inc.,* 508 F.3d 1146, 1160–61 (9th Cir. 2007) ("Google does not have a copy of the images for purposes of the Copyright Act . . . and thus cannot communicate a copy."). As a practical matter, for a digital computer to transmit a work, it must store the work at least in RAM. The Ninth Circuit treats a perceptible representation in RAM as fixed, so in the Ninth Circuit it is a "copy." *MAI Sys. Corp. v. Peak Comput., Inc.*, 991 F.2d 511, 517–18 (9th Cir. 1993). In the Ninth Circuit, then, a digital computer that "displays" a work likely must possess a "copy" of the work. Outside the Ninth Circuit, though, the server test might be better stated as requiring possession of a perceptible representation of the work, without regard to whether the representation (perhaps in RAM) is a "copy."

of a work, as the example of the shopkeeper with a television image illustrates, in each of the three specific examples in the "by means of" clause it's impossible to show a copy of a work without having at least some perceptible representation of the work (such as the television image).

Returning to the example in this brief's introduction, Server 1 lacks any perceptible representation of the image of pink roses, and instead has only instructions that make it possible for the user's browser to request a perceptible representation from Server 2. The server test is consistent with the statutory definition of showing a copy of a work "by means of a film, slide, [or] television image."

**C.**     **Showing a copy of a work "by means of . . . any other device or process" also requires having either a copy or a perceptible representation.**

The final "or any other device or process" option in the statute's "by means of" clause (*id.*) doesn't create an exception to the rule that one cannot show a copy of a work without having at least a perceptible representation of it. This general term must be understood by the company it keeps, because "when a statute sets out a series of specific items ending with a general term, that general term is confined to covering subjects comparable to the specifics it follows." *Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 586 (2008).

As just explained, each of the specifics in the statutory text—"showing by means of a film, slide, [or] television image"—conforms to the commonsense understanding that one cannot show something without having at least a perceptible representation of it. The "any other" general term that follows is analogously confined. The server test correctly reflects that a defendant cannot "show" something that never passes—not even evanescently[10]—through the defendant's hands.

### D.    Any changes to the careful statutory scheme are for Congress to make.

The server test doesn't reduce the public display right to an "atrophied appendage of the reproduction right." *See Nicklen v. Sinclair Broad. Grp., Inc.*, 551 F. Supp. 3d 188, 195 (S.D.N.Y. 2021) (quotation marks and citation omitted). Infringing the reproduction right requires reproducing the work in "copies or phonorecords." 17 U.S.C. § 106(1). "Phonorecords," like "copies," must be material objects. *Id.* § 101 (defining "phonorecords"). The example of the television image shown by a shopkeeper, *see* Arg. I.B, *supra*, explains why the public display right doesn't strictly require having a "copy" or other material object, and therefore also does not require reproducing a copy or phonorecord.

---

[10] H.R. Rep. No. 94-1476, at 53.

If Emmerich or others believe the public display right should be expanded, that is for Congress to decide. The statutory text reflects a thoughtful balance chosen by Congress. For example, notwithstanding the copyright owner's exclusive public display right, the owner of a lawful copy of a work needs no authorization to "display that copy publicly . . . at the place where the copy is located." *Id.* § 109(c). And while "showing a copy . . . by means of a . . . television image" in a public setting—as in the example of the coffee shop—can be a public display (*id.* § 101), that public display is noninfringing unless there is a direct charge for it. *Id.* § 110(5)(A). These detailed limits on the scope of the public display right reflect only part of Congress's careful calibration. *See generally id.* § 110 (providing further exemptions). If the scope of the right needs to change, that is for Congress to decide, not the courts.

## II.     The legislative history of the Copyright Act confirms that one cannot publicly display a work without having at least a perceptible representation of it.

