NO. 25-60550

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

EMMERICH NEWSPAPERS, INCORPORATED,

PLAINTIFF -APPELLANT,

V.

PARTICLE MEDIA, INCORPORATED, doing business as NEWSBREAK,

DEFENDANT- APPELLEE.

On Appeal from the United States District Court
for the Southern District of Mississippi
No. 3:23-cv-26 TSL-MTP

**BRIEF OF AMICI CURIAE ELECTRONIC FRONTIER FOUNDATION, AMERICAN LIBRARY ASSOCIATION, ASSOCIATION OF RESEARCH LIBRARIES, CHAMBER OF PROGRESS, COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION, PUBLIC KNOWLEDGE, AND ORGANIZATION FOR TRANSFORMATIVE WORKS IN SUPPORT OF DEFENDANT- APPELLEE AND AFFIRMANCE**

Mitchell L. Stoltz
 *Counsel of Record*
Corynne McSherry
Victoria Noble
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109
Email: mitch@eff.org
Telephone: (415) 436-9333
Fax:  (415) 436-9993

*Counsel for Amici Curiae*

## STATEMENT OF INTERESTED PARTIES

Pursuant to this Court's Rule 29.2, the undersigned counsel of record for *amici curiae* certifies that the following additional persons and entities, as described in Firth Circuit Rule 28.2.1, have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

1. Electronic Frontier Foundation ("EFF"), American Library Association ("ALA"), Association of Research Libraries ("ARL"), Computer & Communications Industry Association ("CCIA"), Chamber of Progress, Public Knowledge ("PK"), and Organization for Transformative Works ("OTW"), *amici curiae*. EFF, ALA, ARL, PK, and OTW are nonprofit organizations recognized as tax exempt under Internal Revenue Code § 501(c)(3). CCIA and Chamber of Progress are nonprofit organizations recognized as tax exempt under Internal Revenue Code § 501(c)(6). None of *amici* have a parent corporation and no publicly held corporation owns 10 percent or more of their stock.

2. Mitchell L. Stoltz, Corynne McSherry, and Victoria Noble, *counsel for amici curiae* Electronic Frontier Foundation, American Library Association, Association of Research Libraries, Computer & Communications Industry Association, Chamber of Progress, Public

Knowledge and Organization for Transformative Works.

Dated: March 2, 2026        By:   /s/ *Mitchell L. Stoltz*
                      Mitchell L. Stoltz

                     *Counsel for Amici Curiae*

**TABLE OF CONTENTS**

STATEMENT OF INTERESTED PARTIES.................................................................i

TABLE OF AUTHORITIES.............................................................................v

STATEMENT OF INTEREST OF AMICI ...........................................................1

INTRODUCTION ........................................................................................4

ARGUMENT ..............................................................................................5

    I.      LINKING AND EMBEDDING ARE FUNDAMENTAL TO THE OPERATION OF THE INTERNET. ................................................5

          A.    A Webpage Is a Collection of Resources, Often Linked from Different Sources. ...............................................6

          B.    Many Uses of the Internet Depend on Linking and Embedding. ...............................................................9

               1.    Streamlined access to content and information. .............10

               2.    Interactive and multimedia web features........................11

               3.    Dynamic, up-to-date information. .................................12

               4.    Forums, discussion boards and social media. ................12

               5.    Advertising .................................................................13

               6.    Additional functionalities ...........................................13

    II.     THIS COURT SHOULD NOT ENDANGER THE ABILITY TO LINK AND EMBED BY ABANDONING THE SERVER TEST....14

          A.    The Server Test Is Equitable, Easy to Apply, and Provides Essential Legal Certainty. ..........................................15

          B.    Upending the Server Test Would Create a Tsunami of Legal Risk. ........................................................................16

    III.    LINKING AND EMBEDDING DO NOT VIOLATE SECTION 1202..............................................................................18

     A.    URLs Identify Locations, Not Owners, Authors, or Titles. .....19

     B.    Appellant's Theory Would Invite a New Wave of Copyright Trolling. ....................................................................................21

CONCLUSION ....................................................................................24

CERTIFICATE OF COMPLIANCE ....................................................26

CERTIFICATE OF SERVICE.............................................................27

iv

# TABLE OF AUTHORITIES

**Cases**

*AF Holdings, LLC v. Does 1–1058*,
752 F.3d 990 (D.C. Cir. 2014) ............................................................................22

*Bell v. Eagle Mountain Saginaw Indep. Sch. Dist.*,
27 F.4th 313 (5th Cir. 2022) ...............................................................................23

*Bell v. Wilmott Storage Servs.*,
*LLC*, 12 F.4th 1065 (9th Cir. 2021) ...................................................................23

*Craig v. UMG Recordings, Inc.*,
380 F. Supp. 3d 324 (S.D.N.Y. 2019)..................................................................23

*Design Basics, LLC v. Lexington Homes, Inc.*,
858 F.3d 1093 (7th Cir. 2017) ......................................................................22, 23

*Doe 1 v. GitHub, Inc.*,
672 F. Supp. 3d 837 (N.D. Cal. 2023) .................................................................21

*Emmerich Newspapers, Inc. v Particle Media*,
2025 WL 2146609 (S.D.Miss. July 292025) ......................................................19

*Fischer v. Forrest*,
968 F.3d 216 (2d Cir. 2020)................................................................................18

*Flava Works, Inc. v. Gunter*,
689 F.3d 754 (7th Cir. 2012) ..............................................................................15

*Kadrey v. Meta Platforms, Inc.*,
2025 WL 1786418 (N.D. Cal. June 27, 2025) .....................................................18

