# United States Court of Appeals

*for the*

# Fifth Circuit

Case No. 25-60550

EMMERICH NEWSPAPERS, INCORPORATED,

*Plaintiff-Petitioner,*

v.

PARTICLE MEDIA, INC., d/b/a Newsbreak,

*Defendant-Respondent.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NO. 3:23-cv-00026-TSL-MTP

## BRIEF OF COPYRIGHT SCHOLARS AS *AMICI CURAE* IN SUPPORT OF RESPONDENT

PROFESSOR MARK A. LEMLEY
STANFORD LAW SCHOOL
559 Nathan Abbott Way
Stanford, CA 94305
(650) 723-4605
mlemley@law.stanford.edu

PROFESSOR JESS MIERS
UNIVERSITY OF AKRON
    SCHOOL OF LAW
150 University Avenue
Akron, OH 44325
(703) 727-9412
jmiers@uakron.edu

PROFESSOR REBECCA TUSHNET
HARVARD LAW SCHOOL
1585 Massachusetts Avenue
Cambridge, MA 02130
(703) 593-6759
rtushnet@law.harvard.edu

*Counsel for Amicus Curiae*

CP COUNSEL PRESS    (800) 4-APPEAL • (715590)

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

## List of Signatories[1]

Timothy K. Armstrong
Professor of Law, University of Cincinnati College of Law

Lea Bishop
Professor, Indiana University

Michael W. Carroll
Professor of Law, American University Washington College of Law

Zachary L. Catanzaro
Assistant Professor, Widener University Delaware Law School

Margaret Chon
Faculty Director, Technology, Innovation Law, and Ethics Institute, Seattle University School of Law

Ralph D. Clifford
Emeritus Professor of Law, Univ. of Massachusetts School of Law

Rachael M. Dickson
Assistant Professor of Law, Willamette University School of Law

Shahrokh Falati
Associate Professor of Law, New York Law School

Eric Goldman
Professor, Santa Clara University School of Law

---

[1]  Signatures are in our individual capacity; institutions are listed for identification only

Michael P. Goodyear
Associate Professor, New York Law School

Timothy T. Hsieh
Associate Professor of Law, Oklahoma City University School of Law

Robert Kasunic
Adjunct Professor, American University Washington College of Law

Stacey Lantagne
Professor of Law, Suffolk University Law School

Mark Lemley
William H. Neukom Professor of Law at Stanford Law School

Jack I. Lerner
Clinical Professor of Law, University of California, Irvine School of Law

Yvette Joy Liebesman
Professor, Saint Louis University School of Law

Brian J. Love
Professor of Law, Santa Clara University School of Law

Mark P. McKenna
Professor of Law, UCLA Law

Jess Miers
Assistant Professor of Law, University of Akron School of Law

Tyler T. Ochoa
Professor of Law, Datta Center for High Tech Law, Santa Clara University School of Law

Sarah Polcz
Acting Professor of Law, UC Davis School of Law

Amanda Reid
Associate Professor, University of North Carolina at Chapel Hill

Betsy Rosenblatt
Tom J.E. and Bette Lou Walker Professor of Law, Case Western Reserve
University School of Law

Christopher Jon Sprigman
Murray and Kathleen Bring Professor of Law, NYU Law

Rebecca Tushnet
Frank Stanton Professor of the First Amendment, Harvard Law School

/s/ Professor Mark A. Lemley

*Counsel for Amicus Curiae*
Professor Mark A. Lemley
Stanford Law School
559 Nathan Abbott Way
Stanford, CA 94305
(650) 723-4605
mlemley@law.stanford.edu

**TABLE OF CONTENTS**

INTEREST OF AMICUS CURAE ........................................................................1

SUMMARY OF ARGUMENT .........................................................................1

ARGUMENT .................................................................................................3

    I.    THE SERVER TEST REMAINS CORRECT. .............................................3

        A.    The Technology Remains the Same. ...............................................3

        B.    The Entity that Controls the Display Makes the Display. ...........8

        C.    Embedding Is Not Transmission. ..................................................11

        D.    The Weight of Authority Supports the Server Test. ....................14

        E.    Contrary District Court Cases Are Mistaken. .............................16

        F.    *Am. Broad. Cos. v. Aereo, Inc.*, 573 U.S. 431 (2014), Has No Bearing on the Server Test. ..................................................19

    II.    POLICY AND INSTITUTIONAL CONSIDERATIONS SUPPORT THE SERVER TEST..22

CONCLUSION ............................................................................................24

# TABLE OF AUTHORITIES:

## Cases

*Am. Broad. Cos. v. Aereo, Inc.*, 573 U.S. 431 (2014)...................................19, 20, 21

*APL Microscopic, LLC v. United States*, 144 Fed. Cl. 489, 499 (2019) .................14

*Bell*, 12 F. 4th at 1073 ..................................................................................................17

*BWP Media USA, Inc. v. T & S Software Assoc., Inc.*, 852 F.3d 436, 442, 444 (5th Cir. 2017), ............................................................................19, 20, 24

*Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 34–35 (2003)........................................................................................................23

*Darden v. Peters*, 488 F.3d 277, 284 (4th Cir. 2007) .....................................................2

*Fox Broad. Co., Inc. v. Dish Network LLC*, 747 F.3d 1060, 1067 (9th Cir. 2014). ......................................................................................19

