NO. 25-60550

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

**EMMERICH NEWSPAPERS, INC.**
*Plaintiff - Appellant*

**VERSUS**

**PARTICLE MEDIA, INC.**
*Defendant - Appellee*

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION (NO. 3:23-CV-26 TSL-MTP)**

**REPLY BRIEF OF APPELLANT,
EMMERICH NEWSPAPERS, INC.**

**ATTORNEYS OF RECORD FOR APPELLANTS:**

WILSON H. CARROLL, MS Bar No. 5984
WILSON CARROLL, PLLC
2506 Cherry Street
Vicksburg, Mississippi 39180
Tel:         601-953-6579
Email:      wilsoncarroll59@gmail.com

MICHAEL B. WALLACE
CHARLES E. COWAN
WISE CARTER CHILD & CARRAWAY, P.A.
401 E Capitol St.
Jackson, Mississippi 39201
Tel:         601-968-5500
Email:      mbw@wisecarter.com

DON W. BARRETT
BARRETT LAW GROUP, P.A.
404 Court Square North
Lexington, Mississippi 39095
Tel:         662-834-9168
Email:      donbarrettpa@gmail.com

CHRISTIAN E. HUDSON
CUNEO GILBERT & LADUCA, LLP
222 Livingston Street
Unit 2
Brooklyn, New York 11201
Tel:         202-789-3960
Email:      christian@cuneolaw.com

# CERTIFICATE OF INTERESTED PERSONS

No. 25-60550

## *Emmerich Newspapers, Inc. v. Particle Media, Inc.*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

| | |
|---|---|
| Appellant: | Emmerich Newspapers, Inc. (No publicly held corporation owns 10% or more of its stock and it has no parent corporation) |
| Appellants' Counsel: | Wilson H. Carroll<br>Michael B. Wallace<br>Don W. Barrett<br>Christian E. Hudson<br>Charles E. Cowan |
| Appellee: | Particle Media, Inc. |
| Appellees' Counsel: | Steven Carmody<br>Karen Howell |
| District Judge: | The Honorable Tom Lee |

/s/ Wilson H. Carroll
Appellants' Counsel

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

The parties concur in their request for oral argument, to assist the Court in understanding the legal and factual issues that are presented in this Appeal.

# TABLE OF CONTENTS

STATEMENT OF FACTS ........................................................................1

ARGUMENT ........................................................................................5

   I.   Particle Publicly Displays Emmerich's Copyrighted Articles........5

     A.   The Statutory Language Provides That a Copy Is Displayed When Any Device or Process Causes it to Be Seen. .........................7

     B.   No Other Court of Appeals Has Adopted the Ninth Circuit's Server Test. ..................................................................................12

     C.   District Courts Outside of the Ninth Circuit Generally Reject the Server Test....................................................................................15

     D.   Both the Supreme Court and Congress Endorsed a Broad Reading of Processes Causing Infringement. ...................................17

   II.   Emmerich's URLs Qualify as Copyright Management Information. ...................................................................................20

     A.   This Court has jurisdiction to provide legal guidance to the District Court. ..................................................................................20

     B.   Emmerich's removed URLs are CMI......................................24

       1.   Emmerich's URLs Fall Within the Broad Scope of CMI.......24

       2.   Emmerich's CMI is Conveyed With its Articles. ...................30

       3.   Particle Deleted Emmerich's CMI.........................................32

CONCLUSION ..................................................................................34

CERTIFICATE OF SERVICE.............................................................36

CERTIFICATE OF COMPLIANCE ....................................................36

# TABLE OF AUTHORITIES

**Cases**

*ABC, Inc. v. Aereo, Inc.*,
573. U.S. 431 (2014) ....................................................................17

*After II Movie, LLC v. Grande Commc'ns Networks, LLC*,
2023 WL 1422808, (W.D. Tex. Jan. 31, 2023) .............................26

*BWP Media USA, Inc. v. T & S Software Assocs., Inc.*,
852 F.3d 436 (5th Cir. 2017) ...............................................18, 19

*Design Ideas, Ltd. v. Meijer, Inc.*,
2018 WL 3545157 (C.D. Ill. July 23, 2018) ................................29

*Dow Jones & Co. v. Harris*,
749 F. Supp. 3d 776 (W.D. Tex. 2024) .......................................33

*Energy Intel Grp. Inc. v. Kayne Anderson Cap. Advisors, L.P.*,
948 F.3d 261 (5th Cir. 2020) ...............................................passim

*Entergy Corp. v. Comm'r*,
683 F.3d 233 (5th Cir. 2012) ......................................................13

*Falkner v. Gen. Motors LLC*,
393 F. Supp. 3d 927 (C.D. Cal. 2018) ........................................33

*Fischer v. Forrest*,
968 F.3d 216 (2d Cir. 2020).........................................................28

*Fisher v. Halliburton*,
667 F.3d 602 (5th Cir. 2012) ......................................................22

*Flava Works, Inc. v. Gunter*,
689 F.3d 754 (7th Cir. 2012) ......................................................13

*Goldman v. Breitbart News Network, LLC,*
    302 F. Supp. 3d 585 (S.D.N.Y. 2018) ....................................15, 16

*Great Bowery v. Best Little Sites,*
    2024 WL 3416038 (D. Utah Jul. 15, 2024) ..................................15

*Hunley v. Instagram, LLC,*
    73 F.4th 1060 (9th Cir. 2023)........................................................14

*IMAPizza, LLC v. At Pizza, Ltd.,*
    965 F.3d 871 (D.C. Cir. 2020) .....................................................13

*In re Frontier Commc'ns Corp.,*
    658 B.R. 277 (Bankr. S.D.N.Y. 2024) .........................................25

*Jackson v. City of Houston,*
    143 F.4th 640 (5th Cir. 2025)......................................................21

*Leader's Institute v. Jackson,*
    2017 WL 5629514 (N.D. Tex. Nov. 22, 2017) .............................15