The legislative history confirms that Congress meant what it said. Before the Copyright Act of 1976, the Supreme Court held that community antenna television (CATV) systems that amplified and retransmitted broadcast television signals didn't publicly "perform" the works embodied in those signals. *See Fortnightly Corp. v. United Artists Television, Inc.*, 392 U.S. 390 (1968); *Teleprompter Corp. v. Columbia Broad. Sys., Inc.*, 415 U.S. 394 (1974).

In response, Congress enacted new definitions of public performance and public display as part of the Copyright Act of 1976.[11] "Under the definitions of 'perform,' 'display,' 'publicly,' and 'transmit' in section 101, the concepts of public performance and public display cover not only the initial rendition or showing, but also any further act by which that rendition or showing is *transmitted or communicated* to the public." H.R. Rep. No. 94-1476, at 63 (emphasis added). Whatever else might be true, Congress still intended that some "rendition or showing"—some perceptible representation—must be "transmitted or communicated" to the public for a work to be publicly performed or publicly displayed. *Id.*

The legislative history of the "by means of" clause confirms this conclusion. In addition to the direct showing of a "copy," the House Report explains that "display" includes "the projection of an image on a screen or other surface by any method, the transmission of an image by electronic or other means, and the showing of an image on a cathode ray tube, or similar viewing apparatus connected with any sort of information storage and retrieval system." *Id.* at 64. Each of these options—projection, transmission, or showing on a viewing apparatus connected to an information storage system—requires having either a copy or a perceptible

---

[11] *See Aereo*, 573 U.S. at 439 ("History makes plain that one of Congress' primary purposes in amending the Copyright Act in 1976 was to overturn this Court's determination that [CATV] systems (the precursors of modern cable systems) fell outside the Act's scope.").

representation of the work. The projection of an image on a surface can be "by any method," the transmission by "electronic or other means," and the showing can be of an image on any "similar viewing apparatus," but in each case to publicly display one must *have* the image being displayed in one form (a copy) or the other (a perceptible representation).

The legislative history of the Copyright Act reveals no intent to deviate from the plain language meaning that "showing" a work by some means still requires having at least a perceptible representation of it. The server test correctly applies this rule to the internet's architecture.

## III.    Instructions are not public displays.

Embedding[12] involves providing instructions (lines of code) that direct a user's device to content located on a third-party server. Those instructions are neither a copy of that content, nor are they a perceptible representation of it. One cannot show a copy of a work merely by sending someone instructions that explain where to find it.

This reality comes even more sharply into focus when one considers that the provider of instructions has no control over what the follower of those instructions

---

[12] Nothing about the logic of the server test depends on the technological terminology used to describe what is happening. The Ninth Circuit uses the terms "embedding," "in-line linking," and "framing" interchangeably for purposes of the server test. *Hunley v. Instagram, LLC*, 73 F.4th 1060, 1062 n.1 (9th Cir. 2023).

might find. If the operator of Server 2 in our example substitutes an image of a skunk where the pink roses used to be, users looking for roses on Website 1 will be surprised by what shows up in their browsers.

Applying the public display right to the technology of the internet doesn't change the practical fact that you can't show what you don't have. "Sound policy, as well as history" supports judicial "deference to Congress when major technological innovations alter the market for copyrighted materials." *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 431 (1984). Here, the statutory text doesn't require adoption of Emmerich's proposed definition of public display; Congress hasn't "plainly marked [the] course" that Emmerich advocates. *Id.*

In the nearly fifty years since the adoption of the 1976 Act—and in the nearly two decades since the Ninth Circuit's adoption of the server test—the effects of the innovations of the internet have grown exponentially, yet Congress hasn't amended the definition of the public display right. Deference to Congress's role in defining the scope of the limited monopoly granted to authors counsels against reading the public display right to extend to providing instructions about how a work can be viewed.