*L.A. News Serv. v. Reuters Television Int'l, Ltd.*,
149 F.3d 987 (9th Cir. 1998) ..............................................................................17

*Liebowitz v. Bandshell Artist Mgmt.*,
6 F.4th 267 (2d Cir. 2021) ..................................................................................22

*Liebowitz v. Bandshell Artist Mgmt.*,
858 F. App'x 457 (2d Cir. 2021) .........................................................................22

*Limelight Networks, Inc. v. Akamai Technologies, Inc.*,
572 U.S. 915 (2014).............................................................................................24

*Matter of Liebowitz*,
226 A.D.3d 117 (2024) ........................................................................................23

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
    545 U.S. 913 (2005) ..............................................................................15

*Packingham v. North Carolina*,
    582 U.S. 98 (2017) ................................................................................16

*Perfect 10 v. Amazon*,
    508 F.3d 1146 (9th Cir. 2007) ............................................................14

*Reno v. Am. Civil Liberties Union*,
    521 U.S. 844 (1997) ..............................................................................16

*Righthaven LLC v. Democratic Underground, LLC*,
    791 F. Supp. 2d 968 (D. Nev. 2011) ...................................................22

*Rock v. Enfants Riches Deprimes, LLC*,
    2020 WL 468904 (S.D.N.Y. Jan. 29, 2020) ........................................23

*Schneider v. YouTube, LLC*,
    649 F. Supp. 3d 872 (N.D. Cal. 2023) ................................................21

*Society of Holy Transfiguration Monastery, Inc. v. Gregory*,
    689 F.3d 29 (1st Cir. 2012) ..................................................................14

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
    464 U.S. 417 (1984) ..............................................................................24

*Usherson v. Bandshell Artist Mgmt.*,
    2020 WL 3483661 (S.D.N.Y. June 26, 2020) ...............................22, 23

*Viral DRM, LLC v. Seven W. Media Ltd*,
    768 F. Supp. 3d 1025 (N.D. Cal. 2025) ..............................................24

**Statutes**

17 U.S.C. § 107 ...........................................................................................18

17 U.S.C. § 1202 ...............................................................................4, 18, 19

17 U.S.C. § 1203 ......................................................................................5, 24

17 U.S.C. § 504 ...........................................................................................17

**Constitutional Provisions**

U.S. Const. art. I, § 8, cl. 8 .....................................................................4, 23

**Other Authorities**

*Adjust the Calculator to Estimate Your Monthly Mortgage Payment*, U.S. BANK .11

*Adult BMI Calculator*, U.S. CTRS. FOR DISEASE CONTROL AND PREVENTION ........12

*All-in-One Reviews*, ELFSITE.................................................................11

*Block Access From Countries by Using the Firewall*, GODADDY ..........................9

Buffy, *How Do I Upload Images and GIFS?*, DISCORD .....................................13

*Chart Widget*, BENZINGA.................................................................12

Duce, *Historic Houston Images*, HOUS. ARCHITECTURE INFO. F. (Dec. 28, 2004)..13

*Embedding Media and Third-Party Content on Your Website*, WORDPRESS .........10

*How to Embed Jobs on Your Website (Job Widget)*, WORKABLE .........................12

HTTP Archive, *Third Parties*, WEB ALMANAC (Jan. 15, 2026)............................6, 9

Hu Fu et al., *Ad Auctions with Data*, 7615 LECTURE NOTES IN COMP. SCI. 168, 168
  (2012) ...........................................................................8

Joan Calzada & Ricard Gil, *What Do News Aggregators Do? Evidence from
  Google News in Spain and Germany*, 39 MARKETING SCI., 134 (2020) ..............16

Jonathan Zittrain, Kendra Albert & Lawrence Lessig, *Perma: Scoping and
  Addressing the Problem of Link and Reference Rot in Legal Citations*, 127
  HARV. L. REV. FORUM 176 (2014) ...........................................8, 15

Joseph Lorenzo Hall, *Why Embedding Content Matters*, INTERNET SOC'Y (Oct. 26,
  2022) ...........................................................................9

Matthew Sag, *Copyright Trolling, An Empirical Study*, 100 Iowa L. Rev. 1105
  (2015) ..........................................................................22

Mozilla, *403 Forbidden,* Mozilla Developer Network...............................9

Mozilla, *Creating Links*, MOZILLA DEVELOPER NETWORK ................................6, 10

Mozilla, *From Object to iFrame — General Embedding Technologies*, MOZILLA
  DEVELOPER NETWORK...............................................................7

Mozilla, *What is a URL?*, MOZILLA DEVELOPER NETWORK ...................................6

Mustafa Boleken, *5 Step-Guide on How to Make a Video Streaming Server*, ANT
  MEDIA............................................................................8

Natasha Singer, *Your Online Attention, Bought in an Instant*,
  The New York Times (Nov. 17, 2012) ............................................13

*Opinions Citing Internet Resources*, U.S. COURT OF APPEALS LIBR. FOR FIFTH CIR 8

PINTREST .........................................................................13

Superior Court of California: County of Orange, *Courtroom Live Streaming*, JUD.
  COUNCIL CAL. ..................................................................12

*The Maps Embeded API Overview*, Google Maps Platform ...............................11

Tim Berners-Lee, *Realising the Full Potential of the Web*, W3 (Dec. 3, 1997)5, 6, 9

*U.S. v. Steele*, No. 16-cv-00334, Plea Agreement and Sentencing Stipulations, ECF No. 43 (D. Minn. Mar. 6, 2017)........................................................................22

*Why Do You Need a Cookie Banner & How to Stay Compliant with Privacy Laws Like the GDPR and CCPA*, Osano (Jan. 6, 2023) ...............................................14

**STATEMENT OF INTEREST OF AMICI**[1]

The Electronic Frontier Foundation ("EFF") is a non-profit civil liberties organization with more than 30,000 dues-paying members that has worked for more than 30 years to ensure that technology supports freedom, justice, and innovation for all people of the world. EFF represents the interests of technology users in court cases and policy debates regarding the application of law to digital technologies. EFF, its members, and the broader community of technology users they represent have a strong interest in a copyright system that promotes progress by safeguarding freedom of expression and access to knowledge.