*Flava Works, Inc. v. Gunter*, 689 F.3d 754, 756, 761 (7th Cir. 2012) ..............13, 14

*Goldman v. Breitbart News Network, LLC*, 302 F. Supp. 3d 585, 592-596 (S.D.N.Y. 2018) .................................................................12, 16, 18, 22

*Hotaling v. Church of Jesus Christ of Latter-Day Saints*, 118 F.3d 199 (4th Cir. 1997) ...............................................................................................17

*Hunley v. Instagram, LLC*, 73 F.4th 1060, 1070, 1074 (9th Cir. 2023)............11, 14

*Leader's Inst., LLC v. Jackson*, No. 14-cv-3572, 2017 WL 5629514, at \*11 (N.D. Tex. Nov. 22, 2017)......................................................................16

*Nicklen v. Sinclair Broadcast Group, Inc.*, 551 F. Supp. 3d 188, 195 (S.D.N.Y. 2021)........................................................................................16, 22

*Paige v. Banks*, 80 U.S. 608, 611 (1871)........................................................................2

*Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007) 1160, 1161, 1172 ................................................................................1, 3, 14, 20, 24

*Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 668 (9th Cir. 2017)...................14

*Religious Tech. Ctr. v. Netcom On-Line Comm'n. Servs.*, 907 F. Supp 1361, 1365 (N.D. Cal. 1995) .................................................................................12

*Sackett v. Env't Prot. Agency*, 598 U.S. 651, 677 (2023).............................................9

*Society Holy Transfiguration Monastery, Inc. v. Gregory*, 689 F.3d 29, 55 (1st Cir. 2012)......................................................................................14

*VHT, Inc. v. Zillow Group, Inc.*, 918 F.3d 723, 736 (9th Cir. 2019) ......................14

*White v. Samsung Elecs. Am., Inc.*, 989 F.2d 1512, 1514 (9th Cir. 1993) ................2

*Whitman v. American Trucking Assns., Inc.*, 531 U.S. 457, 468 (2001)...................9

**Statutes**

17 U.S.C § 101 ......................................................................1, 8, 11, 15, 22

17 U.S.C § 110 ...................................................................................22

17 U.S.C § 512 ...................................................................................22

17 U.S.C. § 106(A) ..............................................................................23

17 U.S.C. § 109(c) ............................................................................8, 17

17 U.S.C. §108 ...................................................................................22

17 U.S.C § 106(A)(c)(2) .......................................................................23

**Other Authorities**

American Law Institute, Restatement of Copyright, Tentative Draft No. 6, at
§6.09, Comment *g* ...........................................................................15

*An Investigation of Hotlinking and Its Countermeasures*, 34 Comput.
Commn's 577, 581 (2011)....................................................................22

*Michael Goodyear, The Server Test Quandary and Embedding Permission
Culture, 75 Okla. L. Rev. 263, 287 (2023)* ...........................................10, 20

R. Anthony Reese, *The Public Display Right: The Copyright Act's
Neglected Solution to the Controversy over RAM "Copies,"* 2001 U. Ill. L.
Rev. 83, 149-50 (2001).........................................................................2

Restatement of Copyright, *supra*, §6.09, Comment *g*. ............................18

*The State of Social Embeds*, Samdesk.io (2016) .....................................22

**INTEREST OF AMICUS CURAE**

Amici are professors of intellectual property and internet law at schools throughout the United States. We have no personal interest in the outcome of this case but have a professional interest in seeing that the law develops in a way that satisfies the constitutional purpose of copyright to promote the progress of science. No one other than the undersigned has written or made any financial contribution to the drafting of this brief. The parties have provided blanket consent to amicus briefs. A full list of amici is attached as Appendix A.

**SUMMARY OF ARGUMENT**

The Copyright Act's definition of "display" requires a defendant to "*show* a copy" of a work—not merely point to one that someone else has shown. 17 U.S.C. §101 (emphasis added). And while the statute includes within the ambit of "display" a showing that occurs "by means of any device or process," embedding isn't a "process" of *showing a copy* any more than turning on a computer is, although both may be but-for causes of a specific display. Embedding is a process of directing a browser to a location where someone else's copy may (or may not) reside. It is the server on which the copy resides that may (or may not) "show" that copy. The "server test" in *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007), recently reaffirmed in *Hunley v. Instagram, LLC*, 73 F.4th 1060 (9th Cir. 2023), recognizes this reality.

In the United States, "'copyright' is, so far as the law recognizes it, … a creature of statute. A man has no more 'copyright' than what the statute gives him." *Paige v. Banks*, 80 U.S. 608, 611 (1871); *see also Darden v. Peters*, 488 F.3d 277, 284 (4th Cir. 2007) ("Copyright is solely a creature of statute" and "whatever rights and remedies exist do so only because Congress provided them").