*Learning Res. Inc. v. Trump,*
    607 U.S. ____, 2026 WL 477534 (U.S. Feb. 20, 2026).................18

*Live Face on Web, LLC v. Biblio Holdings, LLC,*
    2016 WL 4766344 (S.D.N.Y. Sept. 13, 2016)..............................16

*McGucken v. Newsweek, LLC,*
    2022 WL 836786 (S.D.N.Y. Mar. 21, 2022) ...............................16

*Millennium Funding, Inc. v. Priv. Internet Access, Inc.,*
    2022 WL 7560395, (D. Colo. Oct. 13, 2022)...............................26

*Nguyen v. Am. Comm. Lines, L.L.C.,*
    805 F.3d 134 (5th Cir. 2015) ......................................................22

*Nicklen v. Sinclair Broad. Grp., Inc.,*
    551 F. Supp. 3d 188 (S.D.N.Y. 2021) .........................................15

vii

*Pearson Educ., Inc. v. Ishayev,*
   963 F. Supp. 2d 239 (S.D.N.Y. 2013) ............................................16

*Perfect 10 v. Google, Inc.,*
   416 F. Supp. 2d 828 (C.D. Cal. 2006) ..........................................14

*Perfect 10, Inc. v. Amazon.com, Inc.,*
   508 F.3d 1146(9th Cir. 2007) ...............................................passim

*Pers. Keepsakes, Inc. v. Personalizationmall.com, Inc.,*
   975 F.Supp.2d 920 (N.D. Ill. 2013) ............................................32

*Powers v. Law Offs. of Marcos & Assocs., P.C.,*
   2024 WL 5185699 (S.D. Tex. Sept. 23, 2024) ........................31, 32

*Prepared Food Photos, Inc. v. Chicken Joes, LLC,*
   2024 WL 382529 (S.D.N.Y. Feb. 1, 2024) ....................................16

*Recif Res., LLC v. Juniper Capital Advisors, L.P.,*
   2020 WL 5739138 (S.D. Tex. Sept. 24, 2020) ............................29

*Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs.,*
   907 F. Supp. 1361 (N.D. Cal. 1995) ............................................19

*Silverthorne Seismic, L.L.C. v. Sterling Seismic Servs., Ltd.,*
   125 F.4th 593 (5th Cir. 2025).....................................................22

*Society of Holy Transfiguration Monastery, Inc. v. Gregory,*
   689 F.3d 29 (1st Cir. 2012)........................................................13

*Tomelleri v. Zazzle, Inc.,*
   2015 WL 8375083 (D. Kan. Dec 9, 2025)..............................28, 32

*UMG Recordings, Inc. v. Grande Communications Networks, L.L.C.,*
   118 F.4th 697 (5th Cir. 2024).....................................................12

*Urbanimage Media Ltd. v. IHeartMedia, Inc.*,
 793 F. Supp. 3d 852 (W.D. Tex. 2025) ..........................................16

**Statutes**

17 U.S.C. § 101................................................................8, 9, 11, 18

17 U.S.C. § 106(1) .....................................................................14

17 U.S.C. § 106(4) .....................................................................14

17 U.S.C. § 106(5) ...........................................................6, 8, 11, 13

17 U.S.C. § 1202.....................................................................21, 29

17 U.S.C. § 1202(b)(1).............................................................21, 34

28 U.S.C. § 1292(b) ................................................................21, 23

**Other Authorities**

American Law Institute, Restatement of Copyright,
 Tentative Draft No. 6..............................................................12

*Any*, Merriam-Webster.com (Mar. 12, 2026) ..........................................8

*Communicate,* Merriam-Webster.com (Mar. 16, 2026)........................10

*Convey*, Merriam-Webster.com (Mar. 12, 2026)...................................35

*Show*, Merriam-Webster.com (Mar. 15, 2026) ......................................8

**Treatises**

4 Nimmer on Copyright § 12A.10[B][1][a] ...........................................35

Particle and its three groups of amici rely on multiple factual assertions, some presented in this Court for the first time.

1.    Particle acknowledges that Emmerich's copyright content is being publicly displayed, Appellee's Brief, 26, but assigns Emmerich full responsibility.  It describes its process only as "provid[ing] an address for the user's computer to know *where* to make a request, so that the *copyright holder's server* may send data to the user's computer." *Id.* 29 (emphasis in original).  The process of causing a display of Emmerich's content, however, begins long before the provision of the address. Particle constantly sends its web crawler to find articles prepared by others, including Emmerich's copyrighted works.  ROA.69084.  Having provided its customers "free Apps called NewsBreak," Particle regularly furnishes them "a single continuous page or newsfeed," which "contains a snippet of each article." *Id.* 12.  Particle's transmission of these snippets causes its customer to select an Emmerich article, about which the user might never have otherwise known.  At that point, the address provided by Particle causes the user's computer to cause Emmerich's copy to be seen on the user's screen.  Particle modestly claims to "play[]

a passive role" in providing its customers with Apps, snippets, and addresses. *Id.* 2. It does not acknowledge that its web crawler collects the snippets.

2. Particle asserts that its customer is simply "view[ing] content the copyright holder has chosen to publicly display." *Id.* 26. Emmerich displays its content to the public, but only on Emmerich's terms. The public sees what Emmerich wants it to see, including Emmerich's advertisements and multiple functional buttons. Emmerich has not chosen to permit its copyrighted content to be accompanied by Particle's advertisements and Particle's functional buttons. Emmerich displays its work publicly to assist Emmerich's business, not Particle's.