**IV.    Emmerich's dictionary-based argument is unavailing.**

Emmerich argues that Particle publicly displayed its works by supposedly "causing" users to see copies of those works. Emmerich Br. 25. Emmerich argues that (1) section 101 defines "display" to mean "show a copy"; (2) Merriam-Webster defines "show" to mean "cause . . . to be seen"; (3) when Particle sends a file with an embedding reference, that causes the user's device to request a file from Emmerich; (4) requesting the file causes Emmerich to send the file; (5) sending the file causes the device to render Emmerich's work; and (6) rendering the work causes the user to see a copy of the work. This long chain divorces the word "cause" from the word "display" that Emmerich ultimately claims to be defining. *Cf. Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 287 (1992) (Scalia, J., concurring) ("'for want of a nail, a kingdom was lost' is a commentary on fate, not the statement of a major cause of action against a blacksmith") (citation omitted).

Emmerich's reliance on a dictionary definition is unnecessary; it attempts to sow uncertainty that doesn't otherwise exist. While dictionary definitions can help resolve ambiguities created by the statutory text, courts "need not resort to dictionary definitions where statutory definitions leave no ambiguity." *Cotropia v. Chapman*, 978 F.3d 282, 289 (5th Cir. 2020). It defies common sense to suggest that a defendant publicly "displays" or "shows" an image or article by telling users

to ask a server that the defendant does not control to send a file to the user. Dictionary definitions should be used "only to illuminate true ambiguity, rather than to create ambiguity where no honest disagreement about meaning exists . . . ." *BNSF Ry. Co. v. United States*, 775 F.3d 743, 754 (5th Cir. 2015). No one needs a dictionary to know that they cannot show something if they lack even a perceptible representation of it.

Even were the Court to conclude that "causing" a copy to be seen could constitute a display, "proximate causation historically underlines copyright infringement liability no less than other torts." *BWP Media USA, Inc. v. T & S Software Assocs., Inc.*, 852 F.3d 436, 440 n.1 (5th Cir. 2017) (citation omitted). Telling friends to visit a gallery is not the proximate cause of them seeing paintings at the gallery, because the gallery must decide to permit them to enter. Likewise, if Server 1 sends instructions to a web browser about how to request a file from Server 2, Server 1 doesn't control whether Server 2 sends the file. If a user sees a copy of a work sent by Server 2, Server 1 is not the proximate cause of the user seeing that copy.

## V. The Supreme Court's *Aereo* decision doesn't call the server test into question.

*Aereo* is a public performance right case. 573 U.S. at 437. The server test addresses a different right, the public display right. But applying the server test to

the public performance right and the facts in *Aereo* would have led to the same outcome reached by the Supreme Court.

In Aereo's system, "one of Aereo's servers selects an antenna." *Id.* at 436. "A server then tunes the antenna to the over-the-air broadcast . . . and an Aereo transcoder translates the signals received into data that can be transmitted over the Internet." *Id.* An Aereo server then "saves the data in a subscriber-specific folder on Aereo's hard drive," and the Aereo server "begins to stream the saved copy of the show to the subscriber over the Internet." *Id.* at 436–37.

There was no dispute that there was a performance, but Aereo argued that its subscriber *privately* performed the work, while it merely supplied the equipment used. *See id.* at 437–38. The Supreme Court disagreed, holding that the history that led to the 1976 Act's definition of publicly perform "makes clear that Aereo is not simply an equipment provider." *Id.* at 442.

Under the server test, "infringing the exclusive right of public display requires the transmission of a display." *Hunley*, 73 F.4th at 1069. Applied to the public performance right, the server test would require transmission of a performance. When Aereo's system streamed a saved copy of a show to a subscriber, that was a transmission of a performance. When a user visits a website and sees a work sent to the user by Emmerich's servers, the outcome is no

different; if Emmerich transmitted the work to the user, Emmerich displayed the work.