The American Library Association ("ALA"), established in 1876, is a nonprofit professional organization of more than 50,000 librarians, library trustees, and other friends of libraries dedicated to providing and improving library services and promoting the public interest in a free and open information society. The Association of Research Libraries ("ARL") is an association of 123 research libraries in North America. ARL's members include university libraries, public libraries, and government and national libraries. ARL programs and services promote equitable access to and effective use of recorded knowledge in support of

---

[1] Pursuant to Federal Rule of Appellate Procedure Rule 29(a)(4)(E), *amici* certify that no person or entity, other than *amici curiae,* their members, or their counsel, made a monetary contribution to the preparation or submission of this brief or authored this brief in whole or in part. The parties have consented to the filing of this brief.

teaching and research. ALA and ARL represent thousands of libraries and librarians that routinely use hyperlinks in information products they create, such as directories and bibliographies, and assist library users in the development of research papers that employ hyperlinks.

Chamber of Progress is a tech-industry coalition devoted to a progressive society, economy, workforce, and consumer climate. Chamber of Progress seeks to protect Internet freedom and free speech, promote innovation and economic growth, and empower technology customers and users. Particularly relevant here, Chamber of Progress' intellectual property legal advocacy is rooted in the belief that copyright exists—as the Founders intended—to 'promote the progress of science and useful arts.' Chamber of Progress's work is supported by its corporate partners, but its partners do not sit on its board of directors and do not have a vote on, or veto over, its positions. Chamber of Progress does not speak for individual partner companies, and it remains true to its stated principles even when its partners disagree.

The Computer & Communications Industry Association ("CCIA") is an international, not-for-profit association representing a broad cross-section of communications, technology, and Internet industry firms that collectively employ more than 1.6 million workers, invest more than $100 billion in research and development, and contribute trillions of dollars in productivity to the global

economy. For more than 50 years, CCIA has promoted open markets, open systems, and open networks. CCIA regularly files amicus briefs to promote balanced copyright policies that reward, rather than stifle, innovation.[2]

The Organization for Transformative Works ("OTW") is a nonprofit organization established to protect and defend fans and fanworks from commercial exploitation and legal challenge. Its members make and share stories commenting on and transforming existing works—from reworking a film from the perspective of the villain to using storytelling to explore racial and gender dynamics in media. The Archive of Our Own, OTW's free, volunteer-operated website, has over 10 million registered users and hosts over 15 million unique works. It is one of the top-visited sites in the U.S. and a Library of Congress heritage site.

Public Knowledge is a nonprofit organization dedicated to preserving the openness of the internet and the public's access to knowledge, promoting creativity through balanced intellectual property rights, and upholding and protecting the rights of consumers to use innovative technology lawfully. Public Knowledge has extensive experience in both copyright and telecommunications policy, including promoting broadband competition, advocating for an open internet, and ensuring that communications networks remain accessible to all users.

---

[2] A list of CCIA members is available at https://www.ccianet.org/members.

**INTRODUCTION**

Appellant asks the Court to subject two of the internet's most fundamental and useful functions—linking and embedding—to staggering new potential liability. The Court should decline. For nearly two decades, a pragmatic and statutorily consistent application of the Copyright Act's public display right, known as the server test, has allowed the internet to flourish. It provides a clear and workable standard for determining whether a website or user has "displayed" a work online within the meaning of the Copyright Act, assigning principal responsibility to the web server that actually transmits the work to users, but not to websites and users who merely direct users to that work.

Rejecting the server test would make the common act of embedding a legally fraught activity, discouraging its use except by the well-resourced, the reckless, and the ignorant. This, in turn, would significantly diminish the internet's utility as a tool for the creation and dissemination of knowledge—a result at odds with copyright law's Constitutional purpose "to Promote the Progress of Science and useful Arts." U.S. CONST. art. I, § 8, cl. 8.

The threat of liability for embedding under Section 1202 of the Digital Millenium Copyright Act ("DMCA") is equally dangerous. 17 U.S.C. § 1202. Interpreting the definition of "Copyright Management Information" ("CMI") to include Uniform Resource Locators ("URLs"), as Appellant proposes, could

subject unsuspecting internet users to ruinous legal risk, particularly given Section 1202's statutory penalties. 17 U.S.C. § 1203 (providing "statutory damages for each violation of section 1202 in the sum of not less than $2,500 or more than $25,000").

Amici are organizations that advocate for a wide range of internet users, including individuals, nonprofits, libraries, educators, creators, and businesses of all sizes. We, and our customers, patrons, and members, rely on linking and embedding for innumerable everyday online activities. We urge this Court to reject Appellant's invitation to destabilize the internet by rendering those activities legally uncertain at best, and a new source of liability at worst.