It is particularly important to avoid overexpanding copyright owners' powers here, where the embedded image is not alleged to be an infringing reproduction. The copyright owner placed the image online for public viewing, and the defendant's embedding simply directed users to that same source. "Intellectual property rights aren't like some constitutional rights, absolute guarantees protected against all kinds of interference, subtle as well as blatant. They cast no penumbras, emit no emanations: The very point of intellectual property laws is that they protect only against certain specific kinds of appropriation." *White v. Samsung Elecs. Am., Inc.*, 989 F.2d 1512, 1514 (9th Cir. 1993) (Kozinski, J., dissenting) (footnote omitted); R. Anthony Reese, *The Public Display Right: The Copyright Act's Neglected Solution to the Controversy over RAM "Copies,"* 2001 U. Ill. L. Rev. 83, 149-50 (2001) ("[I]nsisting that the specific rights implicated by a particular activity (such as transmitting images over the World Wide Web) be properly identified emphasizes that copyright owners do not simply 'own' their 'works' but, rather, they have exclusive control over certain specified uses of those works,

while other uses—for example, reading or viewing a copy of a work, privately performing a work, or using a work's uncopyrightable elements—are not under the copyright owner's control.").

Rejecting the server test would profoundly distort copyright law and create millions of unknowing infringers. It would allow copyright owners to sue third parties for pointing others to non-infringing copies. The Copyright Act is not so broad.

## ARGUMENT

### I. THE SERVER TEST REMAINS CORRECT.

*Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007), correctly held that the entity that "publicly displays" content within the meaning of the Copyright Act is the entity that controls the means by which a particular copy of that content is shown to the public. Where the public display of content occurs online, by means of a digital transmission, the entity responsible for the display of that content is the one that controls the server that transmits the display (the "server test").

#### A. The Technology Remains the Same.

The Ninth Circuit described the relevant technology at issue in this case nearly twenty years ago: "Instead of communicating a copy of the image, [someone embedding an image] provides HTML instructions that direct a user's

browser to a website publisher's computer that stores the full-size photographic image." *Id.* at 1161.[2] Those HTML instructions are lines of text, not images, and they have no power in themselves to cause the images to appear on a user's screen. *Id.* Instead, they provide a HTML address to the user's browser, which then contacts the computer that stores the image. "It is this interaction that causes an … image to appear on the user's computer screen." *Id.*

While the surrounding technical environment has evolved—particularly with the rise of mobile applications—the core distinction recognized in *Perfect 10* remains unchanged. Embedding does not itself transmit or host the displayed copy. Whether implemented through HTML instructions in a browser or through platform-supplied webview components in a mobile app (as is the case here), embedding directs a user's device to retrieve content from a third-party server that controls the transmission.

Inline linking, or embedding, is ubiquitous on the internet. It is the reason people can see news articles in posts on Facebook pages. It is the reason news sites can point people to social media comments, court documents, or web pages that appear to the user on the screen along with the news article.

For example, when Buzzfeed ran an article on the many different

---

[2] Of course, where the server operator is itself infringing, the entity that embedded the image may be subject to secondary liability under appropriate circumstances. *Perfect 10*, 508 F.3d at 1161.

photographers covering 2020 protests who were posting on Instagram, Buzzfeed created its own native content, along with instructions to embed content from Instagram. To do so, Buzzfeed provided a user's browser with HTML code directing it to Instagram. The user's browser would then ask Instagram for the specific images, which Instagram would then transmit from its servers to the user.

Another photographer, Chris Facey, has been capturing live video of protests as they unfold on the streets of New York City. "I want to make sure the stories of my fellow black brothers and sisters are accurately represented," he told BuzzFeed News. "I want to do my part in making sure you see us as human beings."

Follow these photographers on Instagram for their perspectives on the protests.

## Alyssa Pointer in Atlanta

Because the image Buzzfeed pointed to was never transmitted or copied by

---

[3] Hunley v. Instagram, complaint, Ex. A at 3.

Buzzfeed, only Instagram or the specific account that posted the original image

could control whether the image displayed to the Buzzfeed user, even though

Buzzfeed's HTML remained exactly the same:



Instagram: @alyssapointerphoto [4]

Crucially, the host server retains ultimate control over whether and what

content is transmitted in response to a request. The host may refuse to respond,

---

[4] Screenshot of Buzzfeed story as it appeared as of Jan. 10, 2026 (Gabriel H. Sanchez, Here Are Powerful Pictures of the Protests Through the Eyes of Black Photographers, BuzzFeed News, Oct. 29, 2020), https://www.buzzfeednews.com/article/gabrielsanchez/powerful-pictures-protest-black-photographers-instagram).

require authentication, alter the returned resource, or take the content offline entirely. When that occurs, embedded displays fail, even if the embedding code itself remains unchanged.[5]

As this example shows, the host server controls the display; Buzzfeed does not. Because Instagram has now chosen not to respond to requests like Buzzfeed's, the image no longer shows on Buzzfeed.

Nothing relevant to the copyright inquiry has changed since *Perfect 10.* Embedding is a form of linking. Linking tells the user's browser where to find the image, which remains on the original server and is "displayed" from there. Linking is a foundational feature of how the internet works.

Modern embedding often occurs within native mobile applications using platform-supplied webview components rather than through standalone web browsers. In those environments, apps invoke OS-level application programming interfaces to render third-party content, and platform providers (not embedders) define the technical standards governing retrieval and display. But this architectural shift does not alter the relevant copyright inquiry. The app does not transmit the work itself. The transmission occurs, if at all, from the third-party server responding to the user's device.

---

[5] The degree of practical control a host exercises over third-party embedding may vary across web and mobile environments and across services. But in all cases, the embedding party does not itself transmit the content.