3. Particle asserts that Emmerich has misrepresented that Particle users are "on a NewsBreak URL," but it never denies its content is visible along with Emmerich's articles in framed view. Appellee's Brief, 14 n.2. The affidavit cited by Particle confirms that "fully-hosted articles" are viewed on NewsBreak. ROA.69029. Framed articles appear in a window on NewsBreak. ROA.69052. Particle's brief acknowledges that, above Emmerich's articles, "there is a small

Newsbreak 'N' at the top left of the screen to direct the user back to the NewsBreak news feed." Appellee's Brief, 15. Particle's advertisements and buttons are clearly visible just below that link. ROA.69511. Neither the affidavit nor the brief suggests how this occurred without a Particle URL. Particle admits that it created a new URL each time "an article was 'shared' using a button on the NewsBreak app," ROA.69086, and it does not deny that the publisher's URL appears when the publisher's share button is pressed. ROA.7465, R.E. Tab 5. The difference between the publisher's URL and Particle's URL is readily apparent:



ORIGINAL URL

PARTICLE'S SUBSTITUTE URL

ROA.7469–71, R.E. Tab 5.[1]

4.      Particle and its amici blame Emmerich for allowing its server to participate in Particle's process.  "… Emmerich's server was the one that provided the process for sharing that content."  *Id.* 39. "[T]he provider of instructions has no control over what the follower of those instructions might find."  Google Brief, 17–18.  "[I]t is the owner of the server that stores the content who has ultimate control over the content itself, whether that content is served, when, and to whom."  EFF Brief, 14.  "[T]he host server retains ultimate control over whether and what content is transmitted in response to a request."  Scholars Brief, 6.    Emmerich had no control, because Particle secretly scraped thousands of articles before it had any idea of what was going on.[2] ROA.7462–64, R.E. Tab 5.

5.      Finally, Particle and its amici claim that holding Particle statutorily liable for its display of Emmerich's content will destroy the Internet.  Particle asserts that, should this Court reject the server test,

---

[1] The brief also cites ROA.72199, which is the first page of a sealed document.  No evidence appears on that page.

[2] The Scholars graciously concede that "[t]he degree of practical control a host exercises over third-party embedding may vary."  Scholars Brief, 7 n.5.  Emmerich might have had some practical control had Particle asked its permission, but it had no control whatsoever when Particle kept it in the dark.

"the internet would grind to a screeching halt," Appellee's Brief, 1, and its amici add numerous other apocalyptic assertions. The supposed consequences of enforcing the law as Congress wrote it might possibly be taken into consideration had Particle presented expert testimony before the District Court. This Court can hardly take judicial notice of the multitude of supposed nightmares set out in the amici briefs.

Such concerns have no relevance to the Congressional definition of display. Should this Court agree that Particle is also publicly displaying Emmerich's work, concerns for the welfare of the Internet might possibly have some bearing on the defense of fair use. This Court's job at this point is to enforce the law as Congress wrote it in 1976.

## ARGUMENT

### I. Particle Publicly Displays Emmerich's Copyrighted Articles.

Consistent with the definitions in 17 U.S.C. § 101, Particle, "by means of … any … device or process," "show[ed] a copy of" copyrighted articles "fixed" in Emmerich's websites. Particle says the "device or process" it uses is called "WebView," Appellee's Brief, 13, but it matters not what it is called or how it works. Because Particle has done all this

"publicly," it is infringing Emmerich's exclusive right of display under 17 U.S.C. § 106(5).

This Court has agreed to consider the "server test," which states "a person displays a photographic image by using a computer to fill a computer screen with a copy of the photographic image fixed in the computer's memory." *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1160 (9th Cir. 2007). Further, "the owner of a computer that does not store and serve the electronic information to a user is not displaying that information." *Id.*, at 1159.[3] To constitute a display, there must be "a copy of the photographic image fixed in the computer's memory." *Id.*, at 1160.[4]

The limitation imposed by *Perfect 10* is not supported by the statutory language. Section 101 defines "copies" to "include[] the material object … in which the work is first fixed." Here, the copyrighted works are first fixed in Emmerich's computers. Particle uses WebView to show those articles as they are fixed there. Nothing

---

[3] The Ninth Circuit described this last sentence as the "server test," attributing the label to the District Court in that case. *Id.*

[4] Particle's amici explain that it is possible in some circumstances to display a work "without possessing a copy." Scholars Brief, 13. Thus, they disavow the server test as *Perfect 10* identified it.

in the statutory language suggests that one computer cannot display a work fixed in a different computer. Particle does this through the "device or process" known as WebView, and thus displays Emmerich's copyrighted work.

The statutory language alone is sufficient to establish Particle's responsibility for an infringing display of Emmerich's work. The case law and legislative history, while not necessary to the analysis, confirm it.

### A. The Statutory Language Provides That a Copy Is Displayed When Any Device or Process Causes it to Be Seen.

Particle begins with its statutory analysis, applying definitions in § 101 to the right of display protected by § 106(5). Appellee's Brief, 27–31. At no point in that discussion does Particle address the definition of "show," which lies at the heart of § 101's statutory definition of "display":

> To "display" a work means to show a copy of it … by means of … any … device or process … .

17 U.S.C. § 101.

Emmerich and Particle agree on important points on the application of the statutory language. Particle affirms that Emmerich

7

"*has publicly displayed*" its "*own*" copy, Appellee's Brief, 29 (emphasis in original), thereby admitting that an original also qualifies as a copy. That copy is "'fixed' … on *Emmerich's server*." *Id.* 30 (emphasis in original). However, without citation to relevant statutory language, Particle jumps to the conclusion that a work on "the copyright holder's own publicly accessible server" cannot also be displayed by someone else. *Id.* 28. Statutory language negates that unsupported conclusion.

Congress in § 101 said that "[t]o 'display' a work means to show a copy of it." Because Congress did not define "show," this Court must apply the ordinary dictionary meaning, which means "to cause or permit to be seen." *Show*, Merriam-Webster.com (Mar. 15, 2026). Particle causes the copy fixed in Emmerich's server to be seen, thereby displaying it. The definition of "display" in § 101 makes clear that the cause may result from "any … device or process," and "any" is defined broadly as "one or some indiscriminately of whatever kind." *Any*, Merriam-Webster.com (Mar. 12, 2026). The process of "provid[ing] an address for the user's computer," Appellee's Brief, 29, by itself causes the copy at that address to be seen, but Particle's process described in the Statement of Facts involves much more than that.