Emmerich argues that, under *Aereo*, technical differences that are "invisible to subscriber and broadcaster alike," 573 U.S. at 444, cannot defeat liability. But the "broadcaster" in *Aereo* was the copyright owner—the technical difference was invisible to both subscriber and copyright owner. In the present case, the technical difference considered by the server test isn't invisible to Emmerich. If Particle embeds Emmerich's works, Emmerich's server receives and responds to requests from the users. If Particle instead hosts those works on its own server, Emmerich receives no requests and sends nothing. The technical difference between embedding and its alternative is readily apparent to Emmerich, the copyright owner. Moreover, Emmerich can control whether to respond to particular inbound requests. By contrast, the broadcasters in Aereo were transmitting their signals over-the-air for anyone with an antenna to pick up.

The Supreme Court's aside must also be read in the context in which it was made—the Court's consideration of the history that led to the 1976 Act's statutory definition of the public performance right. The Court concluded that Congress intended to overturn the Court's pre-1976 Act determination that CATV systems didn't publicly perform works when they amplified and retransmitted broadcast signals. *See id.* at 438. Both a CATV subscriber and an Aereo subscriber viewed

programming that was broadcast by a television station, then transmitted by the CATV or Aereo system, and then received by the subscriber.



The technical difference was whether the defendant (in between the copyright owner and the subscriber) sent material to the subscriber continuously (as CATV services did) or only when the subscriber tuned to a channel (as Aereo's system did). *Id.* at 443. That difference was invisible to subscriber and copyright owner alike. In either scenario, the defendant sent a perceptible representation to the subscriber watching the programming—a CATV system retransmitted broadcast signals, and Aereo's system transcoded the signals and transmitted a digital stream. *See Hunley*, 73 F.4th at 1074 ("*Aereo* may have clarified who is liable for retransmitting or providing equipment to facilitate access to a display—but unless an underlying 'copy'[13] of the work is being transmitted, there is no direct infringement of the exclusive display right.").

Embedding isn't analogous to a CATV service or Aereo's system. The embedder sends instructions about where to find a work to the user's device. The

---

[13] Again, outside the Ninth Circuit, the safer course might be to state the server test in terms of a "perceptible representation" rather than a "copy." *See* Arg. I.B n.9, *supra* (discussing RAM representations).

user's device asks a different server for the work. That server transmits the work to the user's device. Only in the final step—a transmission from the server (in the present case, the copyright owner's server) to the user—is there a perceptible representation of the work.



The Supreme Court didn't consider whether one who never possesses a perceptible representation of a work could or should be liable for publicly performing the work. Neither does anything in *Aereo* explain how it could be possible for an embedder to publicly display something without having a perceptible representation of it.

The Supreme Court concluded that Aereo, which created a digital copy and transmitted it, performed the work that it transmitted to its subscribers. The server test analogously holds that a server that transmits the work to a user who requested it displays the work. If Particle doesn't transmit a work to the user, it cannot publicly display the work.

**Conclusion**

For the foregoing reasons, *amici* urge the Court to adopt the server test. The

Court should hold that a defendant that never possesses either a copy or a

perceptible representation of a work doesn't publicly display the work.

Respectfully submitted,

March 2, 2026

/s/ Michael S. Kwun

MICHAEL S. KWUN
NEHA S. ANDERSON
KWUN BHANSALI LAZARUS LLP
555 Montgomery Street, Suite 750
San Francisco, California 94111
(415) 630-2350
*Attorneys for Amici Curiae*

**Certificate of Service**

I certify that this brief is being served on all required parties through the court's electronic filing system.

March 2, 2026                          /s/ Michael S. Kwun
                                       MICHAEL S. KWUN

**Certificate of Compliance**

1.      This document complies with the word limit of FED. R. APP. P. 29(a)(5) and 32(a)(7)(B) because, excluding the parts of the document exempted by FED. R. APP. P. 32(f) and 5TH CIR. R. 32.2, it contains 5,849 words.

2.      This document complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type-style requirements of FED. R. APP. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman type.

March 2, 2026                          /s/ Michael S. Kwun
                                       MICHAEL S. KWUN