## ARGUMENT

## I. LINKING AND EMBEDDING ARE FUNDAMENTAL TO THE OPERATION OF THE INTERNET.

The ability to incorporate external content into a webpage through "in-line linking," sometimes called "framing" or "embedding," has always been fundamental to the infrastructure and functionality of the internet.[3] In fact, ninety

---

[3] As the creator of the World Wide Web, Sir Tim Berners-Lee, explained in 1997: "The Web was designed to be a universal space of information, so when you make a bookmark or a hypertext link, you should be able to make that link to absolutely any piece of information that can be accessed using networks. The universality is essential to the Web: it looses [sic] its power if there are certain types of things to which you can't link." Tim Berners-Lee, *Realising the Full Potential of the Web*, W3 (Dec. 3, 1997), https://perma.cc/Z6YJ-NMFX.

percent of web pages include content hosted by third parties.[4] Without the ability to embed or link to third-party content, the internet as we know it would not exist.

### A. A Webpage Is a Collection of Resources, Often Linked from Different Sources.

A webpage is not, and never has been, equivalent to a printed page. By design and in practice, many webpages combine content from multiple sources.[5] A webpage can incorporate content located virtually anywhere on the internet by "linking" to the uniform resource locator ("URL) associated with that content.[6] This instructs the viewer's browser to fetch these materials from the server on which they are stored, which is often different from that of the linking website, controlled by a different entity.[7]

To display the webpage, the browser, running on the viewer's device, assembles the pieces of content it obtains from various sources, and generates the webpage for the viewer to see. Generally, the user will see both the webpage they

---

[4] HTTP Archive, *Third Parties*, WEB ALMANAC (Jan. 15, 2026), https://perma.cc/C4M8-5ZGP.

[5] Berners-Lee, *supra* note 3.

[6] *See generally* Mozilla, *What is a URL?*, MOZILLA DEVELOPER NETWORK, https://perma.cc/Z56K-PBFJ (archived Feb. 24, 2026).

[7] *See generally* Mozilla, *Creating Links*, MOZILLA DEVELOPER NETWORK, https://perma.cc/Y7U6-Q6YX (archived Feb. 24, 2026).

visited and the embedded third-party content at the same time.[8] This is called "embedding," "in-line linking," or "framing."

As an example, consider a hypothetical HTML file of a webpage located at www.eff.org that contains an in-line link to an image located at www.whitehouse.gov/image1.jpg. This file would instruct the user's browser to retrieve the image from the www.whitehouse.gov server, and to display the photo within the www.eff.org webpage. If the browser follows these instructions, it will "embed" the photo within the webpage.

However, the embedder has no control over content hosted on a third party's server. The entity that controls the hosting server dictates whether and how that server responds to requests for embedded files. In the hypothetical case where the page at www.eff.org includes a reference to www.whitehouse.gov/image1.jpg, for example, whomever controls the www.whitehouse.gov server determines what content, if any, appears at that link. If that web address initially pointed to a picture of the White House at the time that www.eff.org linked to it, but the operator of the www.whitehouse.gov server changes it so that "image1.jpg" is now a picture of the President, then the server will transmit a picture of the President when it receives that request from a user's browser.

---

[8] *See generally* Mozilla, *From Object to iFrame — General Embedding Technologies*, MOZILLA DEVELOPER NETWORK, https://perma.cc/KH9A-7X7M (archived Feb. 24, 2026).

Changes like these are commonplace. Studies show, for example, that *half* of the URLs referenced in U.S. Supreme Court opinions no longer produce the information originally referenced by the relevant citation.[9] More than thirty percent of URLs published in the *Harvard Law Review* and other legal journals suffer from the same issue.[10] The Fifth Circuit has recognized this problem, and in response, created a database of archival, fixed-in-time copies of all webpages referenced in Fifth Circuit opinions, issued since January 2007.[11]

Some servers necessarily vary the content they present moment-to-moment. For example, a server may transmit a photo or video from a live camera feed, depicting events that will change.[12] In the advertising context, servers respond to requests for images by conducting an auction of advertisers, which occurs in milliseconds.[13] The image that is given in response to the request is determined by

---

[9] Jonathan Zittrain, Kendra Albert & Lawrence Lessig, *Perma: Scoping and Addressing the Problem of Link and Reference Rot in Legal Citations*, 127 HARV. L. REV. FORUM 176, 180 (2014), https://perma.cc/6UB7-5Z4T.

[10] *Id.* at 183 ("From the initial status code check, only 65% of *HLR* links returned a working page (indicated by a '200' code), along with 60% of *HRJ* links, and 67% of *JOLT* links.").

[11] *Opinions Citing Internet Resources*, U.S. COURT OF APPEALS LIBR. FOR FIFTH CIR., https://perma.cc/MS7S-VM6Q (archived Feb. 18, 2026).

[12] Mustafa Boleken, *5 Step-Guide on How to Make a Video Streaming Server*, ANT MEDIA, https://perma.cc/7JLJ-QEZY (archived Feb. 24, 2026).

[13] Hu Fu et al., *Ad Auctions with Data*, 7615 LECTURE NOTES IN COMP. SCI. 168, 168 (2012) ("In online display advertising settings, the publisher auctions off opportunities to show an advertisement to its users in real time, often through

the advertiser with the winning bid and is usually impossible to predict in advance.

The person who runs a server also has the power to limit access to certain requestors. For instance, many servers have private files. If your computer asks the server to provide such a file, it will decline (this is one cause of error messages such as "Error 403: Forbidden").[14] Other servers refuse requests from certain parts of the world, or any request that does not come from a trusted computer.[15]

### B.     Many Uses of the Internet Depend on Linking and Embedding.

Linking and embedding are not unusual, nefarious, or misleading practices. Rather, the ability to embed external content and code is a crucial design feature of internet architecture, responsible for many of the internet's most useful functions. Indeed, ninety percent of webpages link to third party content or code.[16]

Embedding allows anyone—from casual internet users to sophisticated web developers—to create content and make it more accessible to more people, using fewer resources.[17] Websites can embed a wide array of external media, including

---

online ad marketplaces operated by companies such as Yahoo!, Google or Microsoft.").