## B. The Entity that Controls the Display Makes the Display.

To "display" a work means "to show a copy of it, either directly or by means of a film, slide, television image, or any other device or process." 17 U.S.C. §101. "Directly" here means in person, in the place where the copy is located. *See* 17 U.S.C. § 109(c) (allowing certain unauthorized public displays, but only "directly or by the projection of no more than one image at a time, to viewers present at the place where the copy is located"). The language of §109(c) makes clear that to display "directly" means to do so unmediated by technology, while a "projection" requiring the use of a process or device is indirect. *See also* § 101 ("To 'display' a work means to show a copy of it, either directly or by means of a film, slide, television image, or any other device or process or, in the case of a motion picture or other audiovisual work, to show individual images nonsequentially"). "Indirect," that is, describes how the audience might perceive the work, not who is doing the public display.

To hold otherwise would be to create a new kind of secondary liability out of thin air—and one that applies only to the public display right, since none of the other § 106 rights are subject to this language. If Congress wanted "indirect" to replace the overall Copyright Act framework distinguishing direct liability from secondary liability, but only for the public display right and not for reproduction,

8

derivative works, distribution, or public display's near-twin public performance, all of which are listed alongside public display in § 106's list of exclusive rights, there would surely be more evidence of this decision in the statute or the legislative history. There is none. *See Sackett v. Env't Prot. Agency*, 598 U.S. 651, 677 (2023) ("Congress does not hide elephants in mouseholes by altering the fundamental details of a regulatory scheme in vague terms or ancillary provisions.") (cleaned up) (quoting *Whitman v. American Trucking Assns., Inc.*, 531 U.S. 457, 468 (2001)).

So, "indirect" here means mediated by technology. Unsurprisingly, then, an "indirect[]" "show[ing]" also requires a "device or process" of some kind. 17 U.S.C. § 101. A server that responds to a user's request by transmitting an image is such a device, and a process of transmitting the data that, when received, will display the image, is such a process. Thus, the entity whose server initiated the transmission that displays the image—here, the copyright owner—is the entity engaged in the indirect showing.

Causing someone else to see a publicly displayed work, by contrast, is not the same thing as publicly displaying it. Consider a tour guide who leads people to see specific works in a museum in a specific order as part of a tour about generational change in artistic styles. The tour guide is a but-for cause of the public displays to tour participants—indeed, many might never have come to the museum

without the tour, especially if they like the tour guide more than the specific museum—but their path to or through the public display is none of copyright's concern.

Embedding functions like that tour guide: It directs users to a copy that is already publicly displayed. If the museum removes the paintings, the tour will fail even if the tour guide continues to provide it in exactly the same way. But if the museum bars entry to the tour guide and the tour guide stops providing the tours, the paintings will still be publicly displayed (albeit less seen). In exactly the same way, for embedding of an image to work, the image must continue to be displayed by its original host server. Embedding also requires that the original server continue to respond to requests, and server operators have many tools to limit which requests they respond to, just as museum operators have many tools to limit who they will admit to see their displays. Crucially, the embedder, like the tour guide, has no control over whether a user will be able to see a work—i.e., whether the work will be publicly displayed. An infringement action against the original server would stop the display; one against the embedder would only stop one set of directions. *Cf. Michael Goodyear, The Server Test Quandary and Embedding Permission Culture, 75 Okla. L. Rev. 263, 287 (2023) (*"Copyright owners should target direct infringers, without whom no further circulation or embedding of the work would occur."*)*.

Another way to explain the difference is that the "public display" right is about the quality of publicness, not the number of people in the audience. A display is "public" if it's in a place "open to the public," even if no one is there. 17 U.S.C. § 101 (defining "public"); *see also id.* (referring to people "*capable* of receiving the performance or display" rather than to actual receivers) (emphasis added). Bringing new people to an existing public display, as embedding does, does not create a new public display. If it did, a person who used a telescope to show a distant billboard to friends would also be "displaying." So, an embedder may change the number of people to whom the host displays the work, but that doesn't make its acts equivalent to engaging in its own public display.

C.     Embedding Is Not Transmission.

This case does not involve proxy-based architectures in which an intermediary server fetches, modifies, or retransmits content on its own behalf. Such systems may raise different questions about copying and transmission. Here, as the district court found, the content is delivered from the copyright holder's servers directly to users' devices.

An online display is transmitted by whoever controls the server hosting the content. By the statute's terms, "to 'transmit' a performance or display is to communicate it by any device or process whereby images or sounds are received beyond the place from which they are sent." 17 U.S.C. §101. A person publicly

11

displaying content by transmission must therefore "sen[d]" the content "from" one "place" to another. However, an embedder doesn't "send" or "communicate" the work itself. Instead, the HTML that creates embedding provides an address for where the embedder saw the work. Just as the map is not the territory, the address is not the work. The embedder can only instruct users to ask, by pointing them to its past location. The host may then, at its discretion, "send" or "communicate" the work, or even some other work in its place.