Through its extensive process, from web crawler to address, Particle unquestionably causes Emmerich's copy to be seen on its customer's computer. This is showing, and a copy shown is therefore displayed under the plain language of § 101. Although the server test says that "a computer that does not store and serve" the copy cannot display it, *Perfect 10,* 508 F.3d at 1159, the statutory language does not provide that one person cannot show a copy in someone else's possession.

Neither Particle nor any of its amici address the fact that "show" is defined to include anything that causes a work to be seen. Instead, they seek to engage in a battle of metaphors. Their favorite is that a tour guide does not display a gallery's artwork when he walks his customers through the building. Appellee's Brief*,* 14, 38, 43; Google Brief, 8; Scholars Brief, 9–10. However, a tour guide can take his customers outside the building, whether a museum or a shop, and show them through the window artwork he does not possess. Indeed, as in this case, the window tour guide gets paid by his customers, and the museum does not. The Google amici's assertion that "one cannot 'show

9

a copy' of a work without *having* a copy," Google Brief, 8 (emphasis in original), is false as a matter of simple English.

Even though Particle causes Emmerich's copy to be seen, Particle objects that it does not transmit that copy. Appellee's Brief, 29. Transmission, of course, is not part of the definition of display; a copy is displayed whenever it is caused to be seen. Transmission is relevant because the right protected by § 106(5) is the right "to display the copyrighted work publicly," and transmission is part of § 101's explanation of "publicly" as including a party's action "to transmit or otherwise communicate a … display of the work … to the public, by means of any device or process." "Transmit" is separately defined by § 101 as "to communicate [a display] by any device or process whereby images or sounds are received beyond the place from which they are sent." Thus, § 101 says "transmit" means "communicate," which the dictionary defines as "to convey knowledge of or information about." *Communicate,* Merriam-Webster.com (Mar. 16, 2026). Particle's process does this. It "convey[s]" to its customer's computer "knowledge of or information about" Emmerich's copy, namely its address on the Internet. *Id.* That communication causes Emmerich's computer to send

10

its copy to Particle's customer's computer, which, of course, is "beyond the place from which they are sent" by Emmerich's computer. Section 101's definition does not say that "the place from which they are sent" must belong to the party who caused the display to be sent.

The Scholars acknowledge that the process by which a display is communicated may include many causes. All of those steps together may constitute "a process that results in works being received." Scholars Brief, 15. Indeed, addressing Particle's favorite metaphor, they admit, "The tour guide is a but-for cause of the public displays to tour participants" of the artwork. *Id*. 9.[5] They caution, however, against "holding liable people whose connection to the ultimate transmission is so distant and attenuated that it would not amount to proximate cause." *Id*. 18 (quoting American Law Institute, Restatement of Copyright, Tentative Draft No. 6, at § 6.09, Comment *g*).

---

[5] Remarkably, Particle asserts, "Without [web] crawling, search engines would not be able to discover or index webpages so that interested viewers can find them in the first place." Appellee's Brief, 47. That is just another way of saying that Particle's web crawler is a but-for cause of the display of Emmerich's articles to Particle's customers. Particle confirms that fact when it acknowledges that "any webpage or search engine that provides a link to another page can be said to *cause* the latter's display." *Id*. 40 (emphasis in original).

Whether or not Congress intended to distinguish between but-for cause and proximate cause in determining responsibility for public display, the concept is of no use to Particle. Particle is not only a but-for cause of the public display of Emmerich's work; it is the primary cause. When it scrapes Emmerich's content and dispatches it to its customers in the form of snippets, it intends those customers to do exactly what they do, which is to bring Emmerich's content up on their screens along with Particle's advertisements. Particle is not the remote cause of this display; it is the real cause. Particle has thus violated Emmerich's exclusive right of display under the statutory language.

**B.      No Other Court of Appeals Has Adopted the Ninth Circuit's Server Test.**

Particle admits that this Court has not adopted the server test. Appellee's Brief, 32 n.6. This Court quoted *Perfect 10* on the issue of contributory infringement, not the direct infringement asserted here. *See UMG Recordings, Inc. v. Grande Communications Networks, L.L.C.*, 118 F.4th 697, 715–16 (5th Cir. 2024) (quoting *Perfect 10*, 508 F.3d at 1172).

However, Particle erroneously asserts that the First and Seventh Circuits have endorsed the server test. Appellee's Brief, 32. The

Seventh Circuit has an interesting metaphor concerning the right of performance under § 106(4), but it says nothing about the right of display. *See Flava Works, Inc. v. Gunter*, 689 F.3d 754, 761 (7th Cir. 2012). Indeed, the Court acknowledged that its discussion related to an argument plaintiff never made. *Id. Society of Holy Transfiguration Monastery, Inc. v. Gregory*, 689 F.3d 29 (1st Cir. 2012), concerns the reproduction right under § 106(1). The First Circuit quoted *Perfect 10* on the issue of what it takes to be "fixed," a necessary requirement for a copy. *Id.*, at 55 (quoting 508 F.3d at 1160). Here, Particle now admits that copies of copyrighted articles are fixed in Emmerich's computer. The First Circuit's opinion does not remotely endorse the server test.

Finally, Particle relies on *IMAPizza, LLC v. At Pizza, Ltd.*, 965 F.3d 871 (D.C. Cir. 2020), Appellee's Brief, 33, which does not cite *Perfect 10* at all. In a reproduction case under § 106(1), it observed that a copy is not made until it is fixed. 965 F.3d at 877.

Despite Particle's assertions, only the Ninth Circuit has adopted the server test. It is true that this Court attempts to avoid the creation of circuit conflicts, but it also must avoid adherence to decisions that are wrong. *See Entergy Corp. v. Comm'r*, 683 F.3d 233, 239 (5th Cir. 2012).

As already demonstrated from the statutory language, *Perfect 10* is wrong.