[14] *See generally* Mozilla*, 403 Forbidden,* Mozilla Developer Network*,* https://perma.cc/4RXH-XQZ3 (archived Feb. 24, 2026).

[15] *Block Access From Countries by Using the Firewall*, GODADDY, https://perma.cc/J6WF-Z4BE (archived Feb. 24, 2026).

[16] HTTP Archive, *supra* note 4; Berners-Lee, *supra* note 3.

[17] *See* Joseph Lorenzo Hall, *Why Embedding Content Matters*, INTERNET SOC'Y (Oct. 26, 2022), https://perma.cc/VRQ7-FFWJ.

videos, social media posts, and audio, and surveys, as well as interactive features like maps, surveys, and customer support chatbots.[18] Millions of websites and users embed external content or code for everything from selecting fonts and streaming music to providing services like customer support and legal compliance.[19]

Consider these illustrative examples:

### 1. *Streamlined access to content and information.*

Inline linking allows websites to present multimedia content, collected and stored by different people and organizations, in real time, on request.

- News articles frequently embed newsworthy social media posts, such as timely posts by high profile public figures.[20]

- Library catalogs—organized, searchable listings of books, databases, and other resources available from the library—provide information about works in their collections, often including links to digital resources and embedded images of works. For example, the Stanford University Libraries' "SearchWorks" catalog embeds photos of book covers from Google Books, allowing users to see what a book looks

---

[18] Mozilla, *supra* note 8; *Embedding Media and Third-Party Content on Your Website*, WORDPRESS, https://perma.cc/4C4H-CLV5 (archived Feb. 20, 2026).

[19] HTTP Archive, *supra* note 4 (identifying thirteen types of third party uses).

[20] *See, e.g.*, Chenda Ngak, *Obama "Four More Years" Tweet Becomes No. 1 Retweet*, CBS NEWS (Nov. 7, 2012), https://perma.cc/5FSN-UQ48.

like without leaving the website.[21] Without the ability to embed these images, providing on-demand access to millions of photos would be significantly more expensive and would likely compromise the site's performance.

- Businesses can embed up-to-date customer reviews from multiple websites, allowing users to make more informed purchases.[22]

### 2. Interactive and multimedia web features.

Websites can also convey information in multimedia and interactive formats.

- Rather than simply provide the street address of a building, sites can embed Google maps.[23] This allows users to get directions to a location without pasting the address into a different application.

- A webpage providing information about mortgage rates can embed a mortgage rate calculator.[24]

- Webpages with information about weight management often embed

---

[21] *SearchWorks Catalog*, STAN. U. LIBRS., https://perma.cc/Q647-HFPZ (archived Feb. 24, 2026) (displaying a publication located at a law library).

[22] *See, e.g.*, *All-in-One Reviews*, ELFSITE, https://perma.cc/9Z72-X74S (archived Feb. 24, 2026).

[23] *The Maps Embeded API Overview*, GOOGLE MAPS PLATFORM, https://perma.cc/3SN4-264S (archived Feb. 24, 2026).

[24] *Adjust the Calculator to Estimate Your Monthly Mortgage Payment*, U.S. BANK, https://perma.cc/D872-2L5B (archived Feb. 24, 2026).

tools that calculate a person's body mass index.[25]

### 3. Dynamic, up-to-date information.

A website can include real-time information by embedding external sources that are updated in real time.

- For example, many courts use live-streamed YouTube videos to provide real-time public access to hearings.[26]

- Companies and non-profit organizations often embed active job listings provided by recruiters and other third parties.[27]

- Websites that report information that frequently changes, such as dynamic stock listings, can embed links to sources that reflect prices in real time, rather than manually updating the information or providing outdated information.[28]

### 4. Forums, discussion boards and social media.

Users of online forums and discussion boards, including sites that serve neighborhoods, causes, civic organizations, or hobbies, can include inline linked

---

[25] *Adult BMI Calculator*, U.S. CTRS. FOR DISEASE CONTROL AND PREVENTION, https://perma.cc/3QM8-CV2S (archived Feb. 24, 2026).

[26] *See, e.g.*, Superior Court of California: County of Orange, *Courtroom Live Streaming*, JUD. COUNCIL CAL., https://perma.cc/4KFW-T2WF (archived Feb. 24, 2026).

[27] *How to Embed Jobs on Your Website (Job Widget)*, WORKABLE, https://perma.cc/59JA-ED42 (archived Feb. 24, 2026).

[28] *Chart Widget*, BENZINGA, https://perma.cc/59JA-ED42 (archived Feb. 24, 2026).

images in their posts.[29] And messaging and social media apps, such as Slack, Discord, Facebook, and X, typically insert inline links displaying images retrieved from a website every time a user posts a website address in a chat.[30] Pinterest is essentially a collection of embedded content collected across the web.[31]

### 5. *Advertising*

Online advertising—a key source of revenue for website publishers, including Appellant's local news sites, Appellant's Br., 8, 12, 38–39—depends on embedding advertisement images selected in real time at each request.[32]

### 6. *Additional functionalities*

Websites often embed code developed by third parties to provide crucial features, enabling important functionalities that sites may otherwise lack such as translation tools, security features that depend on third party sites, and tools that enable privacy permissions like cookie banners, which are required for compliance

---

[29] *See, e.g.*, Duce, *Historic Houston Images*, HOUS. ARCHITECTURE INFO. F. (Dec. 28, 2004), https://perma.cc/74L9-DBCW.