It is true that embedding can make content appear to users as though it is part of the defendant's website. *Goldman*, 302 F. Supp. 3d at 593. But that doesn't change the ordinary meaning of the statute. To infringe copyright's public display right, the work must be transmitted. Whether a viewer believes that a particular website copied a work or publicly displayed a work is unimportant to the statute. Confusion is a concept from trademark law.[6]

As one widely influential early case explained, a focus on the precise acts and actors at issue is necessary to avoid infinitely expanding liability—even with respect to *infringing* copies, much less noninfringing ones. *Religious Tech. Ctr. v.*

---

[6] Goodyear at 285 ("As to the appearance, any consumer confusion resulting from seamlessly integrating outside content into one's webpage is beyond the pale of copyright law."). The *Goldman* court erroneously relied on a trademark case to support its rejection of the server test on seamlessness grounds. 302 F. Supp. 3d at 592 (citing *Hard Rock Café Int'l v. Morton*, No. 97 Civ. 9483(RPP), 1999 WL 717995 (S.D.N.Y. Sept. 9, 1999)).

*Netcom On-Line Comm'n. Servs.*, 907 F. Supp 1361, 1365 (N.D. Cal. 1995) ("[I]t does not make sense to hold the operator of each computer liable as an infringer merely because his or her computer is linked to a computer with an infringing file…. No purpose would be served by holding liable those who have no ability to control the information to which their subscribers have access, even though they might be in some sense helping to achieve the Internet's automatic 'public distribution' and the users' 'public' display of files.").[7] The Seventh Circuit reasoned similarity: "To call the provision of contact information transmission or communication and thus make [the linking party] a direct infringer would blur the distinction between direct and contributory infringement and by doing so make the provider of such information an infringer even if he didn't know that the work to which he was directing a visitor to his website was copyrighted." *Flava Works, Inc. v. Gunter*, 689 F.3d 754, 756 (7th Cir. 2012). Technologically speaking, an online display through embedding only results when the sending computer transmits the necessary data. Ordinary embedding requires the sending computer to possess a copy, although digital streaming cameras may be able to display by transmission without possessing a copy. Possession is therefore technically

---

[7] *Netcom* used volition as a dividing line: volitional actors could be directly liable, while others could only be secondarily liable. Expanding direct liability further was "unnecessary as there is already a party directly liable for causing the copies to be made." *Id.* at 1372–73. In the embedding context, the distinction between direct and secondary liability is likewise vital.

incidental to the "server test," although in most embedding cases the server will in fact possess a copy. The entity that transmits a work is the one that provides the data that, when received, will display the work. Transmitting an *instruction* to request the work is simply not equivalent to transmitting the work.

D. The Weight of Authority Supports the Server Test.

The Ninth Circuit has applied *Perfect 10*'s server test multiple times to numerous factual situations. *See, e.g.*, *Hunley*, 73 F.4th at 1070, 1074 (embeds from Instagram); *Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 668 (9th Cir. 2017); *VHT, Inc. v. Zillow Group, Inc.*, 918 F.3d 723, 736 (9th Cir. 2019). Other circuits have agreed that the hosting server is the source of transmissions. *Society Holy Transfiguration Monastery, Inc. v. Gregory*, 689 F.3d 29, 55 (1st Cir. 2012) (holding archbishop liable for public display because infringing work was "loaded on the Archbishop's computer server and posted to his Website.") (citing, inter alia, *Perfect 10*, 508 F.3d at 1160); *APL Microscopic, LLC v. United States*, 144 Fed. Cl. 489, 499 (2019) (same result); *Flava Work*, 689 F.3d at 761 ("giving web surfers addresses where they can find entertainment" is not "transmitting or communicating" them under the Copyright Act).

The Restatement of Copyright concurs, using the following example:

> [A] TV newscaster might read an internet address on an over-the-air broadcast (e.g., "Visit xyz.org for more information") and a member of the public who views that broadcast might then type that address into their internet browser, which connects to the webpage at that address, and the

viewer would thereby see the images that are posted on that webpage displayed on the viewer's computer screen.

American Law Institute, Restatement of Copyright, Tentative Draft No. 6, at §6.09, Comment *g*.[8] The Restatement explains that all of these "steps" could in theory be characterized as a "process whereby images . . . are received beyond the place from which they are sent." 17 U.S.C. § 101.  But "[i]t seems unlikely … that Congress would have intended that chain of events to mean that the TV station itself (or the viewer who types in the internet address) is publicly displaying the images on the xyz.org website and thereby infringing unless authorized by the copyright owner or some other provision of copyright law." *Id.*

The Restatement explains that conceiving of "process" so broadly would lead to a finding of infringement in "a situation in which a defendant places on its website an ordinary hyperlink that, when clicked by a website visitor, opens a new page on which an image from a third-party webpage is displayed." *Id.* Both the embedding website and the website that launches links in a new window use a process that results in works being received. But the Restatement doubts that the "one additional step of the user clicking on the link," *id.*, can provide a meaningful

---

[8] Although the final Restatement text has not yet been published, Tentative Drafts and Proposed Final Drafts that have been approved by the American Law Institute's Council and membership represent the A.L.I.'s current and official position on the subject and may be cited in briefs and judicial opinions pending publication of the final text. *Can I Cite ALI Project Drafts?*, A.L.I., https://www.ali.org/publications-faq (last visited Feb. 6, 2026).

distinction, and it is right to do so. The difference between an <img>tag (which causes the linked image to be displayed) and an <a>tag (which displays as a link) cannot bear that weight. To say, as some district courts do, that embedding is "automatic" whereas launching clicked-on links in a new window is not, and that therefore only the former could be a public display, *see Goldman v. Breitbart News Network, LLC*, 302 F. Supp. 3d 585, 594 (S.D.N.Y. 2018), is to ignore the user's previous acts: In both cases, that user decided to visit a page (probably without knowing what the full contents would be). The embedding was only "automatic" once the user made the volitional decision to visit the embedding site—just as launching a new page is "automatic" once the user makes the volitional decision to click a link.