In any event, it is not the task of this Court to decide whether a conflict exists, because the facts of this case have never been presented to the Ninth Circuit. In *Perfect 10*, the pictures in question were stored on "third-party websites that display infringing full-size versions of Perfect 10's images." 508 F.3d at 1154. The District Court, at least, thought that was important. "[H]ere the initial *direct* infringers are the websites that stole P10's full-size images and posted them on the internet for all the world to see." *Perfect 10 v. Google, Inc.*, 416 F. Supp. 2d 828, 844 (C.D. Cal. 2006) (emphasis in original). The server test did not leave Perfect 10 without a remedy because it could pursue the direct infringer. Although *Hunley v. Instagram, LLC,* 73 F.4th 1060, 1070–71 (9th Cir. 2023), reviewed other decisions which extended *Perfect 10* beyond its particular facts, the Ninth Circuit rule is that "the entity providing access to infringing content did not directly infringe, but the website who copied and displayed the content did." *Id.* at 1074. The Ninth Circuit has never considered these facts, where the infringer has displayed the copyright owner's own copy. Here, Particle has ransacked

Emmerich's inventory and invited its customers to come take their pick. If and when the Ninth Circuit endorses that business plan, then there will be a circuit split.

C.    **District Courts Outside of the Ninth Circuit Generally Reject the Server Test.**

The District Court here expressly acknowledged that the server test had been rejected by *Leader's Institute v. Jackson*, 2017 WL 5629514 (N.D. Tex. Nov. 22, 2017), *Goldman v. Breitbart News Network, LLC*, 302 F. Supp. 3d 585 (S.D.N.Y. 2018), and *Great Bowery v. Best Little Sites*, 2024 WL 3416038 (D. Utah Jul. 15, 2024).   Particle expresses its disagreement with *Goldman* and *Leader*'s and attempts to distinguish them, but it never suggests the District Court misunderstood them.

Particle factually distinguishes *Nicklen v. Sinclair Broad. Grp., Inc.*, 551 F. Supp. 3d 188 (S.D.N.Y. 2021), on the same basis as *Goldman*, Appellee's Brief, 35–36, but does not deny *Nicklen* holds "embedding a video on a website 'displays' that video."  551 F. Supp. 3d at 194.[6]  Particle also factually distinguishes *Urbanimage Media Ltd. v.*

---

[6] Emmerich agrees that Particle's embedding Emmerich's address is sufficient to constitute a public display, but Particle's process is much more extensive than that.

*IHeartMedia, Inc.*, 793 F. Supp. 3d 852 (W.D. Tex. 2025), without disputing that it rejects the server test. Particle completely ignores *Prepared Food Photos, Inc. v. Chicken Joes, LLC*, 2024 WL 382529 (S.D.N.Y. Feb. 1, 2024), and *McGucken v. Newsweek, LLC*, 2022 WL 836786 (S.D.N.Y. Mar. 21, 2022).

Particle would have this Court believe that the server test was endorsed by two earlier New York cases, *Live Face on Web, LLC v. Biblio Holdings, LLC*, 2016 WL 4766344 (S.D.N.Y. Sept. 13, 2016), and *Pearson Educ., Inc. v. Ishayev*, 963 F. Supp. 2d 239 (S.D.N.Y. 2013). *Goldman*, however, declared that neither of those cases "adopted the Server Test for the display right," because neither case concerned the display right. 302 F. Supp. 3d at 591. It is telling that Particle cites no district court case supporting the server test in the last decade.

For at least the last ten years, courts outside the Ninth Circuit have refused to follow the server test. That unbroken string at least suggests that this Court's rejection of the server test is unlikely to destroy the Internet.

**D. Both the Supreme Court and Congress Endorsed a Broad Reading of Processes Causing Infringement.**

No one suggests that this case is controlled by *ABC, Inc. v. Aereo, Inc.*, 573. U.S. 431 (2014). Nor does anyone suggest that legislative history takes precedence over statutory language. Certainly, nothing in Emmerich's brief urges this Court to "ignore what statutes say." Appellee's Brief, 46. To the contrary, *Aereo* and the legislative history support what the statutes say.

*Aereo* does not control because it concerned the performance right, not the display right. However, the respective definitions found in § 101 use identical language to describe the means by which those rights may be violated. A work may be "display[ed] by means of … any other device or process." A work may be performed "by means of any device or process." 17 U.S.C. § 101. Similar broad language appears in the definitions of "publicly" and "transmit." Although *Aereo* had devised a technologically complicated process to avoid the copyright restrictions placed on cable systems, the Court nevertheless found it to be "a 'process' of transmitting a performance." *Aereo,* 573 U.S. at 448. An equally realistic approach to the facts of this case supports the

conclusion that Particle's process caused the communication of Emmerich's work to Particle's customers.

Emmerich's references to legislative history confirm that the broad language chosen by Congress and applied in *Aereo* ought to be broadly construed on these facts. *See* Appellant's Brief, 28–31. Moreover, while all agree that statutory language controls, there are judges who find it important to consult committee reports for confirmation. *See Learning Res. Inc. v. Trump*, 607 U.S. ___, 2026 WL 477534 (U.S. Feb. 20, 2026) (Jackson, J., concurring).

The Scholars observe that this Court applied *Aereo* carefully in *BWP Media USA, Inc. v. T & S Software Assocs., Inc.*, 852 F.3d 436 (5th Cir. 2017). There, this Court considered a defendant that "hosted an internet forum on which third-party users posted images that infringed copyrights." *Id.* at 438. Distinguishing the two cases, this Court said, "Although *Aereo* and *T & S* both provided a service that others could use to infringe, only *Aereo* played an active role in the infringement. That role was to route infringing content to its users." *Id.* at 442.