[30] *See, e.g.*, Buffy, *How Do I Upload Images and GIFS?*, DISCORD, https://perma.cc/RRK4-GM4U (archived Feb. 24, 2026) ("You can also copy and paste a GIF or image URL into chat, and the link preview will display said image.").

[31] *See generally*, PINTREST, https://perma.cc/B92Z-J8R8 (archived Feb. 24, 2026).

[32] *See* Natasha Singer, *Your Online Attention, Bought in an Instant*, N.Y. TIMES (Nov. 17, 2012), https://perma.cc/A5TQ-SALQ.

with privacy laws like the European Union's General Data Protection Regulation.[33]

There is no practical distinction between these uses and the news aggregators that are the subject of this appeal. Nor is there any basis in the text of the Copyright Act for drawing such a distinction. In all of these use cases, it is the owner of the server that stores the content who has ultimate control over the content itself, whether that content is served, when, and to whom. And in all of these cases, the owner of the website that provides the inline link only tells the user's browser where to go to request access.

## II. THIS COURT SHOULD NOT ENDANGER THE ABILITY TO LINK AND EMBED BY ABANDONING THE SERVER TEST.

In the analog world, a person is free to tell others where they may view a third party's display of a copyrighted work, without being directly liable for infringement if that display turns out to be unlawful. The server test is the straightforward application of the same principle in the online context, that well-settled authority has provided legal certainty for the many valuable internet activities described above. Multiple sister circuits have recognized as much. *E.g.*, *Perfect 10 v. Amazon*, 508 F.3d 1146, 1160-61 (9th Cir. 2007); *Society of Holy Transfiguration Monastery, Inc. v. Gregory*, 689 F.3d 29, 55 (1st Cir. 2012); *Flava*

---

[33] *Why Do You Need a Cookie Banner & How to Stay Compliant with Privacy Laws Like the GDPR and CCPA*, OSANO (Jan. 6, 2023), https://perma.cc/CZE7-2DRY.

*Works, Inc. v. Gunter*, 689 F.3d 754, 757-58 (7th Cir. 2012).

This Court should join them.

**A.    The Server Test Is Equitable, Easy to Apply, and Provides Essential Legal Certainty.**

The server test reasonably assigns liability for infringement to the entity that is actually hosting the content and "serving" that content to the rest of the internet. The operator of a website controls what—if anything—may be accessed at a given link to their site. That entity is best positioned to know whether the content is lawful and has the power to take it offline if it finds otherwise. By contrast, a third party that embeds or links to a different website generally has no control over the content that appears at that link, which the site's operator can change or remove at any time.[34]

Thus, the server test places primary legal responsibility where it belongs: with the entity that has the greatest control over the allegedly infringing material.[35] Imposing liability for content that third parties may change at any time would be

---

[34] Zittrain, Albert & Lessig, *supra* note 9 at 176 ("[A]s websites evolve, not all third parties will have a sufficient interest in preserving the links that provide backwards compatibility to those who relied upon those links.").

[35] Moreover, third parties may still be held liable under appropriate circumstances. For example, third parties that direct people to infringing content can be held secondarily liable if additional factors are present, such as "purposeful, culpable" conduct to encourage infringement. *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 936-37 (2005).

arbitrary and unfair.

Appellants attempt to distract from the server test's immense benefits to users by focusing on its supposed harms to some websites. This focus ignores the way that the internet works in practice, particularly on the facts of this case. Sites like news aggregators can expose users to new sites and sources, which actually increases traffic.[36] Thus, the server test benefits both users and publishers.

**B.**     **Upending the Server Test Would Create a Tsunami of Legal Risk.**

The Supreme Court has identified "the 'vast democratic forums of the Internet' in general and social media in particular" as crucial vehicles for free expression. *Packingham v. North Carolina*, 582 U.S. 98, 104 (2017) (quoting *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 868 (1997) (citation omitted). The emergence of those forums has depended, in significant part, on the legal certainty the server test provides.

Indeed, no principled textual or policy distinction separates an embedding tool from the billions of links shared by web publishers, libraries, bloggers, and regular internet users every day. A link is an information location and retrieval tool whether it incorporates information into a website with an in-line link, or requires a user to navigate elsewhere to access that content. Nor is there any meaningful

---

[36] Joan Calzada & Ricard Gil, *What Do News Aggregators Do? Evidence from Google News in Spain and Germany*, 39 MARKETING SCI., 134, 134 (2020).

difference between the uses of embedding in this case, and those Appellants' Amici want to preserve, including to enhance news coverage, Br. of Amici News/Media Alliance, et al., ECF No. 43, at 24; Br. of Amici American Photographic Artists, et al., ECF No. 18-2 at 25.

Without the certainty provided by the server test, embedding content would create enormous potential liability, such that many would fear to link to anything. Moreover, the services upon which many users rely to share information would hesitate to allow many forms of user-generated content. To avoid the risk of liability, those services might have to conduct a legal review of all such content to root out any potentially infringing links. Given the cost of such a review, most would choose to avoid the risk altogether, particularly small businesses and startups.

What is worse, as Amici supporting Appellant indicate, the impact may extend to countless existing links that were created against the backdrop of the clear rule established in the Ninth Circuit. Br. of Amici News/Media Alliance, et al., ECF No. 43, at 15. If that rule is withdrawn, those links could potentially trigger an infringement claim and the possibility of statutory damages. 17 U.S.C. § 504(c)(2). And the liability risks are not even limited to those that point to commercially valuable materials. *See L.A. News Serv. v. Reuters Television Int'l, Ltd.*, 149 F.3d 987, 996 (9th Cir. 1998).