E.     Contrary District Court Cases Are Mistaken.

A handful of district court cases have rejected the correct rule because of their inattention to the question of *who* engaged in a transmission of an image. *See, e.g., Nicklen v. Sinclair Broadcast Group, Inc.*, 551 F. Supp. 3d 188, 195 (S.D.N.Y. 2021) (using the passive voice to ask whether a work "*is shown*") (emphasis added); *Goldman v. Breitbart News Network, LLC*, 302 F. Supp. 3d 585, 592 (S.D.N.Y. 2018).

Those decisions claim that the server test conflates the public display right and the reproduction right, but the decisions confuse *possession* (not a copyright

16

right) with *reproduction*. *See, e.g.*, Nicklen, 551 F. Supp. 3d at 195; *Leader's Inst., LLC v. Jackson*, No. 14-cv-3572, 2017 WL 5629514, at *11 (N.D. Tex. Nov. 22, 2017). The server test does not impose any sort of reproduction or even a possession requirement; this claim is a red herring diverting attention from the issue of who "displayed" the image.

One may, especially offline, *possess* an infringing copy without having *made* an infringing copy. Even online, it is not only possible for this to occur, it has led to litigation. *See Bell*, 12 F. 4th at 1073 (entity that bought a server containing infringing image, and thus made no infringing reproduction, violated the public display right); *cf. Hotaling v. Church of Jesus Christ of Latter-Day Saints*, 118 F.3d 199 (4th Cir. 1997) (owner of infringing copy could violate distribution right independent of reproduction right). *Perfect 10*'s server test therefore properly asks who controls the transmission of a display. Such control is not the equivalent of reproduction.

Other scenarios also demonstrate the properly differing scopes of the reproduction and public display rights. A live camera feed might not save a copy, but could still engage in a public display—as explicitly contemplated by Congress's provision for an owner of a lawfully made copy to transmit publicly in limited circumstances. 17 U.S.C. §109(c) (allowing owner "to display that copy publicly, either directly or by the projection of no more than one image at a time,

to viewers present at the place where the copy is located"). A non-owner, by contrast, has no such privilege, while even the owner does not have an unlimited right to transmit the image to the public at large. It is their control over the transmission to the public of the image, not their control over the copy, that matters. None of these conclusions throw any doubt on the server test, and they distinguish the reproduction and public display rights.

Likewise, leading someone to a transmission is not the same as transmitting. A teacher who instructs students to open the New York Times on their laptops is not herself "displaying" the photos transmitted from the Times' servers to students' laptops, despite the but-for relationship and even if disobeying the teacher carries consequences for the students.

The Restatement of Copyright correctly rejects the reasoning of the district court cases:

> Holding that any series of steps that results in a display of a work being transmitted to a member of the public constitutes displaying that work "publicly" would lead to holding liable people whose connection to the ultimate transmission is so distant and attenuated that it would not amount to proximate cause and thus would not render them responsible for any resulting injury under ordinary tort notions.

Restatement of Copyright, *supra*, §6.09, Comment *g*.

The district court cases also reason that an embedding site is engaged in public display because the *user's* computer receives the content automatically after requesting the page in which the content is embedded. *See, e.g., Goldman*, 302 F.

Supp. 3d at 594. As explained above, "automaticity" can't distinguish embedding from linking. Further, the sending computer can refuse the request, be offline, or return a different image.

> F.    *Am. Broad. Cos. v. Aereo, Inc.*, 573 U.S. 431 (2014), Has No Bearing on the Server Test.

The transmit clause was added in 1976, as part of the new Copyright Act, to give copyright owners the right to control cable retransmissions of broadcast television programs. *Aereo*, 573 U.S. at 441. Aereo's system retransmitted broadcast television through the Internet, using Aereo-owned and-controlled servers, antennae, and other equipment. *Id.* at 436-37. The Supreme Court held that Aereo was engaged in public performance because "Aereo's activities are substantially similar to those of the [cable] companies that Congress amended the Act to reach." *Id.*

Given the *Aereo* Court's reliance on the analogy to cable, its decision was necessarily of limited helpfulness to interpreting the language of the statute as applied to other situations. Courts since *Aereo* have limited its holding to that cable-like system. *See, e.g., Fox Broad. Co., Inc. v. Dish Network LLC*, 747 F.3d 1060, 1067 (9th Cir. 2014).

This Court has also read *Aereo* as largely limited to its facts in ways supportive of the server test. *BWP Media USA, Inc. v. T & S Software Assoc., Inc.*, 852 F.3d 436 (5th Cir. 2017), found Justice Scalia's dissent to be "helpful in

understanding the decision." *Id.* at 441. That dissent emphasized the textual reasons for imposing a volitional conduct requirement. *Id.* This Court also noted that the *Aereo* majority itself described its willingness to distinguish "other cases involving different kinds of service or technology providers." *Id.* (citing *Aereo*, 573 U.S. at 444). Aereo provided "equipment[,] … access and the means to transmit the infringing material," making it a direct infringer. *BWP*, 852 F.3d at 442.