Here, Particle played an active role in scraping Emmerich's websites and routing snippets to its customers, to be used by the

WebView tool Particle provided to its customers. This process indisputably meets "the volitional-conduct requirement" established by *BWP*. *Id.*

That holding presents one solution to the potential problem of extending liability to every person who is a but-for cause of an infringing display. According to the Court that established the volitional-conduct requirement, it would "not make sense to adopt a rule that could lead to the liability of countless parties whose role in the infringement [was] nothing more than setting up and operating a system that is necessary for the functioning of the Internet." *Id.* at 439 (quoting *Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs.*, 907 F. Supp. 1361, 1372 (N.D. Cal. 1995)). The volitional-conduct requirement would protect the innocent tour guide but not the elaborate process Particle established to display Emmerich's articles.

The plain language of the Act dictates that the protections for copyright owners should be broadly construed, and *Aereo* and the legislative history confirm that breadth. To the extent that responsibility for causing a public display might be thought to reach too

19

broadly, doctrines like volitional-conduct and fair use can protect innocent parties. This Court should reject the server test.[7]

## II. Emmerich's URLs Qualify as Copyright Management Information.

### A. This Court has jurisdiction to provide legal guidance to the District Court.

The order from which this appeal has been authorized granted Particle's motion for summary judgment on Emmerich's Copyright Management Information ("CMI") claims. ROA.72071, R.E. Tab 2, 60. Recognizing that 28 U.S.C. § 1292(b) limits interlocutory review to "a controlling question of law," the District Court certified the question of "whether under [17 U.S.C.] § 1202, a URL can be considered Copyright Management Information, and, if so, whether a URLs intentional removal constitutes a violation of § 1202(b)(1)." ROA.72162, R.E. Tab 3, 3. Here, the District Court found, "Emmerich's URLs are not file names," accepting Particle's argument that "the purpose of a URL differs fundamentally from that of a file name." ROA.72068, R.E. Tab

---

[7] Particle suggests that rejection of the server test will result in unconstitutional levels of damages. Appellee's Brief, 34. No constitutional defense appears in Particle's answer. ROA.72015–40, 72262–86.

2, 57.  This is the "issue of first impression" which the District Court found to be the controlling issue of law.  ROA.72162, R.E. Tab 3, 3.

Particle, repeating arguments it made to the District Court and the motions panel, ROA.72113–72141, *Answer to Petition for Permission to Appeal Pursuant to 28 U.S.C. § 1292(B)*, No. 25-90026 (Dkt. #7 Oct. 10, 2026),  seeks to limit this Court's consideration of the question.  It acknowledges that this Court may resolve "the abstract legal question of whether URLs *generally* can qualify as CMI." Appellee's Brief, 56 (emphasis in original).  Particle's restrictive language, however, is not the question certified by the District Court. The question directly relevant to this litigation is whether URLs can be CMI.  This Court needs to establish that rule of law to guide the District Court.

If URLs can sometimes, but not always, constitute CMI, then it is appropriate for this Court to provide guidance on the difference. "Jurisdiction also extends to all questions that are material to that certified order." *Jackson v. City of Houston*, 143 F.4th 640, 644 (5th Cir. 2025) (citation omitted).  In so doing, the Court may necessarily refer to evidence of the facts.  In *Nguyen v. Am. Comm. Lines, L.L.C.*, 805 F.3d

134, 139 (5th Cir. 2015), the Court considered whether plaintiffs had satisfied a statutory requirement to "present their claims to the responsible party." Reviewing the information provided by the plaintiffs, this Court determined both what presentation was required and that plaintiffs' efforts satisfied that requirement. *Id.* at 139–40.

The cases on which Particle relies, *Silverthorne Seismic, L.L.C. v. Sterling Seismic Servs., Ltd.*, 125 F.4th 593 (5th Cir. 2025), and *Fisher v. Halliburton*, 667 F.3d 602 (5th Cir. 2012), are not to the contrary. The order appealed in *Silverthorne* concerned computation of damages, which this Court found was not "a controlling question of law," since the trial would have to be held to determine liability regardless of the disposition of the damages question. 125 F.4th at 600. *Fisher* found jurisdiction to exist to consider the scope of a statute's coverage. 667 F.3d at 609. Neither case sheds any light on this Court's authority here.

As with the review of any summary judgment order, this Court cannot resolve disputed issues of material fact. As this Court explained in *Nguyen*:

> Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a). This court must construe "all facts and inferences in the light most favorable to the nonmoving party."

805 F.3d at 138 (citation omitted).

Wyatt Emmerich has sworn that his company's URLs always contain the title of an article as its file name. ROA. 7461, R.E. Tab 5. No evidence contradicted that testimony; the District Court simply concluded, "a file name describes data while a URL is akin to a roadmap to data on the Internet." ROA.72069, R.E. Tab 2, 58. Although this Court has explicitly declared that a file name can be CMI, *Energy Intel Grp. Inc. v. Kayne Anderson Cap. Advisors, L.P.*, 948 F.3d 261, 277 (5th Cir. 2020), the District Court found it could not be CMI when included inside a URL. Review of that determination is clearly within the jurisdiction of this Court.

Emmerich has relied on additional types of CMI, and this Court's jurisdiction to address them will turn on the status of the record, as discussed hereafter. As for the intentional removal of the URLs, Emmerich has already acknowledged that additional findings will need to be made before establishing liability, Appellant's Brief, 63, but there is no reason this Court cannot acknowledge that CMI has been removed.

### B. Emmerich's removed URLs are CMI.

This issue on appeal relates to Particle's display of thousands of Emmerich articles in full-text mode, which the District Court ruled to be copyright infringement. ROA. 72037, R.E. Tab 2, 26. Particle scraped pages from Emmerich's websites and then "parsed" the content to remove everything except the headline, photo, and the full text of the article. ROA.68203. Particle never revealed to its customers the original URL for each article. Full-text articles were displayed "from NewsBreak's own servers." Appellee's Brief, 17. That means Particle displayed the article on its own website, under its own URL. Particle confirms that, "if content is in different places, different URLs must be used to find it." *Id.* 55. Particle's own expert stated, "[w]henever the location of any object on the internet changes, the URL changes, by design, by function, by definition and by logic." ROA.68941.