Other legal doctrines cannot adequately mitigate these risks. For example, while the fair use doctrine may offer some protection, fair use can be expensive to determine and difficult to predict. Moreover, rightsholders often have extremely conservative views of what qualifies as fair use and may pursue legal action even against clearly lawful uses.

## III. LINKING AND EMBEDDING DO NOT VIOLATE SECTION 1202.

If this Court concludes, as it should, that Appellee has not infringed copyright, it follows that Appellee has not violated Section 1202 either with respect to most of the articles at issue. Section 1202 repeatedly ties liability to intentional activity undertaken in connection with infringing activity. As a judge in the Northern District of California recently explained in another Section 1202 case where the underlying conduct was found to be a noninfringing fair use:

> It does not make sense that Congress would have wanted to exempt secondary users who make a fair use from infringement liability, only to open them back up to DMCA liability if they removed some boilerplate in doing so.

*Kadrey v. Meta Platforms, Inc.*, 2025 WL 1786418, at *1 (N.D. Cal. June 27, 2025); *see also Fischer v. Forrest*, 968 F.3d 216, 223 (2d Cir. 2020) (to state a Section 1202(b)(1) claim, plaintiffs must allege "(1) the existence of [copyright management information ("CMI")] *on the allegedly infringed* work, (2) the removal or alteration of that information and (3) that the removal was intentional") (emphasis added).

If the Court nonetheless decides to reach the Section 1202 claims with respect to the remaining works, Amici urge the Court to affirm the district court's conclusion that URLs are not CMI. *Emmerich Newspapers, Inc. v Particle Media*, 2025 WL 2146609, at *19-20 (S.D. Miss. July 29, 2025).

## A. URLs Identify Locations, Not Owners, Authors, or Titles.

It defies reason to suggest that most authors, owners, or readers would rely on URLs to communicate the title of a work, much less its copyright owner. A URL tells a user, or more directly, a user's computer, where something is located at a certain point in time. But it doesn't tell the user much about what they will find there, particularly over time, any more than giving someone a physical address guarantees that the residents will still live there a year from now.

For example, a webpage giving the history of EFF can be found at: https://www.eff.org/about/history. Clicking on that link sends web users to a page describing EFF's founding and mission, which a user might generally anticipate. But it doesn't tell a user anything else about the content of the site which, as discussed *supra* Section I.A, may easily change over time if new text is added, or even new images to which EFF may or may not hold the copyright. Moreover, if EFF takes the page off of its website, or moves it to a different location on its site, the link may no longer identify anything at all.

To take another example, the district court docket for this case can be found

on PACER at https://ecf.mssd.uscourts.gov/cgi-bin/DktRpt.pl?117274. The content in that URL does not provide much detail about the content it locates, particularly to anyone unfamiliar with legal practice. Although it might, at least to a trained reader, indicate that the file is a docket report located at the U.S. District Court for the Southern District of Mississippi website, the URL does not contain the case number, the party names, or any information about the contents of that docket such as the principal briefs or other filings.

And many URLs provide even less information about the underlying website, files or resources they locate. The video hosting service YouTube, for example, generates random URLs that provide no information about the underlying content they reference. For example, the URL https://www.youtube.com/watch?v=fkniySdHQdc links to a recording of the Fourth Circuit Court of Appeals' Constitution Day Program on September 14, 2017. Yet there is nothing in the character string "fkniySdHQdc" that tells anyone anything about the content of the video. Other users and services rely on randomized URLs as a security measure to restrict access to content to those who have been given the URL because it is harder for unauthorized users to guess long, computer-generated URLs.

On the flip side, users that want to *facilitate* attention to sites or pages with a long URL, via email or a social media platform, might use link shorteners that

convert a full URL into a shorter one. Take, for example, this link to a page on author Julia Quinn's website where a reader can order digital copies of a book in her famous Bridgerton series: https://juliaquinn.com/books/the-viscount-who-loved-me/#digital. A person creating a gift list might use a link shortener such as TinyURL to create a more compact URL that will direct browsers to the same webpage, for example https://tinyurl.com/4hfccfr9. It is not clear on the face of the shorter URL that it links to Julia Quinn's website, much less a particular page. Does that mean a person who uses a shortener has stripped Quinn's CMI and perhaps owes statutory damages? Surely not.

### B.     Appellant's Theory Would Invite a New Wave of Copyright Trolling.

Appellant might suggest that any concerns about extending the reach of Section 1202 are overstated, because Section 1202 plaintiffs must still show the requisite scienter. Unfortunately, while the double scienter requirements provide important limits on Section 1202 claims, courts are often unwilling to grant early dismissals on that basis. *Doe 1 v. GitHub, Inc.*, 672 F. Supp. 3d 837, 858-59 (N.D. Cal. 2023); *Schneider v. YouTube, LLC*, 649 F. Supp. 3d 872, 891 (N.D. Cal. 2023). Well-resourced defendants can afford to hire lawyers to litigate these cases through summary judgment, appeals, and/or trial; lucky ones may be able to find pro bono representation. But an entire industry is poised to take advantage of those who fit into neither category.