BWP reasoned that, in the case of a user who uploads an infringing file to a web forum, the direct infringer was the user who did the uploading, not the web forum operator. *Id.* Relevantly, this Court agreed that "it does not make sense to adopt a rule that could lead to the liability of countless parties whose role in the infringement is nothing more than setting up and operating a system that is necessary for the functioning of the Internet.'" *Id.* And this Court made clear that, in ruling on direct liability, it was in no way diminishing the scope of secondary liability, meaning that there were still incentives for non-directly liable parties to avoid infringement. *Id.* at 444.[9] This is the same point the Ninth Circuit made for

---

[9] In reading *Aereo* as limited in effect, the Court is in agreement with the other Circuits. *Hunley*, 73 F.4th at 1074 (concluding that causation and volitional conduct requirements survive *Aereo*); *ABKCO Music, Inc. v. Sagan*, 50 F.4th 309, 321-22 (2d Cir. 2022) (reiterating volition requirement); *Giganews*, 847 F.3d at 666 (same as *Hunley*); *Leonard v. Stemtech Int'l Inc*, 834 F.3d 376, 387 (3d Cir. 2016) (endorsing volition requirement); *Tomelleri v. SunFrog, LLC*, 721 F. Supp. 3d 566, 576 (E.D. Mich. 2024) (same, discussing Sixth Circuit cases).

the server test. *Perfect 10*, 508 F.3d at 1161.

The volitional conduct requirement is generally designed to focus attention on who exactly carried out the infringement at issue. The difference here is that, because of plaintiffs' overreaching theories, there is not even an "underlying" infringement. The only transmission at issue comes from a source authorized to transmit public displays: the copyright owner itself. The relevant question is "who made the transmission?" Goodyear at 287 (explaining that "the distinction between user and embedder hews closely to looking at volitional conduct").

A retransmitter can be sure it is delivering an image because it controls the transmission of the image. An embedder, however, does not control whether a work will be transmitted in response to a request from a user's browser. No transmission of the work passes through its equipment or network. *Cf. Aereo*, 573 U.S at 438-40 (Aereo owned antennas and cables through which performances were transmitted); *id.* at 442-43 (emphasizing that Aereo acted as a carrier).

Another way that *Aereo* limited itself was by emphasizing the interaction of the cable analogy and the public performance right specifically.[10] Unlike the public performance right, which unsurprisingly speaks only of the "performance" of a work, public display requires "show[ing] a copy." *Id.*; *see also Aereo*, 573 U.S. at

_____

[10] Distinguishing cloud computing, remote storage DVRs, and any other technology that was not "highly similar to those of the [cable retransmission systems considered in previous cases]." 573 U.S. at 451.

447-48 (evaluating whether a "performance" was transmitted rather than whether a "copy" was transmitted). Thus, unlike a performance of a play, which might have been memorized by the actors, there can be no public display without some tangible copy. For Internet displays, the source server is where that tangible copy resides.

II. POLICY AND INSTITUTIONAL CONSIDERATIONS SUPPORT THE SERVER TEST.
    Linking and embedding are fundamental to the structure of the modern Internet. Almost everyone who posts content online uses embedding. Zi Chu & Haining Wang, *An Investigation of Hotlinking and Its Countermeasures*, 34 Comput. Commn's 577, 581 (2011) (estimating that 99% of blogs used embedding); *The State of Social Embeds*, Samdesk.io (2016), https://cdn.samdesk.io/static-content/The-State-of-Social-Embeds.pdf (nearly a quarter of news articles used embedding). The server test puts direct liability where it should be: the sources of infringing copies. And it doesn't threaten millions of ordinary citizens with up to $150,000 in statutory damages per work.

Notably, the New York district courts that reject the server test try to avoid some of the disastrous implications by exempting search engines by fiat. *Nicklen*, 551 F. Supp. 3d at 195; *Goldman*, 302 F. Supp. 3d at 595-96. This is not statutory interpretation. Unlike many other parts of the Copyright Act, *e.g.*, 17 U.S.C. §108 (exceptions for libraries and archives); § 110 (exemptions for nonprofit educational institutions, places of worship or religious assembly, certain small businesses,

etc.); § 512 (four distinct safe harbors for different types of online service providers), the public display right provides no such distinctions. Rather than invent statutory epicycles, this Court should follow the path presaged by *BWP*: Look for the actual transmitter, which will either be authorized to publicly display the work (in which case there is no liability for embedding) or unauthorized (in which case secondary liability might attach to the embedder under appropriate circumstances).