### 1. Emmerich's URLs Fall Within the Broad Scope of CMI.

The question this Court has agreed to review is whether Emmerich's removed URLs are CMI. Under the clear precedent of *Energy Intelligence Group, Inc.*, they are. There, this Court expressly held that a file name is CMI if it is "conveyed in connection with copies"

of the underlying work and contains a "title and other information identifying the work." 948 F.3d at 277 (citations omitted). Emmerich's URLs identify the copyright owner under the domain name and provide the title of the work as the filename.

Particle contends, "Emmerich does not show that URLs contain, or are themselves, any of the identifying information listed in § 1202(c)(1)-(8)." Appellee's Brief, 57. But this is clearly wrong. "Every article is given a unique filename or URL which begins with the name of the newspaper and includes the headline of the story along with other information regarding the category of the story . . . . The purpose of this naming protocol is to protect our copyrights by ensuring that readers actually go to our websites where they will be exposed to our advertisements and other stories." ROA. 7461, R.E. Tab 5.

The file name recognized as altered CMI in *Energy Intelligence* conveyed much less information, as the infringer identified the content only as "123." 948 F.3d at 267. Multiple cases have found that adding only a few letters to a file name alters CMI. *See, e.g., In re Frontier Commc'ns Corp.*, 658 B.R. 277, 304 (Bankr. S.D.N.Y. 2024); *After II Movie, LLC v. Grande Commc'ns Networks, LLC*, 2023 WL 1422808, at

*9 (W.D. Tex. Jan. 31, 2023); *Millennium Funding Inc. v. Doe*, 2021 WL 5217018, at *7 (E.D. Va. Oct. 15, 2021); *Millennium Funding, Inc. v. Priv. Internet Access, Inc.*, 2022 WL 7560395, at *19–20 (D. Colo. Oct. 13, 2022).

Again mistaking metaphor for statute, Particle contends that URLs are roadmaps, and cannot also name the location where one is headed.[8] Appellee's Brief, 49. But, nothing in the statute or case law dictates that a URL cannot simultaneously tell a user where to go and what will be found on arrival.

Particle concedes that "a filename may be CMI if it is 'information identifying' the work (*i.e.*, a title)," *Id.* 49, but it distinguishes between file names (an "identifying name given to an electronically stored file") and URLs (a "compact string of numbers, letters, and symbols that a computer uses to find a resource on a network and act upon it"). *Id.* 50 (quoting ROA.72068-69, R.E. Tab 2, 57-58). Emmerich's string contains a file name; nothing in *Energy Intelligence* suggests that a PDF file name is the only type that can qualify as CMI. Particle refers to the

---

[8] But Emmerich has never claimed that *every* URL contains such information, only that its own URLs clearly do. The sample URL provided by Emmerich clearly included both the name of the original copyright owner and the title of the work. Appellant's Brief, 51.

URLs it used when it published Emmerich's articles as "a specific document ID." Appellee's Brief, 55. Just as Particle's URL identifies content when Particle uses it, Emmerich's URL identifies content when Emmerich uses it.

Particle argues content located at a particular URL address may be "constantly changing" or "deleted," content can be moved to a new URL, or a URL "might even appear above multiple different types of copyrighted works." Appellee's Brief, 52–53. The evidence at trial may show the content remains unchanged, in which case Particle has diverted traffic from Emmerich's copyrighted work. The possibility of change is irrelevant. The same could be said of any other digital file name recognized as CMI. Nothing in § 1202 prohibits a copyright owner from deleting or altering the content of its own protected works or from identifying itself as the owner of "multiple different types of copyrighted works." This Court has already rejected this argument in *Energy Intelligence*, when the infringer was simply forwarding to non-subscribers an email which had a PDF file attached. It made no difference that on 425 occasions the infringer used the same substitute file name for different articles; this Court ruled that every such occasion

27

constituted a separate and distinct violation of § 1202. *See* 948 F.3d at 277.

In *Tomelleri v. Zazzle, Inc.*, 2015 WL 8375083 (D. Kan. Dec 9, 2025), the Court properly rejected the notion that Zazzle intended to assert copyright ownership over every item appearing on its website by including its name as the domain. But that in no way leads to the conclusion that Emmerich cannot, as a matter of law, include the name of its own publisher in the domain as a form of CMI.

Particle's reliance on *Fischer v. Forrest,* 968 F.3d 216 (2d Cir. 2020), is equally unpersuasive. In that case a business was accused of infringing plaintiff's advertising copy to promote a similar product. *See id.* at 218–19. The Court rejected plaintiff's argument that the deletion of his name from the advertising removed CMI because "what was removed was not Fischer's name *as the copyright holder* of the advertising text, but 'Fischer's' insofar as it was a part of the actual product's name." *Id.* at 323 (emphasis added). Emmerich included the name of its publishers in its URLs to identify them as the copyright holders.

Particle argues the CMI contained in its URLs does not "match anything contained in its copyright registrations." Appellee's Brief, 62. This misapprehends a critical aspect of claims under the DMCA; *no prior registration is even required. See, e.g., Design Ideas, Ltd. v. Meijer, Inc.,* 2018 WL 3545157, *10 (C.D. Ill. July 23, 2018) (prior registration not a prerequisite to recovery under Section 1203); *Recif Res., LLC v. Juniper Capital Advisors, L.P.,* 2020 WL 5739138, *11 (S.D. Tex. Sept. 24, 2020) (same).

Particle argues that, because the URLs in question identified the subsidiary publishers as the copyright owner instead of the parent company, "the domain name tells nothing about copyright ownership." Appellee's Brief, 59. The statute's reference to copyright owner does not limit itself to the current owner. The URLs' identification of the original copyright owner leads readers to the current owner.

Particle makes the critical admission that "a URL sometimes *can* also include a reference [to] the location of a filename," citing the graphic provided by its own expert clearly pointing out that "file name" is a common component of URLs. Appellee's Brief, 60 (emphasis in original) (citing ROA.68942). While not all URLs include the title of the

content appearing on the webpage, Emmerich's clearly do and therefore meet the statutory definition of CMI.