Leveraging the expense of litigation and the risk of high statutory damages, firms known as "copyright trolls" use copyright claims to extort settlement payments from large numbers of individuals. *See e.g., Design Basics, LLC v. Lexington Homes, Inc.*, 858 F.3d 1093, 1097 (7th Cir. 2017). This predatory business model is highly lucrative: trolling schemes have collected millions in payments to settle often-specious claims.[37] *See, e.g.*, *AF Holdings, LLC v. Does 1–1058*, 752 F.3d 990, 991-93, 996-97 (D.C. Cir. 2014) (law firm made $15 million by "manipulat[ing] judicial procedures" and threatening more than a thousand internet users with bad faith copyright claims).[38]

---

[37] *See, e.g.*, Plea Agreement and Sentencing Stipulations at 2, *United States v. Steele*, No. 16-cv-00334 (D. Minn. Mar. 6, 2017), https://embed.documentcloud.org/documents/3492718-Gov-Uscourts-Mnd-160889-43-0/ (multi-million dollar fraud scheme to extort fraudulent copyright settlements by deceiving courts); *Righthaven LLC v. Democratic Underground, LLC,* 791 F. Supp. 2d 968, 979 (D. Nev. 2011) (finding "flagrant misrepresentation" in approximately 200 cases for failure to identify an interested party); *Usherson v. Bandshell Artist Mgmt.*, 2020 WL 3483661, at *1, *11-22 (S.D.N.Y. June 26, 2020), *aff'd in part sub nom. Liebowitz v. Bandshell Artist Mgmt.*, 858 F. App'x 457 (2d Cir. 2021), *and aff'd sub nom. Liebowitz v. Bandshell Artist Mgmt.*, 6 F.4th 267 (2d Cir. 2021) (finding that a "copyright troll" was "frequently sanctioned" for myriad "violations in scores of cases," including lying to courts "repeatedly and under oath," filing false and falsified documents, and bringing and maintaining frivolous copyright lawsuits in bad faith).

[38] *See also* Matthew Sag, *Copyright Trolling, An Empirical Study*, 100 Iowa L. Rev. 1105, 1119-21 (2015), https://perma.cc/74Q6-Y4TS ("The credible threat of damages as high as $150,000 makes any real risk of being found liable for copyright infringement intolerable for anyone who is not completely insolvent or staggeringly wealthy.")

The lawyers and litigants involved in copyright trolling are in "the business of litigation," rather than defending copyrights. *Bell v. Wilmott Storage Servs., LLC*, 12 F.4th 1065, 1082 (9th Cir. 2021) (Clifton and Wardlaw, JJ., concurring) (quotation omitted); *see also Bell v. Eagle Mountain Saginaw Indep. Sch. Dist.*, 27 F.4th 313, 326 (5th Cir. 2022) (holding that a "serial litigant" engaged in "business model of litigation" was "not the typical copyright plaintiff seeking a 'fair return for [his] creative labor'" (citation omitted)). For example, the Liebowitz Law Firm filed approximately 2,500 copyright infringement lawsuits in little more than four years. *Usherson,* 2020 WL 3483661, at *17; *Matter of Liebowitz*, 226 A.D.3d 117, 119 (2024), *leave to appeal denied*, 43 N.Y.3d 902 (2025). A staggering number of these cases were obviously meritless. *Usherson,* 2020 WL 3483661, at *8, *18; *Rock v. Enfants Riches Deprimes, LLC*, 2020 WL 468904, at *4 n.6 (S.D.N.Y. Jan. 29, 2020).

This business model is "far removed from the goals of the Constitution's intellectual property clause to 'promote the Progress of Science and useful Arts.'" *Design Basics, LLC*, 858 F.3d at 1097 (quoting U.S. CONST. art. I, § 8, cl. 8). And notorious copyright trolls have already tried to monetize Section 1202. *Craig v. UMG Recordings, Inc*., 380 F. Supp. 3d 324, 337-38 (S.D.N.Y. 2019). Those efforts rely on not only the expense of litigation but the threat of statutory damages, paired with the absence of ownership and registration requirements. 17

U.S.C. § 1203(c)(3)(B); *Viral DRM, LLC v. Seven W. Media Ltd*, 768 F. Supp. 3d 1025, 1031 (N.D. Cal. 2025).

In this context, the last thing any court should do is read para-copyright statutes broadly. Instead, this Court should follow the Supreme Court's guidance:

> [Where] Congress has not plainly marked our course, we must be circumspect in construing the scope of rights created by a legislative enactment . . . .

*Sony Corp. of Am. v. Universal City Studios, Inc*., 464 U.S. 417, 431 (1984); *see also Limelight Networks, Inc. v. Akamai Technologies, Inc.,* 572 U.S. 915, 923 (2014) ("The courts should not create liability for non-infringing conduct where Congress has elected not to extend that concept.").

## CONCLUSION

For the foregoing reasons, Amici urge the Court to affirm the district court's decision.

Dated: March 2, 2026

By: /s/ *Mitchell L. Stoltz*
Mitchell L. Stoltz

Corynne McSherry
Victoria Noble
ELECTRONIC FRONTIER
FOUNDATION
815 Eddy Street
San Francisco, CA 94109
(415) 436-9333
mitch@eff.org

*Counsel for Amici Curiae*

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), I certify as follows:

1. This Brief of Amici Curiae the Electronic Frontier Foundation, American Library Association, Association of Research Libraries, Chamber of Progress, Computer & Communications Industry Association, Public Knowledge, and Organization for Transformative Works in Support of Defendant-Appellee with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 5,466 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f); and

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365, the word processing system used to prepare the brief, in 14 point font in Times New Roman font.

Dated: March 2, 2026         By: /s/ *Mitchell L. Stoltz*
                                       Mitchell L. Stoltz

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fiftth Circuit by using the appellate CM/ECF system on March 2, 2026.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: March 2, 2026

By: /s/ *Mitchell L. Stoltz*
Mitchell L. Stoltz