A copyright owner who objects to embedding has many options. If it wants to limit the pathways that viewers can use to view its works, it can reject requests that fall outside its parameters, such as requests to embed an image outside of its context on the owner's website, or even requests from websites that haven't formed agreements with the owner.[11]  Giving copyright owners more would create a mutant species of moral right to control the appearance of a work, in contradiction to Congress's actual moral rights scheme. *See* 17 U.S.C. § 106(A) (Visual Artists Rights Act) (limiting moral rights to single- or limited-edition

---

[11] See, e.g., YouTube, Restrict embedding, https://support.google.com/youtube/answer/6301625?hl=en (Jan. 10, 2026); Jaron Schneider, Instagram Users Can Now Prevent Others from Embedding Their Photos , https://petapixel.com/2021/12/17/instagram-users-can-now-prevent-others-from-embedding-their-photos/ (Dec 17, 2021). HTML allows sources to block all embeds, allow embeds only from the same site, or pick and choose. See, e.g., https://developer.mozilla.org/en-US/docs/Web/HTTP/Reference/Headers/Content-Security-Policy/frame-ancestors#examples (providing overview).

works). Indeed, even when Congress granted moral rights against distortion to artistic works, it declined to allow artists control over the context in which they appeared. *Id.* § 106(A)(c)(2) (excluding any claim based on "public presentation, including lighting and placement, of the work"); *cf. Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 34–35 (2003) ("When Congress has wished to create such an addition to the law of copyright, it has done so with much more specificity …. [Accepting a broad reading of "origin" in the Lanham Act would] render these limitations [on the Visual Artists Rights Act] superfluous.").

Given the ability to pursue any direct infringer and the prospect of secondary liability for infringing displays, there is no need to strain the definition of public display to combat online infringement. *BWP*, 852 F. 3d, at 444; *Perfect 10*, 508 F.3d at 1172.

## CONCLUSION

The server test has served us well for nearly two decades. It matches the language of the statute, the well-settled distinction between direct and secondary liability, and the nature of the technology. The copyright owner here makes the work available freely to every site visitor, and may stop embedding with a few clicks on the keyboard. There is no need to strain the law of direct liability to protect any legitimate interests it might have.

This Court should decline the invitation to create a circuit split that would

upset settled expectations and turn millions of online posters into infringers overnight.

The district court's judgment should be affirmed.

*Counsel for Amicus Curiae*

Professor Mark A. Lemley
Stanford Law School
559 Nathan Abbott Way
Stanford, CA 94305
(650) 723-4605
mlemley@law.stanford.edu

**Appendix A**
**List of Signatories[12]**

Timothy K. Armstrong
Professor of Law, University of Cincinnati College of Law

Lea Bishop
Professor, Indiana University

Michael W. Carroll
Professor of Law, American University Washington College of Law

Zachary L. Catanzaro
Assistant Professor, Widener University Delaware Law School

Margaret Chon
Faculty Director, Technology, Innovation Law, and Ethics Institute, Seattle
University School of Law

Ralph D. Clifford
Emeritus Professor of Law, Univ. of Massachusetts School of Law

Rachael M. Dickson
Assistant Professor of Law, Willamette University School of Law

Shahrokh Falati
Associate Professor of Law, New York Law School

Eric Goldman
Professor, Santa Clara University School of Law

Michael P. Goodyear
Associate Professor, New York Law School

Timothy T. Hsieh
Associate Professor of Law, Oklahoma City University School of Law

---

[12]  Signatures are in our individual capacity; institutions are listed for
identification only

Robert Kasunic
Adjunct Professor, American University Washington College of Law

Stacey Lantagne
Professor of Law, Suffolk University Law School

Mark Lemley
William H. Neukom Professor of Law at Stanford Law School

Jack I. Lerner
Clinical Professor of Law, University of California, Irvine School of Law

Yvette Joy Liebesman
Professor, Saint Louis University School of Law

Brian J. Love
Professor of Law, Santa Clara University School of Law

Mark P. McKenna
Professor of Law, UCLA Law

Jess Miers
Assistant Professor of Law, University of Akron School of Law

Tyler T. Ochoa
Professor of Law, Datta Center for High Tech Law, Santa Clara University School of Law

Sarah Polcz
Acting Professor of Law, UC Davis School of Law

Amanda Reid
Associate Professor, University of North Carolina at Chapel Hill

Betsy Rosenblatt
Tom J.E. and Bette Lou Walker Professor of Law, Case Western Reserve University School of Law

Christopher Jon Sprigman
Murray and Kathleen Bring Professor of Law, NYU Law

Rebecca Tushnet
Frank Stanton Professor of the First Amendment, Harvard Law School

**CERTIFICATE OF SERVICE**

I hereby certify that on March 2, 2026 a true and correct copy of the

foregoing Brief for Amicus was served via electronic filing with the Clerk of Court

and all registered ECF users.

March 2, 2026 and

<div style="margin-left:40%">

/s/ Professor Mark A. Lemley
*Counsel for Amicus Curiae*
Professor Mark A. Lemley
Stanford Law School
559 Nathan Abbott Way
Stanford, CA 94305
(650) 723-4605
mlemley@law.stanford.edu

</div>

**CERTIFICATE OF COMPLIANCE**

This brief has been prepared using 14-point, proportionately spaced, serif typeface, in Microsoft Word.  Excluding the parts of the brief exempted by Fed. R. App. P. 32(f), this brief contains 5542 words.

<u>/s/ Professor Mark A. Lemley</u>

*Counsel for Amicus Curiae*
Professor Mark A. Lemley
Stanford Law School
559 Nathan Abbott Way
Stanford, CA 94305
(650) 723-4605
mlemley@law.stanford.edu