Particle argues for the first time that "users frequently use services like Bitly or TinyURL to swap out long URLs . . .with a shortened URL . . . or a customized URL." Appellee's Brief, 53. It never made this argument to the District Court, and the argument fails. None of the proxies cited by Particle alter or remove the underlying URL the way Particle did to display Emmerich's articles in full-text mode. A reader clicking through a shortened URL is always taken to the same internet location where the original URL led. ROA.68253–54. The proxy never takes the reader to a different website where the work appears under a different URL, as occurred here.

## 2. Emmerich's CMI is Conveyed With its Articles.

Particle insists that it is Emmerich's server "that is doing the transmission or communication" of Emmerich's articles. Appellee's Brief, 29. The dictionary defines "convey" to include communication. *Convey*, Merriam-Webster.com (Mar. 12, 2026). Emmerich's CMI is conveyed along with each article.

As explained in the Statement of Facts, the URL is conveyed to the user when Emmerich's share button is pressed, but Particle's own URL is revealed when Particle's button is pressed:



ROA. 7469–71, R.E. Tab 5. Particle's substitution of its URL diverts traffic away from the publisher's website, so as to "induce, enable, facilitate, or conceal infringement" in violation of § 1202.

It makes no difference if someone reading an Emmerich article doesn't immediately see the CMI on the screen. In *Powers v. Law Offs. of Marcos & Assocs., P.C.*, 2024 WL 5185699 (S.D. Tex. Sept. 23, 2024), the Court concluded metadata identifying the copyright owner and work's title, which only appeared when the reader's cursor hovered over

31

the image in question, fell within *Energy Intelligence*'s broad definition of CMI. *See id.* at \*2–3. Similarly, Emmerich's reader would see the same information by clicking the share button.

Particle argues that Emmerich "fails to show that any information is conveyed in connection with a copyrighted work." Appellee's Brief, 64. It insists, "no one would understand a name in a web address as corresponding to copyright ownership." *Id.* Every time Emmerich's website conveys an article to a user's computer, the URL is conveyed with it. Whether the user understands the information the statute describes as CMI is not a statutory requirement. Particle relies on *Pers. Keepsakes, Inc. v. Personalizationmall.com, Inc.*, 975 F.Supp.2d 920, 928 (N.D. Ill. 2013), but that Court merely said certain things did not constitute CMI, adding nothing about whether they were conveyed. *Tomelleri* merely said that putting something on one's own website is not enough to create false CMI absent the removal of pre-existing CMI. 2015 WL 8375083 at \*12–13.

### 3. Particle Deleted Emmerich's CMI.

Particle also argues for the first time that it only "failed to display" Emmerich's URLs, which does not violate § 1202(b)(1). Appellee's Brief,

54. As the Statement of Facts explains, Particle replaced Emmerich's URL with its own. Particle cites *Dow Jones & Co. v. Harris,* 749 F. Supp. 3d 776 (W.D. Tex. 2024), for the proposition, "failure to display a full URL is not an action 'transfer[ing] or movi[ng]' a URL or 'mak[ing] [it] different." Appellee's Brief, 55 (alterations in original). Particle quoted defendant's argument, 749 F. Supp. 3d at 787, not the case's holding. Instead, the Court focused on the defendant's lack of intent. *See id.*, at 788. Particle does not claim the removal of Emmerich's CMI was unintentional. Its automated system worked as intended when Particle scraped Emmerich's articles and stored the content on its servers.

*Falkner v. Gen. Motors LLC*, 393 F. Supp. 3d 927 (C.D. Cal. 2018), is even less helpful. Indeed, the *Falkner* Court noted that § 1202 "was likely intended to prevent . . . 'delet[ing] . . . the electronic information that may accompany a computer file containing a copyrightable composition." *Id.*, at 938–39 (alteration in original) (citing 4 Nimmer on Copyright § 12A.10[B][1][a]). That is exactly what happened here.

## CONCLUSION

For the foregoing reasons, this Court should answer both questions in the affirmative and remand for further consideration, consistent with this Court's opinion.

RESPECTFULLY SUBMITTED, this 16th day of March, 2026.

## COUNSEL FOR

## PLAINTIFF/APPELLANT

*/s/* Wilson H. Carroll
WILSON H. Carroll

WILSON H. CARROLL
WILSON CARROLL, PLLC
2506 Cherry Street
Vicksburg, Mississippi 39180
Tel:   601-953-6579
Email: wilsoncarroll59@gmail.com

MICHAEL B. WALLACE
CHARLES E. COWAN
WISE CARTER CHILD & CARRAWAY, P.A.
401 E Capitol St.
Jackson, Mississippi 39201
Tel:   601-968-5534
Email: mbw@wisecarter.com

DON W. BARRETT
BARRETT LAW GROUP, P.A.
404 Court Square North
Lexington, Mississippi 39095
Tel:   662-834-9168
Email: donbarrettpa@gmail.com

CHRISTIAN E. HUDSON
CUNEO GILBERT FLANNERY & LADUCA, LLP
222 Livingston Street, Unit 2
Brooklyn, New York 11201
Tel:     202-789-3960
Email: christian@cuneolaw.com

## CERTIFICATE OF SERVICE

I, Wilson H. Carroll, hereby certify that I have filed the foregoing document via the Court's electronic filing system, which automatically forwarded copies to all counsel of record.

So certified, this the 16th day of March, 2026.

*/s/* Wilson H. Carroll

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and 5th Cir. R. 32.2 because this brief contains 6,476 words, excluding the parts of this brief exempted by Fed. R. App. P. 32(f) and 5th Cir. R. 32.2. This brief complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5)-(6) and 5th Cir. R. 32.1 because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-Point Century Schoolbook font, with footnotes in 12-point font.

*/s/* Wilson H. Carroll